PAUL, HASTINGS, JANOFSKY & WALKER, LLP
Robert L. Sherman (RS 5520)
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 318-6847
robertsherman@paulhastings.com

*Attorneys for L'Oréal USA, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES POLO ASSOCIATION, INC. and USPA PROPERTIES, INC., <br><br> Plaintiffs, <br><br> - against - <br><br> PRL USA HOLDINGS, INC. and L'ORÉAL USA, INC., <br><br> Defendants. | Civil Action No. 09-9476 (RWS) |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## PRL PARTIES' MOTION FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT.................................................................................... 1

II. STATEMENT OF FACTS...................................................................................... 4

ARGUMENT................................................................................................................. 6

III. THE PRL PARTIES' MOTION FOR A PRELIMINARY INJUNCTION SHOULD
BE GRANTED ........................................................................................................ 6

   A. THE PRL PARTIES WILL BE IRREPARABLY HARMED ABSENT
INJUNCTIVE RELIEF ...................................................................................... 7

   B. THE PRL PARTIES ARE LIKELY TO SUCCEED ON THE MERITS ...................... 8

      1. Strength of the Mark: PRL's Polo Player Logo Is Extremely Strong ...................... 9

      2. Similarity of the Marks: The Marks Are Very Similar ................................. 11

      3. Proximity of the Goods: The Goods Are Identical.................................... 13

      4. Likelihood of Bridging the Gap: There Is No Gap To Bridge ................................ 13

      5. Actual Confusion: Consumer Survey Demonstrates Substantial Confusion......... 14

      6. Bad Faith of Junior User: USPA Adopted Its Mark In Bad Faith ......................... 15

      7. Quality of Junior User's Product: The PRL Parties' Loss Of Control Over
Quality Weighs Heavily In Favor of Granting An Injunction....................... 17

      8. Sophistication of Buyers: Purchasers Of USPA's Products Are Not Likely
To Be Sophisticated Regarding Trademarks .................................... 18

   C. BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF THE PRL
PARTIES .............................................................................................. 20

   CONCLUSION............................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
    537 F.2d 4 (2d Cir. 1976) .................................................................................................. 10

*Berskshire Fashions, Inc. v. Sara Lee Corp.,*
    729 F. Supp. 21 (S.D.N.Y. 1990) ..................................................................................... 15

*Brennan's, Inc. v. Brennan's Rest., LLC,*
    360 F.3d 125 (2d Cir. 2004) .................................................................................... 7, 9, 13

*Cadbury Beverages, Inc. v. Cott Corp.,*
    73 F.3d 474 (2d Cir. 1996) ............................................................................................... 17

*Edison Bros. Stores, Inc. v. Cosmair, Inc.,*
    651 F. Supp. 1547 (S.D.N.Y. 1987) ............................................................................... 15

*Empressa Cubana Del Tabaco v. Crelbro Corp.,*
    70 U.S.P.Q. 2d 1650 (S.D.N.Y. 2004), *rev'd on other grounds,* 399 F.3d 462 (2d Cir. 2005) .............. 15

*Energybrands, Inc. v. Beverage Marketing USA, Inc.,*
    No. 02 CIV. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) ............................... 15

*General Cigar Co. v. G.D.M. Inc.,*
    988 F. Supp. 647 (S.D.N.Y. 1997) (Sweet, J.) .................................................... 6, 9, 11

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,*
    523 F.2d 1331 (2d Cir. 1975) ........................................................................................... 11

*Harlequin Enterprises Ltd. v. Gulf & Western Corp.,*
    644 F.2d 946 (2d Cir. 1981) ............................................................................................. 16

*Harold F. Ritchie, Inc. v. Cheesebrough-Pond's, Inc.,*
    281 F.2d 755 (2d Cir. 1960) ..................................................................................... 14, 16

*Hasbro, Inc. v. Lanard Toys, Ltd.,*
    858 F.2d 70 (2d Cir. 1988) ............................................................................................... 19

*I.H.T. Corp. v. News World Communications, Inc.,*
    No. 83 Civ. 3862-CSH, 1984 WL 604 (S.D.N.Y. July 3, 1984) ....................................... 17

*Jordache Enterprises, Inc. v. Levi Strauss & Co.,*
    841 F. Supp. 506 (S.D.N.Y. 1993) .......................................................................... 14, 18, 19

TABLE OF AUTHORITIES
(continued)

Page(s)

*Kraft General Foods, Inc. v. Allied Old English, Inc.,*
    831 F. Supp. 123 (S.D.N.Y. 1993) .................................................................................... 15, 16

*Kraft General Foods, Inc. v. Friendship Dairies,*
    No. 91 Civ. 2276 (KC), 1991 WL 149755 (S.D.N.Y. June 26, 1991) ............................... 15

*Levi Strauss & Co. v. Blue Bell, Inc.,*
    216 U.S.P.Q. 606 (N.D. Cal. 1982), *aff'd,* 778 F.2d 1352 (9th Cir. 1985) ........................... 3

*Litton Industries, Inc. v. Litronix, Inc.,*
    577 F.2d 709 (C.C.P.A. 1978) ................................................................................................. 3

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
    799 F.2d 867 (2d Cir. 1986) ........................................................................................9, 14, 19

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,*
    426 F.3d 532 (2d Cir. 2005) .................................................................................................7, 11

*Louis Vuitton Malletier v. Dooney & Burke, Inc.,*
    454 F.3d 108 (2d Cir. 2006) .................................................................................................6, 12

*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.,*
    424 F.3d 1229 (Fed. Cir. 2005) ............................................................................................... 3

*McDonald's Corp. v. McBagel's, Inc.,*
    649 F. Supp. 1268 (S.D.N.Y. 1986) ..................................................................................... 15

*MetLife, Inc. v. Metropolitan Nat'l Bank,*
    388 F. Supp. 2d 223 (S.D.N.Y. 2005) ..............................................................................14, 17

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
    818 F.2d 254 (2d Cir.1987) .................................................................................................17, 18

*Nikon v. Ikon,*
    987 F.2d 91 (2d Cir. 1993) ..................................................................................................... 19

*Nina Ricci, S.A.R.L. v. Gemcraft Ltd.,*
    612 F. Supp. 1520 (S.D.N.Y.1985) ....................................................................................... 19

*North American Graphics, Inc. v. North American Graphics of US, Inc.,*
    No. 97 CIV. 3448 (RWS), 1997 WL 316599 (S.D.N.Y. June 10, 1997) (Sweet, J.) .............7, 12, 13

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Omega Importing Corp. v. Petri-Kine Camera Co.,*
451 F.2d 1190 (2d Cir. 1971) .................................................................................................. 8

*Paco Sport, Ltd. v. Paco Rabanne Parfums,*
86 F. Supp. 2d 305 (S.D.N.Y. 2000) ..................................................................................... 18

*Paddington Corp. v. Attiki Imps. & Distrib., Inc.,*
996 F.2d 577 (2d Cir. 1993) ................................................................................................... 17

*Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,*
No. 99 CIV 10175 (JMS), 2001 WL 170672 (S.D.N.Y. Feb. 21, 2001) ............................ 18

*Pfizer Inc. v. Arye Sachs and JetAngel.com,*
No. 08 Civ. 8065 (WHP), 2008 WL 4525418 (S.D.N.Y. Oct. 8, 2008) ........................ 7, 10

*Polaroid Corp. v. Polorad Elecs. Corp.,*
287 F.2d 492 (2d Cir. 1961), *cert. denied,* 368 U.S. 820 (1961) ............................................ 9

*Savin Corp. v. Savin Group,*
391 F.3d 439 (2d Cir. 2004) ................................................................................................... 11

*Simon & Schuster, Inc. v. Dove Audio, Inc.,*
970 F. Supp. 279 (S.D.N.Y. 1997) ........................................................................................ 14

*Simon & Schuster, Inc. v. Putnam Berkley Group, Inc.,*
No. 94 Civ. 8768 (JSM), 1994 WL 689058 (S.D.N.Y. Dec. 8, 1994) ............................... 17

*Soil Solutions, Inc. v. Soil Solution Indus., Inc.,*
No. 09-CV-2470 (JBW), 2009 WL 3753912 (E.D.N.Y. Nov. 6, 2009) ...................... 12, 21

*Star Indus. v. Bacardi & Co.,*
412 F.3d 373 (2d Cir. 2005) ................................................................................................... 13

*The Heisman Trophy Trust v. Smack Apparel Co.,*
595 F. Supp. 2d 320 (S.D.N.Y. 2009) .................................................................................. 7, 8

*The Heisman Trophy Trust v. Smack Apparel Co.,*
637 F. Supp. 2d 146 (S.D.N.Y. 2009) ................................................................................... 16

*The Sports Authority, Inc. v. Prime Hospitality Corp.,*
89 F.3d 955 (2d Cir. 1996) ................................................................................................ 16, 18

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC,*
　221 F. Supp. 2d 410 (S.D.N.Y. 2002) ......................................................................................14, 18

*Union Carbide Corp. v. Ever-Ready, Inc.,*
　531 F.2d 366 (7th Cir. 1976), *cert. denied,* 429 U.S. 830 (1976)............................................................ 15

*Virgin Enterprises Ltd. v. Nawab,*
　335 F.3d 141 (2d Cir. 2003) ..............................................................................................6, 7, 9, 10

*Volkswagen Astiengesellschaft v. Uptown Motors,*
　No. 91 Civ. 3447 (DLC), 1995 WL 605605 (S.D.N.Y. May 11, 1995) ............................................. 15

*Zino Davidoff SA v. CVS Corp.,*
　571 F.3d 238 (2d Cir. 2009) ........................................................................................................6, 7

### STATUTES

15 U.S.C. § 1057 (b) ......................................................................................................................... 9

15 U.S.C. § 1065 ............................................................................................................................. 9

15 U.S.C. § 1114(1)........................................................................................................................... 8

L'Oréal USA, Inc. ("L'Oréal") and PRL USA Holdings, Inc. ("PRL") (collectively, the "PRL Parties") submit this memorandum in support of their motion for a preliminary injunction prohibiting United States Polo Association, Inc. and USPA Properties, Inc. (collectively, "USPA"), during the pendency of this action, from using the trademark shown in Exhibit B[1] to the Complaint (the "Double Horsemen Trademark") or any confusingly similar variation thereof in connection with fragrance products.

## I.   PRELIMINARY STATEMENT

USPA goes to great lengths to position its declaratory judgment complaint, and therefore this entire action, as a mere continuation of prior litigation between PRL and USPA (the "Apparel Litigation"), in a transparent effort to convince this Court that the matter before it effectively has already been decided. It went so far as to file this action as a "related case" despite the fact that there was no other pending action. Judge Daniels rejected the request out of hand. The PRL Parties are confident that this Court will see through the ploy as well.

The goods at issue in this proceeding -- as well as the attendant marketplace factors -- differ from those in the Apparel Litigation. The issue of infringement must be adjudicated fully and separately as it relates to fragrances in today's market, not as it may have related to different products at a different time. In today's market, USPA's Double Horsemen Trademark used in connection with fragrances creates a significant and actionable likelihood of confusion with the PRL Parties. Any effort by USPA to avoid dealing with the facts of *this* case will not make that go away.

---

[1]   USPA alleges that only the Double Horsemen Trademark as shown in Exhibit B is about to be used; there is no case or controversy ripe for adjudication with respect to any other version of its mark.

To test the likelihood of confusion in connection with fragrances, a scientifically controlled survey[2] was conducted using a commercial-quality mock-up of USPA's product and packaging. The results were unequivocal. USPA's Double Horsemen Trademark, when used in connection with fragrances, creates a significant level of confusion among prospective purchasers of men's fragrances. Nearly twenty-eight (28%) percent of those surveyed mistakenly believed that fragrances bearing USPA's Double Horsemen Trademark were produced by the PRL Parties.

As revealing are USPA's efforts to avoid the question of confusion altogether by insinuating that the prior litigation and history between PRL and USPA would render baseless any infringement claims brought by the PRL Parties. As USPA is well aware, the judgment in the Apparel Litigation expressly relates only to apparel and certain other specifically identified goods, which do not include fragrances. During and subsequent to the Apparel Litigation, USPA had full knowledge that the PRL Parties continued to oppose any effort by USPA to use and register the Double Horsemen Trademark for fragrances. Nonetheless, USPA tries to use the Apparel Litigation to pre-empt the PRL Parties' objection to USPA's use of the Double Horsemen Trademark for fragrances, such as by its conflation of apparel and fragrances by repeatedly characterizing its fragrance product as "closely related" or "closely connected" to its apparel licensing program, *see* Complt. ¶¶ 1, 22, 33, 35. What USPA neglects to tell this Court, however, is that the Trademark Trial & Appeal Board ("TTAB") considered and flatly rejected that argument when presented by USPA. *See* Opinion and Order, dated Nov. 21, 2008 (Opp. No. 91-117,030), attached as Exhibit 1 to the declaration of Natalie G. Furman, dated February 25, 2010 ("Furman Decl.").

In its Complaint, USPA tells this Court that following judgment in the Apparel

---

[2]     *See* report of George Mantis, attached as Exhibit 1 to the declaration of George Mantis, dated February 25, 2010 ("Mantis Decl."), submitted herewith.

Litigation, it "requested that the USPTO[3] end suspension of opposition proceedings involving U.S. POLO ASS'N 1890 and Double Horsemen Trademark for cosmetics and fragrances." Complt. ¶ 34. What actually happened was that USPA filed a motion for summary judgment seeking to dismiss the opposition with prejudice based on the decision in the Apparel Litigation. Missing from the pleading filed with this Court, however, is that the TTAB unequivocally and expressly found that the underlying facts and decision in the Apparel Litigation were not material to PRL's likelihood of confusion claim regarding goods in Class 3 (which includes fragrances). *See* TTAB Opinion and Order, dated Nov. 21, 2008. Specifically, the TTAB, in denying USPA's motion, decided that "[i]nsofar as the district court order [in the Apparel Litigation] is silent as to products falling under International Class 3, the likelihood of confusion claim before us involves different transactional facts material to the claim." *Id.* That decision is consistent with a long line of cases finding that a decision regarding likelihood of confusion with respect to specific goods does not estop a party from proving likelihood of confusion in a subsequent proceeding regarding different goods.[4] Thus, the findings of the Apparel Litigation can have no bearing on the question before this Court: whether USPA's use of the Double Horsemen Trademark in connection with fragrances creates a likelihood of confusion as to the source of those goods.

USPA has stated its ability and intent imminently to commence sale of fragrance products bearing the Double Horsemen Trademark. Survey results indicate that doing so would

---

[3]  "USPTO" is an abbreviation for United States Patent and Trademark Office and, in this context, refers more specifically to the TTAB.

[4]  Those cases recognize that consumer perceptions can differ markedly for different products, regardless of whether those products are "related." *See, e.g., Levi Strauss & Co. v. Blue Bell, Inc.,* 216 U.S.P.Q. 606, 608 (N.D. Cal. 1982) (finding that even as between jeans and shirts, with respect to secondary meaning and likelihood of confusion, "[t]here is ample and sufficient evidence in the trial to indicate that consumers treat pants and shirts differently"), *aff'd,* 778 F.2d 1352, 1357 (9th Cir. 1985) ("we deal with different products (jeans v. shirts) and different markets; and the assumptions, perceptions and recognitions with which customers approach a purchase are different"). *See also Litton Industries, Inc. v. Litronix, Inc.,* 577 F.2d 709 (C.C.P.A. 1978); *Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.,* 424 F.3d 1229 (Fed. Cir. 2005).

result in significant consumer confusion.  Such confusion would cause immediate and irreparable harm to the PRL Parties, which, therefore, request that the Court issue a preliminary injunction to ensure that USPA does not introduce its product into the marketplace before the Court has had an opportunity fully to adjudicate the merits of this action.

## II.    STATEMENT OF FACTS

In the 1960s, Mr. Ralph Lauren started his own business (today, after various name changes, known as the Polo Ralph Lauren Corporation), and created what is believed to be the first true lifestyle brand.  In the late '70s, when the decision was made to expand into fragrances, cosmetics and related goods (the "Licensed Products"), an exclusive license agreement was entered into with L'Oréal's predecessor[5] under which L'Oréal would be the only provider of Licensed Products under PRL's brands.  From the outset, it became clear that a discrete and successful niche had been created for the PRL Parties -- men's fragrances.

The first men's fragrance launched under the license featured, and continues to feature to this day, what has become the iconic Polo Player Logo, shown immediately below.



The product was sold and continues to be sold in a green bottle and prominently displays the Polo Player Logo and the POLO[6] brand.  *See* declaration of Leslie Marino, dated February 26, 2010 ("Marino Decl."), at ¶ 4, Exhibit 1.

---

[5]    For simplicity, L'Oréal's predecessor also will be referred to as L'Oréal.

[6]    It also uses "Ralph Lauren" less prominently.

The POLO fragrance bearing the Polo Player Logo became a staple for men throughout the United States. Indeed, it ultimately would be voted into the Fragrance Foundation's Hall of Fame. *Id.,* at ¶ 13. Commencing in approximately 2002, additional men's fragrances were added to the line, each prominently featuring the Polo Player Logo and each with the word POLO in its name. *Id.* at ¶ 5. Each is the subject of a federal trademark registration. Furman Decl., ¶ 3, Ex. 2.

In the last ten years alone, men's fragrances sold under the Polo Player Logo have accounted for more than one-half billion ($500,000,000) dollars in net sales to the trade.[7] Marino Decl., at ¶ 6. POLO BLUE, introduced in 2002, has by far been the leading seller. *Id.,* at ¶ 12.

Men's fragrances sold under the Polo Player Logo can be found in more than 5,000 doors, including in department stores, specialty stores, on the Internet, as well as in other locations. *Id.,* at 9. The Polo Player Logo is prominently displayed on the packaging, on the product itself, as well as in advertising and promotion. *Id.,* at ¶ 10, 11. Although the color of the packaging for each product may vary, the use of the Polo Player Logo is a constant. *Id.,* at ¶ 12.

Tens of millions of dollars have been spent on advertising men's fragrances sold under the Polo Player Logo, in the form of traditional media advertising as well as cooperative advertising and Internet promotion. *Id.,* at ¶ 6. The widespread visibility given to those products and their high quality have resulted in enormous popularity and extremely high brand awareness. *Id.,* at ¶ 8. It cannot seriously be doubted that the Polo Player Logo for men's fragrances is one of the most famous brands in America.

USPA has stated that, through its licensee, it intends to introduce a men's fragrance to the marketplace. Complt. ¶ 44. It is slated to bear a logo (accompanied by words, one of which is "POLO") so similar to the Polo Player Logo as to create a likelihood of confusion among

---

[7]    Naturally, sales to consumers at retail resulted in an even higher figure.

prospective purchasers.  In its Exhibit B to the Complaint seeking a declaratory judgment of non-infringement, USPA identifies the manner in which it intends to use its Double Horsemen Trademark.  A reproduction of the logo that USPA intends imminently to use appears immediately below.



USPA makes no allegation that the use of any other version of its Double Horsemen Trademark is imminent.

**ARGUMENT**

## III. THE PRL PARTIES' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED

The standard for granting a preliminary injunction in this circuit is well-established. A party seeking a preliminary injunction must demonstrate (1) irreparable harm absent injunctive relief and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardships tipping decidedly in its favor. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009) (citing *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)); *Louis Vuitton Malletier v. Dooney & Burke, Inc.*, 454 F.3d 108, 113-114 (2d Cir. 2006); *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003); *General Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 657 (S.D.N.Y. 1997) (Sweet, J.).

## A.    THE PRL PARTIES WILL BE IRREPARABLY HARMED ABSENT INJUNCTIVE RELIEF

The Second Circuit consistently has held that a party that shows a likelihood of confusion establishes a likelihood of success on the merits and is presumed to have established irreparable injury sufficient to support the grant of a preliminary injunction. *See Zino Davidoff S.A.,* 571 F.3d at 246 (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144 (2d Cir. 2005) ("a [party] who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury")); *Pfizer Inc. v. Arye Sachs and JetAngel.com,* No. 08 Civ. 8065 (WHP), 2008 WL 4525418, at *2 (S.D.N.Y. Oct. 8, 2008) ("In the trademark infringement context, a showing of success on the merits generally establishes a risk of irreparable harm") (citing *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir. 1988)); *The Heisman Trophy Trust v. Smack Apparel Co.,* 595 F. Supp. 2d 320, 325 (S.D.N.Y. 2009) ("For actions under the Lanham Act, 'where the plaintiff has a protected mark, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm'") (quoting *Blue & White Food Prods. Corp. v. Shamir Food Indus., Ltd.,* 350 F. Supp. 2d 514, 518 (S.D.N.Y. 2004) (quoting *New Kayak Pook Corp. v. R & P Pools, Inc.,* 246 F.3d 183, 185 (2d Cir. 2001))). *See also Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d 532, 537 (2d Cir. 2005); *Brennan's, Inc. v. Brennan's Rest., LLC,* 360 F.3d 125, 129 (2d Cir. 2004); *Virgin Enterprises Ltd.,* 335 F.3d at 146; *North American Graphics, Inc. v. North American Graphics of US, Inc.,* No. 97 CIV. 3448 (RWS), 1997 WL 316599, at *7 (S.D.N.Y. June 10, 1997) (Sweet, J.) ("irreparable harm is presumed upon a showing of likelihood of confusion"). Because USPA's intended use of the Double Horsemen Trademark on fragrances would create a likelihood of confusion as to the source of those goods, the PRL Parties are entitled to the presumption that they would be irreparably harmed if injunctive relief were not granted.

Here, the PRL Parties also have shown irreparable harm even absent reliance on the presumption. All of the reasons that justify the presumption are present in this case and, as recognized by the Second Circuit, justify a finding of irreparable harm because in almost every case of trademark infringement it is inordinately difficult for the injured party to prove damages with precision or to quantify the harm caused by diminution in reputation; it is frequently difficult to establish the profits an infringer must disgorge; an infringer may fail to earn profits due to poor quality or other reasons; confusion may result in consumers choosing not to purchase either party's products; establishing lost sales due to infringement is "notoriously difficult," and "if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the [senior user's] reputation in the market." *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971).

If USPA were to commence sale of an infringing product its profits would be difficult to prove. The PRL Parties may never be able to establish the full measure of losses if USPA fails to earn profits because of poor quality or other reasons. Marino Decl., at ¶ 15. Confusion may lead consumers not to purchase either party's product and to turn to yet other competitors for their needs. *Id.* Most importantly, the extent of reputational harm and damage to the goodwill of the PRL Parties would be exceedingly difficult to prove. *Id.* There can be no question that USPA's sale of the infringing product would cause the PRL Parties irreparable injury.

## B.   THE PRL PARTIES ARE LIKELY TO SUCCEED ON THE MERITS

In order to prevail in an action for trademark infringement under the Lanham Act, a party "must establish that it possesses a valid, legally protectable mark and that [the junior user's] subsequent use of a similar mark is likely to create confusion as to the origin of the product at issue." *The Heisman Trophy Trust*, 595 F. Supp. 2d at 325 (quoting *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)). *See* 15 U.S.C. § 1114(1).

There is no dispute regarding the ownership and validity of the Polo Player Logo, alone and as used with words, including "POLO." Those marks are federally registered, which constitutes *prima facie* evidence that the marks are valid and owned by PRL. *See* 15 U.S.C. § 1057 (b); Furman Decl., at ¶ 3, Ex. 2. Two of them (Reg. Nos. 1,212,060 and 1,327,818) are incontestable, which makes them *conclusive* evidence of the marks' validity and the PRL Parties' exclusive right to use them. *See* 15 U.S.C. § 1065.

Courts within this circuit determine whether there is a likelihood of confusion by considering the well-established *Polaroid* factors: (1) strength of the senior user's mark; (2) degree of similarity between the marks; (3) proximity of the products; (4) likelihood that the senior user will "bridge the gap" between the two products; (5) actual confusion; (6) bad faith of the junior user; (7) quality of the junior user's product; and (8) sophistication of the buyers of the product. *Polaroid Corp. v. Polorad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961). As discussed below, application of the *Polaroid* factors results strongly in favor of finding a likelihood of confusion. Not one of the factors favors USPA.

**1.    Strength of the Mark: PRL's Polo Player Logo Is Extremely Strong**

The strength of a mark refers to "its tendency to identify the goods sold under the mark as emanating from a particular source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986); *General Cigar Co.*, 988 F. Supp. at 663. Strength is assessed in terms of both the inherent distinctiveness of the mark (legal strength) and the acquired distinctiveness and awareness in the marketplace (commercial strength). *See Brennan's, Inc.*, 360 F.3d at 130-31; *Virgin Enterprises Ltd.*, 335 F.3d at 147-49. By either or both measures, the Polo Player Logo is exceedingly strong.

When considering the inherent distinctiveness of a mark, *i.e.*, legal strength, courts in the Second Circuit review the spectrum of strength of marks by evaluating whether the mark is

generic,[8] descriptive, suggestive, arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Marks at the highest level of strength, *i.e.*, arbitrary or fanciful marks -- those that are not otherwise associated with the goods with which they are used -- are granted the greatest scope of protection. *Id.* at 11; *Virgin Enterprises Ltd.*, 335 F.3d at 147 ("the law accords broad, muscular protection to marks that are arbitrary or fanciful in relation to the products on which they are used").

The Polo Player Logo is arbitrary, as there is no natural connection between the image of a polo player and fragrance products, other than, of course, the association with the PRL Parties that has been established in the minds of consumers. PRL's federally registered Polo Player Logo is at the top of the strength spectrum when used in connection with fragrances and, as a result, is entitled to the broadest scope of protection.

In addition, the Polo Player Logo has tremendous commercial strength. In the last ten years alone, the PRL Parties have spent nearly one hundred million ($100,000,000) dollars advertising fragrances that bear the Polo Player Logo. Marino Decl., at ¶ 6. During that period, in the U.S., net sales to the trade of fragrances sold under the Polo Player Logo have exceeded one-half billion ($500,000,000) dollars, with POLO BLUE, which USPA's intended use most closely resembles, accounting for far more than any other line, and supported by far more advertising than any other line. *Id.*, at ¶ 12. As this court has noted, "[t]he commercial success of a product reinforces the strength of the mark." *Pfizer Inc.*, 2008 WL 4525418, at *3 (citing *Charles of the Ritz Group Ltd. v. Quality King Distributors, Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987)). *See also Virgin Enterprises Ltd.*, 335 F.3d at 148-49. The widespread success of the PRL Parties' men's fragrances demonstrates the commercial strength of the Polo Player Logo. The inherent distinctiveness and commercial success of the Polo Player Logo demonstrate beyond any doubt that it is "origin-

---

[8]    A term that is generic is not really a mark in that it does not function to identify a single source.

indicating," *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004), and exceedingly strong.

2.      **Similarity of the Marks: The Marks Are Very Similar**

Assessing the similarity of marks is based on an analysis of the similarity in sight, sound, and meaning, *see Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975), with a focus on "the overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d at 537. When marks will not be displayed side-by-side in the marketplace, the appropriate question is not "whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." *Id.* at 538. The analysis should consider "the products' sizes, logos, typefaces, and package designs and colors" to determine whether the overall impression in the relevant market context would lead consumers to believe that the product emanates from the same source as products bearing the senior user's mark. *General Cigar Co.*, 988 F. Supp. at 664.

USPA's Double Horsemen logo is very similar to PRL's Polo Player logo. There is little difference between the two with respect to appearance, and none whatsoever with respect to the "meaning" or connotation that the respective logos convey. The only notable visual difference between the two logos, and a difference that is easily overlooked when the two are not compared side-by-side, is that the Double Horsemen logo depicts two players on horseback, whereas the Polo Player Logo depicts a single player. Both marks show the horse facing the same general direction, in the same general stance, with the most prominent figure holding a polo mallet in the overhead position at approximately the same angle. The slight differences in angles and shading that can be seen when the marks are compared side-by-side do little -- if anything -- to counter the enormous similarities between the marks as they are encountered, on their own, by consumers in the

marketplace. "While it is possible that the slight differences in the marks can become discernible when studied alongside each other, it is the likelihood of confusion between them when they are considered individually, as they would be by the consumer, that determines their degree of similarity." *Soil Solutions, Inc. v. Soil Solution Indus., Inc.*, No. 09-CV-2470 (JBW), 2009 WL 3753912, at *4 (E.D.N.Y. Nov. 6, 2009) (citing *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d at 538 and *Harold F. Ritchie, Inc. v. Cheesebrough-Pond's, Inc.*, 281 F.2d 755, 762 (2d Cir. 1960)). *See also Louis Vuitton Malletier v. Dooney and Bourke*, 454 F.3d 108, 117 (2d Cir. 2006) (district court erred in making a side-by-side comparison). Consumers viewing USPA's Double Horsemen Trademark in the marketplace would be much more likely to perceive the substantial similarity between the marks than any minor differences.

The fact that USPA's mark as intended to be used includes the words "U.S. POLO ASSN" and "1890" does nothing to counter the similarities between the marks when viewed as a whole. As USPA has conceded by disclaiming "U.S.," "ASSN," and "1890" in its trademark applications, those terms are descriptive and not entitled to trademark protection. The dominant term in the word portion of USPA's Double Horsemen Trademark, and the word that consumers are most likely to view as having trademark significance, is "POLO." The Polo Player Logo is frequently used in conjunction with various POLO trademarks (*e.g.*, POLO Ralph Lauren, POLO BLUE, POLO BLACK). As this Court has held, "[t]he mere addition or deletion of a term or terms will not necessarily defeat a finding of similarity." *North American Graphics, Inc.*, 1997 WL 316599, at *6 (internal citations omitted). Indeed, in light of the arbitrariness of the term "POLO" in connection with fragrances, rather than differentiating the marks, the word portion of USPA's Double Horsemen Trademark is likely to further reinforce a consumer's overall impression regarding the similarity of the marks.

In addition, as if the remarkable similarities between the marks were not enough,

USPA has exacerbated the likelihood of confusion by choosing to produce its fragrances in a blue bottle and blue packaging mimicking the color of the PRL Parties' most popular fragrance line bearing the Polo Player Logo -- POLO BLUE.[9]  Similarity of the respective marks is obvious when one considers "the products' sizes, logos, typefaces, and package designs and colors," the "overall impression on a consumer" and the "totality of factors that could cause confusion" -- including the similarity between the images of the polo players, the common use of the word "POLO," which is arbitrary as to fragrances, and the blue bottle and packaging of the products.

3.    **Proximity of the Goods: The Goods Are Identical**

"The proximity inquiry asks to what extent the two products compete with each other." *Brennan's, Inc.*, 360 F.3d at 134.  Here, there is no question about the proximity of the goods. USPA seeks a declaratory judgment that it may use its Double Horsemen Trademark on fragrances. The PRL Parties use the Polo Player Logo on fragrances.  The goods are identical.

4.    **Likelihood of Bridging the Gap: There Is No Gap To Bridge**

"Bridging the gap" refers to whether the senior user is likely to develop a product for sale in the alleged infringer's market.  Where the parties' products already are in competitive proximity, as they are here, there is no gap to be bridged. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005)  To the extent that this factor is considered relevant, it can only weigh in favor of finding a likelihood of confusion. *North American Graphics, Inc.*, 1997 WL 316599, at *5 ("where there is already an overlap in the market for the parties' products, as there is here, there is no gap to bridge, and the likelihood of confusion is increased") (citing *Nikon v. Ikon*, 987 F.2d 91, 95 (2d Cir. 1993); *Hasbro, Inc.*, 858 F.2d at 78; and *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 130 (S.D.N.Y. 1993)).

---

[9]    Although the shades of blue may not be identical, one cannot ignore USPA's selection of blue.

5.   **Actual Confusion: Consumer Survey Demonstrates Substantial Confusion**

It is well established that a party need not show actual confusion to prevail on a claim under the Lanham Act, which requires only a showing of likelihood of confusion. *Lois Sportswear*, 799 F.2d at 875; *Harold F. Ritchie, Inc.*, 281 F.2d at 761. *A fortiori*, where, as here, the alleged infringer has not yet introduced its product to the market, instances of actual confusion are not expected  The results of a consumer survey, however, may provide another form of evidence of confusion. *See, e.g., Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518 (S.D.N.Y. 1993) ("Evidence of actual confusion consists of (1) anecdotal evidence of confused consumers in the marketplace; and (2) consumer survey evidence"); *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 298 (S.D.N.Y. 1997) ("Evidence is generally anecdotal in nature or takes the form of a market research survey"); *MetLife, Inc. v. Metropolitan Nat'l Bank*, 388 F. Supp. 2d 223, 232 (S.D.N.Y. 2005) ("a survey as to the potential consumer confusion may be weighed when considering the likelihood of confusion") (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987)).

L'Oréal's attorneys engaged an expert to conduct such a survey, and the results leave no doubt as to the likelihood of confusion.  The legal test for infringement is whether "there is a likelihood that an appreciable number of ordinary prudent purchasers will be misled or confused as to the source of the goods in question or [whether] consumers are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the [junior user's] use of the mark." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 414 (S.D.N.Y. 2002) (citing *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) and *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204-05 (2d Cir. 1979)) (internal punctuation omitted).  The national mall intercept survey submitted herewith, conducted in all nine Census districts, demonstrates, conservatively, that nearly twenty-eight (28%) percent of potential purchasers of a

fragrance bearing USPA's Double Horsemen Trademark (as shown in Exhibit B to its Complaint)

believe the fragrance was put out by, connected to, or authorized by PRL.  *See* report of George

Mantis, Exhibit 1 to the Mantis Decl.  Mr. Mantis's survey followed the protocol of the widely

acknowledged and accepted methodology first approved in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531

F.2d 366 (7th Cir. 1976), *cert. denied*, 429 U.S. 830 (1976).  Such a significant showing easily qualifies

as "an appreciable number" under the law of this circuit.  *See Kraft General Foods, Inc.*, 831 F. Supp. at

130 (discussing a mall intercept survey that indicated net confusion of twenty-six percent (26%) and

stating that the "*extreme demonstration* of confusion evidenced by the survey demonstrates Kraft's

likelihood of success on the merits, as even a *substantially lesser* showing of confusion would support

Kraft's motion for a preliminary injunction") (emphasis added).[10]

    The results of the Mantis survey indicate that a high level of confusion is likely were

USPA to sell fragrances bearing the Double Horsemen Trademark.

**6.    Bad Faith of Junior User: USPA Adopted Its Mark In Bad Faith**

    A junior user's good or bad faith turns on "whether the [junior user] adopted its

mark with the intention of capitalizing on [the senior user's] reputation and goodwill, and any

confusion between his and the senior user's product."  *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.

---

[10]    Courts in this circuit, as in others, frequently rely on surveys with confusion levels lower than
the 28% found in the Mantis survey.  *See, e.g., Empressa Cubana Del Tabaco v. Crelbro Corp.*, 70
U.S.P.Q. 2d 1650 (S.D.N.Y. 2004), *rev'd on other grounds*, 399 F.3d 462 (2d Cir. 2005) (confusion
rate of 15% - 20% indicates a likelihood of confusion); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.
Supp. 1268 (S.D.N.Y. 1986) (24.8% net confusion warranted grant of injunction); *Volkswagen
Astiengesellschaft v. Uptown Motors*, No. 91 Civ. 3447 (DLC), 1995 WL 605605 (S.D.N.Y. May 11,
1995) (two surveys showing 17.2% and 15.8% net confusion justified grant of injunction);
*Berskshire Fashions, Inc. v. Sara Lee Corp.*, 729 F. Supp. 21 (S.D.N.Y. 1990) (mall intercept survey
with 28% confusion level "exceeds" acceptable level of confusion); *Kraft General Foods, Inc. v.
Friendship Dairies*, No. 91 Civ. 2276 (KC), 1991 WL 149755 (S.D.N.Y. June 26, 1991) (mall
intercept survey with 17% confusion sufficient on which to base preliminary injunction);
*Energybrands, Inc. v. Beverage Marketing USA, Inc.*, No. 02 CIV. 3227 (JSR), 2002 WL 826814
(S.D.N.Y. May 1, 2002) (17% net confusion warranted grant of preliminary injunction).

Supp. 1547, 1560 (S.D.N.Y. 1987); *Kraft General Foods, Inc.*, 831 F. Supp. at 131; *The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996). Whereas a finding of bad faith can weigh significantly in the senior user's favor, a finding of good faith generally carries little weight in the junior user's favor. *The Heisman Trophy Trust v. Smack Apparel Co.*, 637 F. Supp. 2d 146, 156 (S.D.N.Y. 2009) (citing *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 19 (1st Cir. 2004) and *Fuji Photo Film Co., Inc. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 596 (5th Cir. 1985)).

USPA's bad faith is demonstrated by its conscious decision to make its Double Horseman Trademark as close as possible to the Polo Player Logo and, moreover, to employ a color used in the most popular fragrance line sold under the Polo Player Logo, namely, POLO BLUE. USPA could have adopted a logo that depicts a polo player in a position and pose that differs from the Polo Player Logo, but intentionally chose not to do so. USPA could have adopted a package or product color dramatically different from the one used by the PRL Parties, but intentionally chose not to. Instead, USPA went after the PRL Parties' most popular Polo Player Logo fragrance as if to use the risks taken and success achieved by the PRL Parties as its own "market research." It is difficult to imagine an explanation other than that it was an intentional effort to confuse consumers, create an association between USPA's fragrance and the PRL Parties, and to ride the coattails and benefit from the good will that the PRL Parties worked so hard, and at such great expense, to create. Any attempted *post hoc* rationalization that such an imitative logo used on fragrances was a natural expansion of an apparel licensing program cannot justify USPA's bad faith.

Where a party has intentionally and in bad faith adopted a mark and employed a color to look similar to a senior user's mark and packaging for the same goods, it can be assumed that the party's intent to confuse consumers will be successful. *See, e.g., Harold F. Ritchie, Inc.*, 281 F.2d at 760 (a finding that a junior user consciously adopted a similar mark in bad faith raises a presumption that its actions will cause the confusion that was intended); *Harlequin Enterprises Ltd. v.*

*Gulf & Western Corp.*, 644 F.2d 946, 949 (2d Cir. 1981) ("the law presumes that an intended similarity

is likely to cause confusion"); *Simon & Schuster, Inc. v. Putnam Berkley Group, Inc.*, No. 94 Civ. 8768

(JSM), 1994 WL 689058, at *2 (S.D.N.Y. Dec. 8, 1994) (same); *Paddington Corp. v. Attiki Imps. &*

*Distrib., Inc.*, 996 F.2d 577, 586-87 (2d Cir. 1993) ("Where a second-comer acts in bad faith and

intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in

causing confusion…. Where … prior knowledge [of the prior user's mark or dress] is accompanied

by similarities so strong that it seems plain that deliberate copying has occurred, we have upheld

findings of bad faith") (internal citations omitted); *Mobil Oil Corp.*, 818 F.2d at 258 ("Intentional

copying gives rise to a presumption of a likelihood of confusion"); *MetLife, Inc.*, 388 F. Supp. 2d at

234 ("Intentional bad-faith copying of a trademark establishes a presumption that the copier

succeeded in causing confusion") (citing *Paddington Corp.*, 996 F.2d at 586-87); *I.H.T. Corp. v. News*

*World Communications, Inc.*, No. 83 Civ. 3862-CSH, 1984 WL 604, at *14 (S.D.N.Y. July 3, 1984)

("Where there is some indication of intentional copying, this inference [of likelihood of confusion] is

deemed justified because a court may reasonably presume that the alleged infringer sought to

achieve a fraudulent end--*i.e.*, confusion in the public mind as to the source of its product") (internal

citations omitted).

7.     **Quality of Junior User's Product: The PRL Parties' Loss Of Control Over Quality Weighs Heavily In Favor of Granting An Injunction**

USPA has not yet introduced its product to the marketplace, so the PRL Parties

naturally cannot establish whether it will be of inferior quality.  However, since it is the loss of

control over quality that is the real gravamen of this factor, courts have not been reluctant to weigh

this factor in the senior user's favor regardless of the quality of the junior user's product.  An

inferior product weighs in favor of issuing an injunction because the senior user will be harmed if

consumers associate the junior user's inferior product with the senior user. *See, e.g., Cadbury Beverages,*

*Inc. v. Cott Corp.*, 73 F.3d 474, 483 (2d Cir. 1996) ("This factor generally considers whether the senior

user's reputation could be 'tarnished by [the] inferior merchandise of the junior user'") (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976)); *The Sports Authority, Inc.*, 89 F.3d at 965 (same) (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir.1995)). On the other hand, similarity in the quality of the products may create an even greater likelihood of confusion as to source inasmuch as consumers may expect products of similar quality to emanate from the same source. *See generally Tommy Hilfiger Licensing, Inc.*, 221 F. Supp. 2d at 420 (discussing the two ways in which quality of the junior user's product has been analyzed); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 325-26 (S.D.N.Y. 2000) (same); *Jordache Enterprises, Inc.*, 841 F. Supp. at 520 (stating that because parties both manufacture quality apparel, the senior user need not be concerned about reputational harm due to tarnishment, but that the equivalent quality of the products "supports the inference that they emanate from the same source").

It is now clear, however, that the question of quality goes not only to the likelihood of confusion or the harm to a senior user when it is mistakenly associated with an inferior product, but also to the harm that is inherent in losing control over one's own reputation. Even in situations in which "quality" is subjective, and thus a determination of "inferior" versus "superior" quality cannot readily be made, a senior user "is entitled to have consumers judge the quality of its product without being confused by" the junior user's product. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, No. 99 CIV 10175 (JMS), 2001 WL 170672, at *13 (S.D.N.Y. Feb. 21, 2001). *See also Mobil Oil Corp.*, 818 F.2d at 259-60 ("a senior user may sue to protect his reputation even where the infringer's goods are of top quality"). Accordingly, even without being able to ascertain the quality of USPA's product, the mere fact that the product is likely to be mistakenly associated with the PRL Parties, which have no control over its quality, results in legally cognizable harm.

8.    **Sophistication of Buyers: Purchasers Of USPA's Products Are Not Likely To Be Sophisticated Regarding Trademarks**

It is generally found that "unsophisticated consumers aggravate the likelihood of

confusion." *Hasbro, Inc.*, 858 F.2d at 78.  However, where the goods are identical and the consumers are brand-conscious, the sophistication of consumers may actually increase the likelihood of confusion.  *See, e.g., Jordache Enterprises, Inc.*, 841 F. Supp. at 520 ("the fact that jeans buyers are sophisticated consumers weighs in Levi's favor … [and] the fact that jeans purchasers are conscious of trademarks further increases the likelihood that the "101" mark will cause confusion as to the association between Jordache and Levi"); *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 875 ("we believe that it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers").  In all events, a consumer's sophistication with respect to fragrances does not make him sophisticated with respect to trademarks.

USPA states that it sells its apparel and other products at Sears and similar merchandisers.  It is fair to assume that USPA will sell its fragrances through similar channels, at price points below the price points of fragrances bearing the Polo Player Logo.  Although purchasers of expensive fragrances are typically found to be somewhat sophisticated consumers, *see, e.g., Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F. Supp. 1520, 1529 (S.D.N.Y.1985), there is nothing to indicate that purchasers of low- to mid-priced fragrances at low- to mid-range retailers are sophisticated.  In a similar situation, in which the senior user's product and consumers were at the upper-end of the market and the junior user's products and consumers were at the lower-end, the Second Circuit determined that consumers of the lower-end products -- even if not "impulsive" -- were less sophisticated and "could be confused about an affiliation between the products." *Nikon*, 987 F.2d at 95.  Prospective purchasers of USPA's products will not be very sophisticated and are likely to be confused and to believe that USPA's product is an authorized "down market" version or extension of the PRL Parties' fragrance products, or that USPA and the PRL Parties are otherwise affiliated.

C.   **BALANCE OF HARDSHIPS TIPS DECIDEDLY IN FAVOR OF THE PRL PARTIES**

The PRL Parties have demonstrated that they are entitled to a preliminary injunction because they have shown a likelihood of success on the merits. As the foregoing analysis of the *Polaroid* factors makes clear, not a single factor favors USPA, which itself created the need for this motion through its knowing and intentional behavior. This Court, therefore, need not consider the balance of hardships under the Second Circuit's alternative ground for granting injunctive relief. However, even if the PRL Parties had not established a likelihood of success on the merits, they have established that there are sufficiently serious questions going to the merits to make them fair ground for litigation and can easily show that the balance of hardships tips decidedly in their favor.

The PRL Parties, over a sustained period of time, have invested an enormous amount of time, effort and money in developing the Polo Player Logo and advertising, marketing and promoting the product lines bearing that logo. They sell tens of millions of dollars of fragrances in connection with the Polo Player Logo each year, and have spent tens upon tens of millions of dollars to develop consumer awareness, loyalty, and goodwill in connection with that logo over the past three decades. That goodwill will be significantly jeopardized by a mistaken association between the PRL Parties and USPA as a result of fragrance products being sold under a confusingly similar mark.

In contrast, USPA has not yet sold *any* fragrance products and has not developed *any* goodwill or reputation in connection with those products. Any financial investment by USPA to develop the identified product was at its own risk and pales in comparison to the PRL Parties' efforts. Any potential harm to USPA is a direct result of its own calculated decision to proceed with the use of the Double Horsemen Trademark in connection with fragrances while on notice of the PRL Parties' opposition thereto, and after being advised (by the TTAB) that the decision in the Apparel Litigation would not protect its use of that mark in connection with fragrances. The

Complaint suggests that USPA may attempt to argue that it and its licensee have incurred certain expenses in developing, manufacturing, and preparing for sale of its fragrance product, and will be harmed by the loss of that investment and any expectation value of expanding its product line. But USPA was well aware of the risk prior to deciding to proceed with development, and cannot now be heard to complain about a situation that is entirely of its own making.

USPA's product is not yet in the marketplace. The long-standing and significant investment by the PRL Parties in their products and brand, which have been in the market for more than thirty years, dwarfs the minor claimed "investment" by USPA in what it knew would be a challenged product category, and clearly shows that the balance of equities is in the PRL Parties' favor. *See Soil Solutions, Inc.*, 2009 WL 3753912, at *4 ("The long-established use by the [senior user] and new use by [the junior user], plus the substantial confusion and possible loss of business by the [senior user] create strong equities for granting a preliminary injunction"). Entering an injunction to preserve the status quo and prohibit USPA from launching its new product during the pendency of this action will cause virtually no harm to USPA, while refusal to grant the injunction -- if USPA were to commence sales, as intended -- would cause significant and irreparable harm to the PRL Parties. Equity requires that an injunction be granted.

## CONCLUSION

The PRL Parties have established both irreparable harm and a likelihood of success on the merits. At minimum, the PRL Parties have shown that there are serious questions going to the merits and that the balance of hardships tips decidedly in their favor. For the foregoing reasons, the PRL Parties respectfully request that the Court grant their motion for a preliminary injunction prohibiting USPA from advertising, promoting, offering for sale or selling fragrance products

bearing the Double Horsemen Trademark.

Dated: New York, NY
       March 2, 2010

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY & WALKER LLP

*Robert L. Sherman*

By:      Robert L. Sherman (RS 5520)

75 East 55th Street
New York, New York 10022
(212) 318-6000 (telephone)
(212) 318-6847 (facsimile)
robertsherman@paulhastings.com

*Attorneys for L'Oréal USA Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF THE PRL PARTIES' MOTION FOR A PRELIMINARY INJUNCTION was served this 2nd day of March, 2010 by delivering a true and correct copy of same by First Class Mail to:

Gerald J. Ferguson, Esq.
Baler & Hostetler LLP
45 Rockefeller Plaza
New York, NY  10111

John M. Callagy, Esq.
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY  10178-0002


_Rosetta Kromer_
Rosetta Kromer