**BAKER & HOSTETLER LLP**
Gerald Ferguson (0370)
David Sheehan (4818)
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
gferguson@bakerlaw.com
dsheehan@bakerlaw.com

*Attorneys for Plaintiffs United States Polo
Association, Inc., and USPA Properties, Inc.*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES POLO ASSOCIATION, INC., and USPA PROPERTIES, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> PRL USA HOLDINGS, INC., and L'OREAL USA, INC., <br><br> Defendants. | CIVIL ACTION NO.  09 CV 9476 (RWS) |

**PLAINTIFFS UNITED STATES POLO ASSOCIATION, INC.'S
AND USPA PROPERTIES, INC.'S OPENING POST-TRIAL
MEMORANDUM OF LAW**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS .................................................................. 6

ARGUMENT .................................................................................. 6

I.    THE STANDARD FOR PERMANENT INJUNCTIVE RELIEF IS GOVERNED
      BY *EBAY, INC. V. MERCEXCHANGE, L.L.C.* ........................................ 6

II.   THE PRL PARTIES HAVE NOT SHOWN SUCCESS ON THE MERITS .................. 7

      A.    The 1984 Order Adequately Protects The Litigants And Allows For
            Lawful Co-Existence Of PRL And U.S. Polo Assn. Branded Products ............... 7

            1.    The 1984 Order and Associated Litigation Establishes The U.S.
                  Polo Assn.'s Right to Conduct a Fragrance Licensing Program
                  Using Its Name and Its Double Horsemen Mark. ...................................... 7

            2.    The U.S. Polo Assn.'s Global Licensing Program Comports with
                  the 1984 Order ................................................................................ 10

      B.    The *Polaroid* Factors Decidedly Tip In Favor Of The U.S. Polo Assn.
            Parties When Viewed In The Particular And Appropriate Factual Context
            Of This Case ......................................................................................... 13

            1.    The *Polaroid* Analysis Must Account For A Legitimate Sporting
                  Association's Inherent Right To Conduct A Licensing Program ............ 14

            2.    The Remaining *Polaroid* Factors Tilt Decisively In Favor Of The
                  U.S. Polo Assn. Parties ..................................................................... 17

                  a.    No Evidence Of Actual Confusion Has Been Proffered
                        Despite Extensive Worldwide Co-Existence ............................... 17

                  b.    The U.S. Polo Assn. Adopted Fragrance Packaging Bearing
                        The Double Horsemen Mark And Its Name In Good Faith......... 20

                  c.    The U.S. Polo Assn. Marks Have Been Judicially
                        Recognized As Dissimilar From PRL's Marks .......................... 22

                  d.    The Fragrance Products Are Not Proximate .............................. 24

                  e.    The PRL Parties Will Not Bridge The Gap Into The Mid-
                        Tier ...................................................................................... 25

                  f.    No Evidence Has Been Presented Regarding The Quality
                        Of The U.S. Polo Assn. Fragrance Product ............................. 25

                  g.    Fragrance Consumers Are Sophisticated And Can Readily
                        Distinguish U.S. Polo Assn. And PRL Fragrances Based
                        Upon Price-points And Channels of Distribution. ..................... 26

# TABLE OF CONTENTS
(continued)

Page

h. The Strength Of PRL's Marks Must Be Balanced In Connection With The U.S. Polo Assn.'s Judicially Recognized Licensing Program And Independent Consumer Recognition................................................................. 26

i. A Balancing Of The *Polaroid* Factors Confirms That The PRL Parties Are Unable To Succeed On The Merits Of Their Claim ............................................................................................. 28

3. Properly Controlled And Unbiased Market Surveys Further Indicate No Likelihood Of Confusion ..................................................... 29

a. The U.S. Polo Assn.'s Controls Comport With The Controlling Standards While The PRL Parties' Control Misses The Mark....................................................................... 29

(1) The Mustang Grille Control Was Fatally Flawed............ 31

(a) The Mustang Grille Control Did Not Function As A Proper Control ............................. 31

(b) The Mustang Grille Control Failed To Screen For Permitted References To The Sport Of Polo ......................................................... 33

(2) The U.S. Polo Assn. Parties' Two Controls Functioned As Proper Controls....................................... 36

(a) The Horsehead Control Followed The Letter Of Professor Diamond's Teachings.................... 36

(b) The Beverly Hills Polo Club Fragrance Control Functioned As A Proper Control ........... 37

(c) There Is No 20% Rule For A Control And No Basis For Adopting Such A Rule.................. 39

b. Survey Questions Must Be Directed To The Proper Universe And Non-Leading In Nature......................................... 41

c. Dr. Helfgott's Survey Appropriately Approximated Market Conditions By Allowing Respondents To View The Product During The Administration Of The Questionnaire ........ 43

d. The Delegation Of Coding And Tabulation To A Professional Survey Firm Is Entirely Appropriate....................... 43

C. The Absence Of A Showing Of A Likelihood Of Confusion Also Tolls The Death Knell For The PRL Parties' Federal And Common Law Unfair Competition Claims ................................................................................... 45

D. The PRL Parties Cannot Prevail On Their Remaining State Law Claims........... 47

# TABLE OF CONTENTS
(continued)

Page

1. The PRL Parties' Claim Under New York General Obligations Law § 349 Fails.................................................................... 47

2. The PRL Parties' Claim Under New York General Business Law Section 133 Fails As A Matter of Law ................................. 48

III. THE PRL PARTIES WILL NOT SUFFER IRREPARABLE INJURY IN THE ABSENCE OF A PERMANENT INJUNCTION ......................................... 48

IV. THE BALANCING OF HARDSHIPS WEIGHS IN FAVOR OF THE U.S. POLO ASSN. PARTIES....................................................................... 50

V. THE PUBLIC INTEREST WILL BE SERVED BY DENYING PRL'S MOTION ...... 52

CONCLUSION.............................................................................................. 53

# TABLE OF AUTHORITIES

**Page**

**Cases**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
447 F.Supp.2d 266 (S.D.N.Y. 2006) ................................................................................. *passim*

*Allied Maint. Corp. v. Allied Mech. Trades, Inc.,*
42 N.Y.2d 538, 369 N.E.2d 1162 (1977).............................................................................. 28

*Andy Warhol Enter., Inc. v. Time, Inc.,*
700 F.Supp. 760 (S.D.N.Y. 1988) ....................................................................................... 45

*Bachellerie v. Z. Cavaricci, Inc.,*
762 F.Supp. 1070 (S.D.N.Y. 1991) (Sweet, J.) .................................................................. 27

*Bi-Rite Enters., Inc. v. Button Master,*
555 F.Supp. 1188 (S.D.N.Y.1983) ...................................................................................... 45

*Capetan v. Brownell,*
148 F.Supp. 519 (E.D.N.Y.1957) .......................................................................................... 8

*Citigroup Inc. v. City Holding Co.,*
171 F.Supp. 2d 333 (S.D.N.Y. 2001) .................................................................................. 22

*Citizens Banking Corp. v. Citizens Fin. Group, Inc.,*
No. 07-11514, 2008 WL 1995104 (E.D. Mich. May 6, 2008), *aff'd,* 320 Fed.
Appx. 341 (6th Cir. 2009)............................................................................................... 31, 32

*Cumberland Packing Corp. v. Monsanto Co.,*
32 F.Supp.2d 561 (E.D.N.Y. 1999) ..................................................................................... 30

*Cumberland Packing Corp. v. Monsanto Co.,*
32 F.Supp. 2d 561 (E.D.N.Y. 1999) .................................................................................... 30

*Do Denim, LLC. v. Fried Denim,*
634 F.Supp.2d 403 (S.D.N.Y. 2009) ................................................................................... 47

*eBay, Inc. v. MercExchange, L.L.C.,*
547 U.S. 338 (2006)........................................................................................................... 6, 7

*Edge Wireless, LLC v. U.S. Cellular Corp.,*
Case No. Civ. 03-1362-AA, 2004 WL 1661992 (D. Or. July 23, 2004) ................................ 44

*Edison Bros. Stores, Inc. v. Cosmair, Inc.,*
651 F.Supp. 1547 (S.D.N.Y. 1987) ..................................................................................... 39

*Eli Lilly and Co. v. Revlon, Inc.,*
577 F.Supp. 477 (S.D.N.Y. 1983) .......................................................................... 26, 43, 45

# TABLE OF AUTHORITIES
(continued)

**Page**

*Elizabeth Taylor Cosmetics Co. v. Annick Goutal,*
  673 F.Supp. 1238 (S.D.N.Y. 1987) .................................................................. 14

*Estee Lauder Inc. v. The Gap, Inc.,*
  108 F.3d 1503 (2d Cir. 1997) ................................................................... 24, 26

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.,*
  618 F.3d 1025 (9th Cir. 2010) ....................................................................... 39

*Georgia Pacific Consumer Products v. Kimberly-Clark Corp.,*
  No. 09-C-2263, 2010 WL 1334714 (N.D. Ill. Mar. 31, 2010) ..................... 44

*Girl Scouts of U.S.A. v. Bantam Doubleday Dell Publ'g Group, Inc.,*
  808 F.Supp. 1112 (S.D.N.Y. 1992) ............................................................... 46

*Hormel Foods Corp. v. Jim Henson Prods., Inc.,*
  73 F.3d 497 (2d Cir. 1996) ........................................................................... 25

*Hutchinson v. Essence Communications, Inc.,*
  769 F.Supp. 541 (S.D.N.Y. 1991) ................................................................. 41

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.,*
  No. 94-civ-2663(RPP), 1995 WL 241875 (S.D.N.Y. Apr. 26, 1995), *vacated on other grounds,* 80 F.3d 749 (2d. Cir. 1996) ............................................ 3, 14, 49, 52

*Le Book Pub., Inc. v. Black Book Photography, Inc.,*
  418 F.Supp.2d 305 (S.D.N.Y. 2005) ............................................................. 45

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,*
  502 F.3d 504 (6th Cir. 2007) ....................................................................... 41

*Louis Vuitton Mallietier v. Burlington Coat Factory Warehouse Corp.,*
  No. 04-civ-2644 (RMB), 2006 WL 1424381 (S.D.N.Y. 2006)..................... 24

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.,*
  292 F.Supp.2d 535 (S.D.N.Y. 2003) ............................................................. 47

*Malaco Leaf, AB v. Promotion in Motion, Inc.,*
  287 F.Supp. 2d 355 (S.D.N.Y. 2003) ........................................................... 18

*Montblanc-Simplo GmbH v. Colibri Corp.,*
  692 F.Supp.2d 245 (E.D.N.Y. 2010) ............................................................... 6

*Nabisco v. Warner-Lambert Co.,*
  32 F.Supp.2d 690 (S.D.N.Y. 1999) ............................................................... 30

# TABLE OF AUTHORITIES
(continued)

**Page**

*New West Corp. v. NYM Co. of Cal., Inc.,*
595 F.2d 1194 (9th Cir. 1979) ................................................................. 45

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
704 F.Supp.2d 305 (S.D.N.Y. 2010) .......................................... 6, 49, 50

*Oliveira v. Frito-Lay, Inc.,*
96 Civ. 9289, 1997 WL 324042 (S.D.N.Y. June 13, 1997)...................... 48

*Orb Factory Ltd. v. Design Science Toys, Ltd.,*
No. 96-civ-9469(RWS), 1999 WL 191527 (S.D.N.Y. Apr. 7, 1999)...................... 27

*Paco Sport, Ltd. v. Paco Rabanne Parfums,*
86 F.Supp.2d 305 (S.D.N.Y. 2000), *aff'd,* 234 F.3d 1262 (2d Cir. 2000)........................ 24, 41

*Playtex Products, Inc. v. Georgia-Pacific Inc.,*
No. 02-civ-7848(HB), 2003 WL 21939706 (S.D.N.Y. Aug. 12, 2003) ............................ 18, 20

*Polaroid Corp. v. Polarad Elecs. Corp.,*
287 F.2d 492 (2d Cir. 1961) *cert denied,* 368 U.S. 820 (1961) ........................................ *passim*

*Pristine Industries v. Hallmark Cards, Inc.,*
753 F.Supp. 140 (S.D.N.Y. 1990) (Sweet, J.) ........................................ 27

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.,*
520 F.3d 109 (2d Cir. 2008). ........................................ *passim*

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.,*
No. 99-cv-10199 (GBD), 2006 WL 1881744 (S.D.N.Y. Jul. 7, 2006)............................ *passim*

*Reed-Union Corp. v. Turtle Wax,*
77 F.3d 909 (7th Cir. 1996) ........................................ 39

*Roederer v. J. Garcia Carrión, S.A.,*
No. 06-213 (JNE/SRN), 2010 WL 3200034 (Aug. 10, 2010 D. Minn.) ................................. 41

*Salinger v. Colting,*
607 F.3d 68 (2d Cir. April 30, 2010) ........................................ 6

*Samiento v. World Yacht Inc.,*
10 N.Y.3d 70, 833 N.E.2d 990 (2008)........................................ 47

*Saratoga Vichy Spring Co. v. Lehman,*
625 F.2d 1037 (2d Cir. 1980) ........................................ 46

# TABLE OF AUTHORITIES
(continued)

**Page**

*Securitron Magnalock Corp. v. Schnabolk,*
    65 F.3d 256 (2d Cir. 1995) ................................................................. 47

*See ConAgra, Inc. v. George A. Hormel & Co.,*
    784 F.Supp. 700 (D. Neb. 1992) ......................................................... 38

*Simon Prop. Group L.P. v. mySimon, Inc.,*
    104 F.Supp.2d 1033 (S.D. Ind. 2000) .................................................. 30

*SLY Magazine, LLC v. Weider Publications L.L.C.,*
    529 F.Supp.2d 425 (S.D.N.Y. 2007) ............................................... 28, 46

*Smith v. Comm'r of Internal Revenue,*
    67 F.2d 167 (4th Cir.1933) .................................................................. 8

*Smith v. Wal-Mart Stores, Inc.,*
    537 F.Supp.2d 1302 (N.D. Ga. 2008) .................................................. 42

*Sovereign Bus. Forms, Inc. v. Stenrite Indus., Inc.,*
    00 Civ. 3867(BDP), 2000 WL 1772599 (S.D.N.Y. Nov. 28, 2000) ........... 48

*THOIP v. Walt Disney Co.,*
    690 F.Supp.2d 218 (S.D.N.Y. 2010) ............................................... 29, 36

*U.S. Polo Ass'n, Inc. v. Polo Fashions, Inc.,*
    No. 84-civ-1142(LBS), 1984 WL 1309 (S.D.N.Y. Dec. 6, 1984) ........... 2, 3

*U.S. v. Spallone,*
    399 F.3d 415 (2d Cir. 2005) ................................................................. 8

*U-Neek, Inc. v. Wal-Mart Stores, Inc.,*
    147 F.Supp.2d 158 (S.D.N.Y. 2001) ............................................... 46, 47

*V & S Vin & Sprit Aktiebolag v. Absolute Publishing USA Inc.,*
    No. 05-civ-4429 (RMB)(RLE), 2006 WL 197001 (S.D.N.Y. 2006) ....... 26, 28

*Wallace International Silversmiths, Inc. v. Godinger Silver Art Co.,*
    916 F.2d 76 (2d Cir. 1990) ................................................................... 1

*Westchester Media v. PRL USA Holdings, Inc.,*
    214 F.3d 658 (5th Cir. 2000) ........................................................... 5, 51

## **Statutes**

15 U.S.C. § 32 ....................................................................................... 45

## TABLE OF AUTHORITIES
(continued)

**Page**

15 U.S.C. § 43 ................................................................................................................ 45

15 U.S.C. § 45 ................................................................................................................ 47

N.Y. Gen. Bus. Law § 133 ............................................................................................ 48

N.Y. Gen. Bus. Law § 349 ................................................................................. 45, 47, 48

### Other Authorities

6 McCarthy on Trademarks and Unfair Competition § 23:21 (4th Ed. 2010) .............................. 22

6 McCarthy on Trademarks and Unfair Competition § 32:48 (4th Ed. 2010) .............................. 43

6 McCarthy on Trademarks and Unfair Competition § 32:159 (4th Ed. 2010) .......................... 41

6 McCarthy on Trademarks and Unfair Competition § 32:171 (4th Ed. 2010) .......................... 32

6 McCarthy on Trademarks and Unfair Competition § 32:184 (4th Ed. 2010) .................... 29, 38

6 McCarthy on Trademarks and Unfair Competition § 32:187 (4th Ed. 2010) ............... 29, 30, 31

"Experimental Design and the Selection of Controls in Trademark and Deceptive
Advertising Surveys," 92 Trademark Reporter 890 (2002) ...................................................... 40

Shari Seidman Diamond, *Reference Guide on Survey Research, in Reference Manual On Scientific Evidence* 229 (Federal Judicial Center 2d ed. 2000) ..................... *passim*

Plaintiffs United States Polo Association, Inc. ("U.S. Polo Assn.") and USPA Properties, Inc. ("Properties"), (collectively, the "U.S. Polo Assn. Parties") submit this post-trial Brief requesting (i) a declaration of the Court that the U.S. Polo Assn. has the right to license and sell fragrance products and packaging bearing "U.S. POLO ASSN." and the Double Horsemen trademark in the United States, and (ii) judgment in their favor dismissing all counterclaims brought against them by PRL USA Holdings, Inc. ("PRL") and L'Oreal USA, Inc. ("L'Oreal") (collectively, the "PRL Parties") and their associated request for permanent injunctive relief.

## PRELIMINARY STATEMENT

"It is the first principle of trademark law that an owner may not use the mark as a means of excluding competitors from a substantial market." *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 81 (2d Cir. 1990) (*abrogated on other grounds*). In violation of this fundamental principal of trademark law, the PRL Parties seek an injunction effectively granting them a monopoly on the use of fragrance products with trademarks that depict or make reference to the sport of polo (except where the PRL Parties permit a third party to use such trademarks). Specifically, they seek to obtain an injunction barring the legitimate representative of the sport of polo in the United States from licensing fragrance products that bear its name – the U.S. Polo Assn – and its Double Horsemen mark – which depicts two polo players competing for a ball in a polo match.

In seeking this injunction, the PRL Parties ask this Court to disregard a 1984 Order of the Honorable Leonard B. Sand, U.S.D.J. (the "1984 Order") which both recognized the right of the U.S. Polo Assn. to commercially license trademarks that refer to the sport of polo, and set forth concrete rules by which the U.S. Polo Assn. could license such trademarks without infringing the rights of PRL. The PRL parties also ask this Court to disregard a 2008 Second Circuit opinion holding that the 1984 Order continues to define the right of the U.S. Polo Assn. Parties'

commercial licensing rights.  (Ex. PX-15 at ¶ 9.C.); *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109 (2d Cir. 2008).

Judge Sand's 1984 Order was a document of incredible foresight.  Judge Sand found that the U.S. Polo Assn. and PRL could co-exist in the marketplace using trademarks that refer to the sport of polo, without creating a likelihood of consumer confusion, so long as the U.S. Polo Assn. followed specific rules regarding the manner of use of its marks.  Specifically, the 1984 Order held that the U.S. Polo Assn. could use its name and a "mounted polo player … which is distinctive from . . . [PRL's] polo player symbol in its content and perspective", subject to specific usage rules intended to eliminate the likelihood of consumer confusion.  (Plaintiffs' Trial Exhibit ("PX"), PX-15 at ¶ 9.C.); *U.S. Polo Ass'n, Inc. v. Polo Fashions, Inc.*, No. 84-civ-1142(LBS), 1984 WL 1309, at *18 (S.D.N.Y. Dec. 6, 1984); *see also PRL USA Holdings, Inc.*, 520 F.3d 109.

The experience of the marketplace has vindicated Judge Sand's vision.  Since 2006, after a jury trial in the Southern District of New York concluded with the jury finding that the Double Horsemen mark did not infringe PRL's rights, products bearing the U.S. POLO ASSN. trademark and the Double Horsemen have extensively co-existed nationwide with PRL products, without any evidence of actual consumer confusion arising.  This co-existence without evidence of actual confusion has occurred in extremely diverse product categories, including: (a) men's and women's casual sportswear; (b) signature sportswear; (c) accessories; (d) tailored and dress clothing; (e) activewear; (f) home goods; and (g) children's apparel.  (Ex. PX-13.)  Since 2007, wholesale sales of such U.S. Polo Assn. products in the United States have been approximately $250 million a year, with products available in national chains, such as Kohl's, J.C. Penney, Sears, Ross, Peebles, Goody's, Dr. J's, and Stage Stores.  (*See* Proposed Findings of Fact

2

("Findings", at ¶¶ 47 and 49.)  In connection with all of these product offerings, the U.S. Polo

Assn. has strictly adhered to the trademark usage rules set forth in the 1984 Order.  (Findings, at

¶¶ 22-30.)  The extensive and widespread co-existence of U.S. Polo Assn. and PRL products,

without any evidence of actual confusion, is reasonably attributable to the U.S. Polo Assn.'s

strict adherence to the 1984 Order.

In offering a "*Polaroid* factors" analysis as a substitute for the 1984 Order, the PRL

Parties ignore the fact that the 1984 Order is the product of a *Polaroid* analysis conducted by

Judge Sand, and recently recognized by the Second Circuit as continuing to state the U.S. Polo

Assn.'s rights.  *See U.S. Polo Ass'n, Inc.*, 1984 WL 1309, at *14.  Accordingly, in order to

succeed on the merits of their claim, a necessary predicate for a permanent injunction, the PRL

Parties must show that the U.S. Polo Assn. either violated the 1984 Order, or that the 1984 Order

no longer constitutes a binding analysis of the *Polaroid* factors.  Given that the U.S. Polo Assn.

demonstrated its strict adherence to the 1984 Order at trial, and that no evidence of actual

confusion has in fact occurred while the 1984 Order has governed the Parties' relationship, the

PRL Parties cannot succeed on the claim for a permanent injunction.

The "*Polaroid* factors" analysis offered by the PRL Parties further disregards established

law requiring the Court to consider the "additional factor" of the right of a legitimate sporting

association to license trademarks that make reference to the sport it represents in a case where a

fashion designer is seeking to usurp that right.  *Int'l Star Class Yacht Racing Ass'n v. Tommy

Hilfiger U.S.A., Inc.*, No. 94-civ-2663(RPP), 1995 WL 241875 (S.D.N.Y. Apr. 26, 1995),

*vacated on other grounds*, 80 F.3d 749 (2d. Cir. 1996).  The 1984 Order anticipated the *Int'l Star

Class Yacht Racing Ass'n* decision in recognizing that the U.S. Polo Assn. had the right to

3

license polo-related trademarks, regardless of the success of PRL in developing recognition in its polo-related trademarks:

> In our vast society there is clearly room for both the United States Polo Association and Polo Fashions Inc. to engage in licensing activities, including licensing activities in the apparel field which do not conflict with each other. Nothing contained in this opinion should be construed as precluding such activities.

*U.S. Polo Ass'n, Inc.*, 1984 WL 1309, at *18.

Unable to offer any evidence of actual confusion despite widespread co-existence between the parties in the marketplace, the PRL Parties seek to manufacture an inference of confusion by offering a fatally flawed market survey conducted by Mr. George Mantis. Mr. Mantis' survey is invalid because it employs a wholly defective control that could not measure survey noise in this case. Rather, the Mustang Grille control – a metallic blue package with the Ford Mustang trademark housed within a chrome automotive grille – tested how well this automotive grille was recognized.

PRL's control is independently flawed because Mr. Mantis intentionally selected a control that did not refer to the sport of polo. In selecting this control, Mr. Mantis impermissibly assumed that the issue "in dispute" in this case is whether PRL could have a monopoly on trademarks that depict or make reference to the sport of polo. (Findings at ¶ 121.) Mr. Mantis' assumption violates the 1984 Order, as reaffirmed by the Second Circuit, and the *Int'l Star Class Yacht Racing Ass'n,* without justification. Accordingly, Mr. Mantis' surveys are devoid of any evidentiary value and should be given no weight.

Dr. Myron Helfgott's rebuttal survey, offered by the U.S. Polo Assn. Parties, cured the serious defects in Mr. Mantis' survey by assuming that the U.S. Polo Assn. Parties had the rights granted to them by the 1984 Order and by employing a control modeled upon the 1984 Order's

directives. (Exs. PX-15 at 9.C., 48 and 54; Findings at ¶ 136.) The control logo that Dr. Helfgott adopted also was judicially accepted as a permissible control in a 2005 trial between the U.S. Polo Assn. and PRL before this Court. (Findings at ¶ 137.) Dr. Helfgott's survey conclusively showed that the Double Horsemen logo is not a likely source of consumer confusion. (Ex. PX-48 at 12-14; Findings at ¶ 147.)

The record is devoid of any evidence as to how the PRL Parties' would suffer irreparable harm if the Court denied their efforts to secure a monopoly on fragrance products with polo-related trademarks. PRL has plucked the luxury and lifestyle aspects of the competitive sport of polo as the proverbial "fruits" of the real-world efforts and the sweat equity of the U.S. Polo Assn. *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 673 (5th Cir. 2000). Although the PRL Parties have enjoyed significant financial benefits from this relationship they have forged with the sport of polo, PRL seeks to arbitrarily limit the U.S. Polo Assn. licensing activities, which supply revenue to the sporting association, so that the sporting association can continue to grow the sport in the United States for the good of its current and future participants and spectators. The injunction that the PRL Parties seek would also harm the public interest by depriving consumers of a choice of polo-related products in the marketplace.

The Lanham Act, and the state statutes that the PRL parties invoke, are intended to enhance fair competition, not drive it away. For these reasons, the balance of hardships and the public interest weigh heavily in favor of denying the PRL Parties attempt to invoke the extraordinary power of a permanent injunction to support the PRL Parties' narrow competitive agenda.

## STATEMENT OF FACTS

The facts adduced from the trial record are submitted herewith in connection with the U.S. Polo Assn.'s proposed Findings of Facts and Conclusions of Law and are hereby cited to as appropriate and incorporated by reference.

## ARGUMENT

I.    **THE STANDARD FOR PERMANENT INJUNCTIVE RELIEF IS GOVERNED BY *EBAY, INC. V. MERCEXCHANGE, L.L.C.***

In accordance with the Supreme Court's decision in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 338 (2006) (permanent injunction sought for alleged patent infringement) and the Second Circuit's application of *eBay, Inc.* in *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. Apr. 30, 2010) (applying *eBay, Inc.* in the context of a preliminary injunction sought for alleged copyright infringement), parties seeking a permanent injunction for alleged trademark infringement, such as the PRL Parties, must satisfy a four-factor test. *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010). Specifically, the PRL Parties must demonstrate: (1) success on the merits; (2) they are likely to suffer irreparable injury in the absence of an injunction; (3) the balance of hardships tips in their favor; and (4) the public interest would not be disserved by the issuance of an injunction.[1] 704 F. Supp. 2d at 328 (citing *Salinger*, 607 F.3d at 79-80, 78 n.7, and finding "no reason that *eBay* would not apply with equal force to an injunction in any type of case"); *see also Montblanc-Simplo GmbH v. Colibri Corp.*, 692 F. Supp. 2d 245 (E.D.N.Y. 2010) (holding "a plaintiff seeking a permanent injunction must satisfy the four-factor test enunciated by the Supreme Court in *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 390, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)"). The PRL

---

[1]       The question as to whether adequate remedies at law such as monetary damages are available to the PRL Parties is not at issue in this case since the PRL Parties only request injunctive relief.

Parties must prove each of these elements.  None, including irreparable harm, may be presumed. *New York City Triathlon, LLC*, 704 F. Supp. 2d at 328; *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 338 (2006).  Accordingly, the PRL Parties claim for permanent injunctive relief in this case must be denied because, as discussed below, the PRL Parties have failed to prove all required elements of the injunctive relief they seek.

## II.    THE PRL PARTIES HAVE NOT SHOWN SUCCESS ON THE MERITS

### A.    The 1984 Order Adequately Protects The Litigants And Allows For Lawful Co-Existence Of PRL And U.S. Polo Assn. Branded Products

#### 1.    The 1984 Order and Associated Litigation Establishes The U.S. Polo Assn.'s Right to Conduct a Fragrance Licensing Program Using Its Name and Its Double Horsemen Mark.

After a trial on the merits and the application of the *Polaroid* factors, Judge Sand's 1984 Order recognized that the U.S. Polo Assn. has the right to conduct a product licensing program (i) using its name, (ii) its horsehead logos and (iii) using a mounted polo player symbol that is "distinctive" from the PRL polo player symbol "in content and perspective" – so long as the U.S. Polo Assn. does not engage in specifically prohibited conduct that increased the likelihood of consumer confusion.  (Findings at ¶ 20; Ex. PX-15 at ¶ 9.C.); *see also PRL USA Holdings, Inc.*, 520 F.3d 109 (finding that the 1984 Order continues to establish the rights of the U.S. Polo Assn.).

Paragraph 8 of the 1984 Order enjoins the U.S. Polo Assn. from infringing PRL's trademarks and trade dress and establishes specific prohibitions that the U.S. Polo Assn. must follow.  Paragraph 9 identifies specific conduct in which the U.S. Polo Assn. may engage without violating paragraph 8, and thus without infringing PRL's trademarks.  *PRL USA Holdings, Inc.*, 520 F.3d at 118.  Specifically, Judge Sand directed that:

> Nothing contained herein shall be construed to prevent USPA and USPAP from conducting a *retail licensing program utilizing the USPA collective membership*

> mark (Reg. No. 1,181,651), the USPA horsehead symbol (Reg. No. 1,304,236) or
> a mounted polo player or equestrian or equine symbol which is distinctive from
> the PFI polo player symbol in its content and perspective, provided that such
> symbol is used in conjunction with trade dress, i.e., labels hangtags and
> packaging, which does not utilize white or silver lettering on a blue background or
> emphasize the word "POLO" by presenting it in a rectangle or between parallel
> lines or in lettering larger than that of associated words or letters used to identify
> USPA, and does not utilize any other trade dress which is likely to cause
> confusion with defendants, Ralph Lauren or any entity affiliated with any of them.

(Ex. PX-15 at ¶ 9.C.) (emphasis supplied)

A Court Order, similar to a contract or other written instrument must be construed as a

whole and all of its parts are relevant to a subsequent Court's interpretation. *U.S. v. Spallone*,

399 F.3d 415, 424 (2d Cir. 2005) (holding that "Court orders are construed like other written

instruments, except that the determining factor is not the intent of the parties, but that of the

issuing court"); *Capetan v. Brownell*, 148 F. Supp. 519, 520 (E.D.N.Y. 1957) ("In construing

orders and judgments, the entire contents of the instrument and the record should be taken into

consideration in ascertaining the intent.") (citing *Smith v. Comm'r of Internal Revenue*, 67 F.2d

167 (4th Cir. 1933)). The PRL Parties impermissibly attempt to read Paragraph 8 to negate

Paragraph 9. However, the restrictions of Paragraph 8 cannot be construed in a vacuum and

must be read in accordance with the "four-corners" of the 1984 Order, including the provisions

of Paragraph 9 which define specific activity that the U.S. Polo Assn. may engage in without

creating a likelihood of confusion and infringing PRL's marks.

The question of what it means for a mark to be "distinctive from . . . [PRL's] polo player

symbol in its content and perspective" was resolved, with respect to clothing, leather goods and

watches, by a three-week jury trial conducted before this Court in October of 2005. *See PRL*

*Holdings, Inc. v. U.S. Polo Ass'n Inc.*, No. 99-cv-10196 (GBD), 2006 WL 1881744, at *5

(S.D.N.Y. Jul. 7, 2006) ("*PRL I*"). In that trial, the parties litigated, among other things, the

issue of whether the Double Horsemen mark on clothing complied with the 1984 Order. *PRL I*, 2006 WL 1881744. PRL argued to the jury that the Double Horsemen mark did not comply with the 1984 Order because it was not sufficiently different in content and perspective from the PRL marks. *Id.* at *1. The jury rejected PRL's argument as to the Double Horsemen mark at issue here, among others, finding that U.S. Polo Assn.'s use of the mark on apparel did not violate the 1984 Order and did not infringe any trademark rights of PRL. *Id.* at *3.

Upon PRL's appeal, the Second Circuit Court of Appeals affirmed the jury decision in *PRL I* and the associated Court Order. *PRL USA Holdings, Inc.*, 520 F.3d 109. Notably, the Second Circuit recognized that the 1984 Order "made clear ... that the USPA remained free to 'conduct[] a retail licensing program utilizing . . . a mounted polo player or equestrian or equine symbol which is distinctive from the [Ralph Lauren] polo player symbol . . . ." *Id.* at 112. It therefore rejected PRL's argument that the district court had erred in refusing to give the jury a requested instruction that the U.S. Polo Assn. should have maintained a "safe distance" from PRL's products. The requested instruction, the Second Circuit held, would have been misleading because it did not account for rights granted to the U.S. Polo Assn. under the 1984 Order:

> To instruct the jury that USPA was required to "keep a safe distance" without further explanation of how this related to *USPA's right, under the injunction, to use a mounted polo player,* could have led the jury to find liability based on conduct which the earlier injunction had expressly permitted. We conclude that the instruction requested by PRL would, at the very least, have confused the jury.

*Id.* at 118. (emphasis added).

Accordingly, in light of this binding precedent, it is PRL's burden to show why the Double Horsemen mark, which is "distinctive . . . in content and perspective" from PRL's polo player mark on clothing, leather goods and watches, is not "distinctive . . . in content and perspective" from PRL's polo player mark on fragrances. *PRL I*, 2006 WL 1881744, at *5.

### 2. The U.S. Polo Assn.'s Global Licensing Program Comports with the 1984 Order

To prevail in this case the PRL Parties must show that the U.S. Polo Assn. violated the 1984 Order with its fragrance product, or that the 1984 Order no longer defines the U.S. Polo Assn.'s rights, despite the Second Circuit's 2008 finding that it does. The PRL Parties have put forth no evidence that the U.S. Polo Assn.'s use of its name and Double Horsemen mark on fragrance product violated the 1984 Order. The U.S. Polo Assn. has presented overwhelming evidence that it has complied with the 1984 Order.

Judge Sand's 1984 Order at issue established a roadmap for how PRL and the U.S. Polo Assn. could co-exist in the marketplace without generating any demonstrable consumer confusion. (Findings at ¶ 26.) The trial testimony of David Cummings and related documentary evidence demonstrate that, in order to comply with Judge Sand's directives, the U.S. Polo Assn. Parties made a conscious decision to construct a judicially recognized licensing program around the 1984 Order. The most important way in which the U.S. Polo Assn. has achieved this goal has been by incorporating the rules in every license agreement with third parties as well as its Brand Rule Book. (*Id.* at ¶¶ 22-24; Ex. PX-19.) The Brand Rule Book at Section 2.2 fully imposes the requirements of the 1984 Order on all U.S. Polo Assn. licensees worldwide by imposing on licensees acceptable and unacceptable uses of the U.S. Polo Assn. trademarks. (*Id.* at ¶¶ 25; Ex. PX-19.) These guidelines are provided to all licensees and all licensees are taught how to use them during regular global meetings. (*Id.*) The guidelines are further enforced by Properties in connection with its ongoing approval process of product Computer-aided Designs ("CADs") that pertain to the design and artwork associated with potential new products to be marked with the U.S. Polo Assn. trademarks. (*Id.* at ¶ 59.) Since 2005, Properties has approved

approximately four thousand CADs for a wide variety of products destined for sale in the United States bearing the Double Horsemen mark.  (Exs. PX-1 and 1A; Findings at ¶ 60.)

The "do's and dont's" as set forth in the Brand Rule Book mirror the prophylactic and permissive provisions of the 1984 Order.  (Findings at ¶¶ 27-30; Ex. PX-19.)  The key provisions of the 1984 Order and the corresponding sections of the Brand Rule Book are summarized as follows:

> 1984 Order Paragraph 8.d.: The U.S. Polo Assn. is restrained from: "using for any commercial purposes whatsoever, the name "*United States Polo Association*," or any other name which *emphasized the word POLO* (or the words U.S. Polo) *separate, apart and distinct from such name* in a manner which is likely to cause confusion with defendants, Ralph Lauren or any other entity affiliated with them. (PX-15 at ¶ 8.d.) (emphasis supplied)

> Brand Rule Book:

> - Paragraph 1.a. in Section 2.2 of the Brand Rule Book provides an acceptable exemplar graphic, identifies that the name of the U.S. Polo Assn. must be the "same size, font, prominence, and color, with adequate spacing" and provides a representative graphic example of an acceptable trademark use.  (Ex. PX-19 at p. 30.)
> - Paragraph 1.b. in Section 2.2 also instructs that "the words of the mark are not separated by an intervening graphic."  (*Id.*)
> - Paragraph 1.c. additionally requires "that the background is the same behind all of the words in the mark."  (*Id.*)  Further, Paragraph 6 instructs licensees "not to use the words 'U.S. Polo' alone without 'Assn.' or 'Association' following."
> - Paragraph 5 gives the directive that the word "polo" may not be used alone "as a trademark, graphic or icon, and in no case may the word be accentuated giving it prominence." (*Id.* at p. 30.)
> - Paragraph 6 provides an acceptable graphic and directive that the word "polo" may not be used alone "as a trademark, graphic or icon, and in no case may the word be accentuated giving it prominence.  (*Id.* at p. 31.)

> Paragraph 8.i.: The U.S. Polo Assn. is restrained from: "affixing, applying or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending to falsely describe or represent such goods as *originating with defendants, Ralph Lauren or any entity affiliated with any of them*, and from offering such goods in commerce, including specifically, but not limited to, all uses of the singular or composite use of POLO and U.S. POLO in a manner which is likely to cause confusion with defendants, Ralph Lauren or any entity affiliated with any of them.  (PX-15 at ¶ 8.i.) (emphasis supplied)

Brand Rule Book:

- Paragraph 14 of the Brand Rule Book imposes Paragraph 8.i. on licensees by requiring a disclaimer to be prominently displayed on packaging and to include the words "Not affiliated with Polo Ralph Lauren Corp." (Exs. PX-19 at p. 31.)

Paragraph 9.A.: Nothing contained herein shall be construed to prohibit plaintiffs, their respective officers, agents, servants, employees, attorneys and those persons in active concert and participation with any of them from *using the word "polo," not as a trademark or indicator of origin, but solely to describe or refer to the sport of polo*. (PX-15 at ¶ 9.A.) (emphasis supplied)

Brand Rule Book:

- Paragraph 3 in Section 2.2 of the Brand Rule Book provides an acceptable exemplar graphic and identifies that the word "polo" can only be used to "describe the actual sport of polo, affiliated actual events or existing polo clubs." (Ex. PX-19 at p. 30.)
- Paragraph 4 instructs that the licensee may use "tournament titles and club names … exactly as they are registered, and not made up. (*Id.*)

Paragraph 9.C.: Nothing contained herein shall be construed to prevent USPA and USPAP from conducting a *retail licensing program utilizing the USPA collective membership mark (Reg. No. 1,181,651), the USPA horsehead symbol (Reg. No. 1,304,236) or a mounted polo player or equestrian or equine symbol which is distinctive from the PFI polo player symbol in its content and perspective*, provided that such symbol is used in conjunction with trade dress, i.e., labels hangtags and packaging, which *does not utilize white or silver lettering on a blue background or emphasize the word "POLO" by presenting it in a rectangle or between parallel lines or in lettering larger than that of associated words or letters used to identify USPA*, and does not utilize any other trade dress which is likely to cause confusion with defendants, Ralph Lauren or any entity affiliated with any of them. (PX-15 at ¶ 9.C.) (emphasis supplied)

Brand Rule Book:

- Paragraphs 12 and 13 in Section 2.2 of the Brand Rule Book provide acceptable exemplar graphics that do not contain white or silver lettering on a blue background or the word "POLO" in a rectangle or between parallel lines. (Ex. PX-19 at p. 31.)

The U.S. Polo Assn. Parties have applied the above Brand Rule Book provisions to fragrance product that it seeks the right to use in this proceeding. Properties has authorized its U.S. licensee to manufacture and distribute three variations of U.S. Polo Assn. fragrance packaging bearing the Double Horsemen mark for use in connection with the sale of fragrance

(the "U.S. Polo Assn. Fragrance Packages"). (Findings at ¶ 81; Exs. PX-51, 52 and 53.)   The

U.S. Polo Assn. Fragrance Packages comply with the restrictions of the 1984 Order. Each U.S.

Polo Assn. Fragrance Package  complies with the 1984 Order by: (1) using the U.S. Polo Assn.'s

name, as permitted by the 1984 Order, in a way that does not emphasize the word POLO,

separate and apart from the entire name of the U.S. Polo Assn., in a font that is the same size,

color and prominence with adequate spacing using the same background (Paragraph 8.d.); (2)

uses the U.S. Polo Assn.'s name as permitted by the 1984 Order in a way that does not

emphasize the word "polo" as a trademark or indicator of origin, but uses it solely to describe or

refer to the sport of polo (Paragraph 9.A.); (3) using the Double Horsemen trademark which has

been judicially recognized as distinctive in content and perspective from the PRL polo player

symbol; (4) using marks that do not contain white or silver lettering on a blue background or any

trade dress owned by PRL (Paragraph 9.C.); and (5) prominently displaying the words "not

affiliated with Polo Ralph Lauren Corp." (Paragraph 8.i) (Ex. PX-19; Findings at ¶ 82.)[2]

**B.**    **The *Polaroid* Factors Decidedly Tip In Favor Of The U.S. Polo Assn. Parties When Viewed In The Particular And Appropriate Factual Context Of This Case**

Given that the 1984 Order was an application of the Polaroid factors that have been

validated in the marketplace, it is not surprising that Polaroid factors tip decidedly in favor of the

U.S. Polo Assn. Parties in this case. The *Polaroid* test requires consideration of at least the

following factors: (1) the strength of plaintiff's mark; (2) the similarity of plaintiff's and

---

[2]       The initial blue fragrance package adopted by the U.S. Polo Assn. did not violate the 1984 Order. Significantly, this packaging used the identical graphics as one of the approved beige fragrance packages and did not contain white or silver lettering on a blue background as prohibited by Paragraph 9.C. (Ex. PRLX-16; Findings at ¶ 71.) The PRL Parties have not asserted any trade dress rights in the color beige that the U.S. Polo Assn. has adopted for its packaging. The PRL Parties' trade dress claim is limited to the "Polo Blue Trade Dress" which is defined as a "distinctive blue packaging, including the Polo Player Logo, the word "POLO," a thin border in contrasting color, all on a blue background." *See* L'Oreal's Answer and Counterclaims, dated March 2, 2010, at ¶¶ 46-49 (Docket No. 14). Accordingly, since the U.S. Polo Assn. Parties have entered into a stipulation and order indicating that it will no longer use blue as the principal color for fragrance packaging and product, the PRL Parties' trade dress claim as plead is mooted by the Stipulated Order. (See Docket No. 45.)

defendant's marks; (3) the competitive proximity of the products; (4) the likelihood that plaintiff

"will bridge the gap" and offer a service like defendant's; (5) actual confusion between services;

(6) good faith on defendant's part; (7) the quality of defendant's services; and (8) the

sophistication of the buyers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.

1961), *cert. denied*, 368 U.S. 820 (1961).

> **1.    The *Polaroid* Analysis Must Account For A Legitimate
> Sporting Association's Inherent Right To Conduct A Licensing
> Program**

The *Polaroid* factors are not to be mechanically applied and where appropriate, the Court

should acknowledge certain "other factors." *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 384 (2d

Cir. 2005); *see also Elizabeth Taylor Cosmetics Co. v. Annick Goutal*, 673 F. Supp. 1238, 1249

(S.D.N.Y. 1987) (acknowledging that the Court cannot ignore the specific circumstances of the

parties to the dispute and the products in dispute and that, at times, it is "necessary to go beyond

the *Polaroid* factors . . . [and to] repair to the underlying concepts of the Lanham Act in an

effort to promote competition, the appropriate interests of sellers and most significantly

consumers."). Because the U.S. Polo Assn. is the senior user of the U.S. POLO ASSN. service

mark for sporting association services since 1924, this Court should recognize its inherent right

to exploit that mark and other logos that represent the sport of polo in a licensing program.

(Findings at ¶ 4; Cummings Decl. in Opposition to Motion for a Preliminary Injunction, at ¶ 3

(Docket No. 42).); *see Int'l Star Class Yacht Racing Ass'n*, 1995 WL 241875. In *Int'l Star Class

Yacht Racing Ass'n*, the Court considered the rights of the plaintiff yachting association, which

governs Star class yacht racing throughout the world in its common law "Star class" marks, *vis-

a-vis* defendant Tommy Hilfiger, a well known fashion designer who was seeking to exploit

professional sail boat racing imagery for his commercial purposes. 1995 WL 241875. In

applying "other factors" to the traditional *Polaroid* factor analysis, the Court took note of the

plaintiff's status as a sporting association and that although it had much less recognition among consumers than the fashion industry giant Tommy Hilfiger, it should not lose the right to control the licensing of its marks merely because of Hilfiger's desire to appropriate images of the sport by taking advantage of Tommy Hilfiger's far greater consumer recognition. *Id.* at *13. The Court ultimately ruled that the rights of this sporting association were a decisive factor and barred the designer from usurping such images in its marketing. *Id.* Along these lines, the Court further noted that Hilfiger marketed the product line with *"authentic details taken from the sport of competitive sailing" and "elements and patterns taken directly from actual racing sails." Id.* at *3 (emphasis supplied).

Here, the U.S. Polo Assn.'s non-profit status as the legitimate governing body of the sport of polo in the United States is beyond dispute. (Findings at ¶ 3.) The trial testimony of David Cummings establishes that the competitive sport of polo is played today in the United States due to the efforts of the U.S. Polo Assn. as a sporting association. Since its beginnings in 1890, the U.S. Polo Assn. has governed the sport through issuing rules, organizing tournaments, establishing player handicaps and training umpires. (Findings at ¶¶ 1, 6-9, Ex. PX-3-7.) In March of 2008, the United States Olympic Committee recognized the U.S. Polo Assn. as the national governing body of the sport of polo in the United States. (Findings at ¶ 1; Ex. PX-5.) Properties was established to sublicense the U.S. Polo Assn.'s trademarks in order to generate royalties for the sporting association and its activities and to promote the sport of polo. (Findings at ¶¶ 2-3.) In an effort to increase recognition for the sport of polo in the United States, the U.S. Polo Assn. has managed training centers, interscholastic and intercollegiate polo competitions and tournaments and provided magazines, publications, brochures and garments associated with its various activities throughout the country. (Findings at ¶ 10-14, Ex. PX-8-12.)

Significantly, the money Properties raises through its international licensing program is used to support these activities and promote the growth of the sport of polo in the United States. (Findings at ¶ 3.) Since 2000, the cumulative efforts of the U.S. Polo Assn. and Properties have resulted in an increase in association membership from 2,000 to over 3,750 members and from approximately 200 to 257 clubs. (Findings at ¶ 15.)

As the evidence at trial has shown, PRL is trying to achieve a monopoly on polo-related trademarks by investing heavily in advertising, marketing and merchandising calculated to make an association in the consumer's mind between designer Ralph Lauren and polo-related images. PRL's "World of Polo" campaign makes clear that PRL seeks to capitalize on imagery associated with authentic elements of the sport in connection with their trademarks. (Findings at ¶¶ 86 and 88; Ex. PX-94.) In addition to employing Nacho Figueras – a world renowned professional polo player – the recent Big Pony Collection includes bottles and packaging that bear the PRL polo player logo along with the numbers 1, 2, 3 and 4 which are true elements of the sport of polo that directly relate to the four players on a polo team. (Findings at ¶¶ 88-90; Ex. PRLX-32-35; PX-103 Darsses Dep. Designation 82:7-83:10.) The video advertisement for the Big Pony Collection demonstrates that PRL is seeking an association with imagery of the sport by creating a direct relationship between the numbers 1, 2, 3 and 4 that represent the four polo players in a match and its collection of fragrances and associated shirts. (Ex. PX-90.) Specifically, the ad attempts to tie PRL's trademarks to a live polo match by overlaying imagery of actual mounted polo players in uniforms with the numbers 1, 2, 3 and 4 throughout the duration of the ad and then showing spectators wearing corresponding Ralph Lauren fashion with the very same numbers. (*Id.*) The culminating moment of the ad is to tie all of this polo-related imagery to the featured bottles of its new fragrance collection that bear PRL's

trademarks. (*Id.*) Accordingly, PRL is attempting to encroach on the U.S. Polo Assn.'s territory as the governing body of the sport by utilizing trademarks that are closely tied to a polo match.

Unlike in *Int'l Star Class Yacht Racing Ass'n*, the U.S. Polo Assn. has not sought to prevent use of polo images by the designer Ralph Lauren. Rather, the U.S. Polo Assn. is willing to co-exist with PRL in the marketplace as contemplated by the 1984 Order and has done so since 2006 without a likelihood of confusion or any evidence of actual consumer confusion. Not willing to accept co-existence, PRL seeks an injunction that would effectively grant it a monopoly on the use of polo-related trademarks on fragrance packaging. In this circumstance, the U.S. Polo Assn.'s right as a legitimate sporting association to commercially license trademarks relating to its sport, and to prevent the usurpation of those images by a fashion designer, bars the PRL Parties from obtaining the injunction they seek today, just as Judge Sand declined to enter a similar injunction in 1984.

### 2. The Remaining *Polaroid* Factors Tilt Decisively In Favor Of The U.S. Polo Assn. Parties

The evidence of record defines the marketplace reality that the U.S. Polo Assn., uniquely positioned as the recognized representative of the sport of polo, already co-exists in the marketplace with PRL without demonstrable consumer confusion occurring. (Findings at ¶¶ 97-106.) When these specific facts are viewed in tandem with the U.S. Polo Assn.'s status as a legitimate sporting association with a judicially recognized licensing program, the PRL parties are unable to make a showing that consumers are likely to be confused in a manner that is prohibited under the Lanham Act.

a.   No Evidence Of Actual Confusion Has Been Proffered Despite Extensive Worldwide Co-Existence

The evidence from the marketplace weighs conclusively in favor of no likelihood of confusion. While actual consumer confusion is not required for trademark infringement, lack of

actual confusion where the parties have co-existed for extended time periods weighs against a

showing of a likelihood of confusion. *Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F.

Supp. 2d 355, 374 (S.D.N.Y. 2003) (stating "that the parties have had substantial sales without a

single instance of confusion is an indicator of the absence of likelihood of confusion"); *see also*,

*Playtex Products, Inc. v. Georgia-Pacific Inc.,* No. 02-civ-7848(HB), 2003 WL 21939706, at * 6

(S.D.N.Y. Aug. 12, 2003). In *Playtex Products, Inc.*, defendant's product was on the market and

in competition with plaintiff's product for approximately fourteen months. 2003 WL 21939706,

at *6. In granting the defendant's motion for summary judgment, the Court held that no actual

confusion existed where parties' marks had coexisted on the market without any indication from

consumers that they were confused. *Id.*

     The evidence of co-existence in this case is more extensive than in *Playtex Products, Inc.*

Since at least 2006, both PRL and the U.S. Polo Assn. have co-existed in the overall marketplace

by offering collections of products in the sportswear, accessories, tailored and dress clothing,

activewear, home goods and children's apparel categories. (Ex. PX-13.) The evidence in this

case is overwhelming with respect to the renown of the U.S. Polo Assn.'s brand through

widespread sales and marketing. The U.S. Polo Assn. Parties and their licensees have

extensively manufactured, marketed, and sold product collections bearing the marks of the U.S.

Polo Assn., in both domestic and foreign commerce. (Findings at ¶ 35; Ex. PX-13.) The extent

of these efforts have yielded diverse areas of apparel products including: (a) men's and women's

casual sportswear, such as khaki pants, denim, graphic tees, fleece jackets, hoodies, knit and

woven shirts, sweaters, windbreakers, caps, and hats; (b) signature sportswear, such as fashion

trousers, sweaters, and sport shirts; (c) accessories, such as belts, wallets, watches, eyewear, and

purses; (d) tailored and dress clothing, such as suits, blazers, dress shirts, and neckwear; (e)

activewear, such as fleece, jogging suits, warm up jackets, shorts and shoes; (f) home goods; and

(g) children's apparel. (*Id*; *see also* Exs. PX-35 (men's sport shirt), 36 (men's sweater), 37

(men's knit shirt), 38 (ladies' knit shirt), 39 (men's shorts), 40 (men's denim jeans), 41 (men's

swimming shorts) , 42 (men's casual shirt), 44 (ladies' casual long-sleeve shirt), 45 (men's neck

tie) and 46 (watch).)  Products bearing the U.S. Polo Assn.'s trademarks have been marketed and

sold to consumers in over 5,000 independent retail stores throughout the United States, including

major national chains such as Kohl's, J.C. Penney, Sears, Ross, Peebles, Goody's, Dr. J's, and

Stage Stores as well as in fifteen U.S. Polo Assn. outlet stores.  (Findings at ¶ 36.)

The extensive marketing campaigns of the U.S. Polo Assn. Parties and their licensees

have similarly yielded significant sales volumes both in the United States and worldwide.  (Ex.

PX-26.)  Since 2007, wholesale sales of such U.S. Polo Assn. products in the United States have

been approximately $250 million a year, with products available in national chains, such as

Sears.  (Findings at ¶ 47.)

PRL's internet website provides a mechanism for consumers to provide information

regarding product confusion or other complaints.  (Findings at ¶ 104; Ex. PX-47.)  Likewise,

PRL employees also are aware that they need to keep a close watch for counterfeit products and

to bring them to the attention of the legal department in the event such products are found.  (*Id.*

at ¶ 105; Ex. PX-103 Darsses Dep. Designation 153:12-156:5.)  Despite the parties' extensive

co-existence, the PRL Parties have failed to produce any evidence of actual confusion of any of

their consumers.

PRL has argued that the lack of evidence of actual confusion in the apparel and

accessories marketplace is irrelevant because apparel, accessories and fragrances are distinct.

But testimony at trial thoroughly rebuts this claim and shows that both the PRL Parties and the

U.S. Polo Assn. Parties present their clothing, accessories and fragrance products to consumers as belonging to an integrated fashion brand.  (Ex. PX-86; Findings at ¶ 96.)  This practice is typical of companies in the fashion industry.  (Findings at ¶ 93.)  The PRL Parties represent clothing and fragrance lines with the same spokesman; they identify clothing and fragrance products with the same brand names; and they promote both clothing and fragrances with the same advertising and marketing.  (Findings at ¶¶ 92 and 94-96.)  For example, the "Big Pony Collection" refers to both a PRL clothing line and PRL fragrance line.  (Exs. PX-86 and 90.)  Advertisements for the Big Pony Collection fragrances prominently display Big Pony Collection Clothing.  (Ex. PX-90; Findings at ¶ 95.)

Significantly, the U.S. Polo Assn.'s use of the Double Horsemen mark in connection with apparel since the jury's finding of non-infringement in 2006 also demonstrates co-existence in the marketplace with PRL.  (Findings at ¶ 97.)  The reality of the marketplace over the last four years shows that the U.S. Polo Assn.'s clothing and accessories co-exist in the market with Ralph Lauren products without generating any evidence of consumer confusion.  This market reality serves as a reliable indicator of no likelihood of confusion when the same trademarks are used on closely related fragrance products.  Accordingly, this factor weighs heavily in favor of the U.S. Polo Assn. Parties.

        b.      The U.S. Polo Assn. Adopted Fragrance Packaging Bearing The
                  Double Horsemen Mark And Its Name In Good Faith

The evidence presented at trial of the U.S. Polo Assn.'s good faith is overwhelming.  At issue with this factor is whether the U.S. Polo Assn. adopted U.S. POLO ASSN. and the Double Horsemen mark with the intention of capitalizing on PRL's reputation and goodwill and any confusion between these marks and PRL' products.  *Playtex Products, Inc.*, 2003 WL 21939706, at *5.

In 1924, the U.S. Polo Assn. adopted its current name in order to reflect its status as the governing body of the sport in this country, 43 years before designer Ralph Lauren decided to build his brand around trademarks that refer to the sport of polo. (Findings at ¶¶ 4, 17.) This fact speaks for itself.

In 1996, the U.S. Polo Assn. adopted the Double Horsemen symbol after presenting it to PRL's representatives for the purpose of avoiding disputes, and obtaining a verbal agreement from PRL that it would not oppose the U.S. Polo Assn.'s use of the Double Horsemen symbol. (Findings at ¶ 39; Exs. PX-22 and 23.) After the U.S. Polo Assn. made application to the U.S. Patent and Trademark Office (the "USPTO") for trademark registration of the Double Horsemen symbol for clothing, watches and leather goods (Serial No. 75-111,144), the USPTO published it for potential opposition by third parties. At that time, PRL made a conscious decision not to oppose the application during the proscribed opposition period. (Findings at ¶ 40; Exs. PX-25 and 25A.) As a result, the U.S. Polo Assn.'s merchandizing program using the U.S. POLO ASSN. and the Double Horsemen Mark on products was launched in 1998, and was judicially approved after extensive litigation with PRL in 2006. (Findings at ¶¶ 41-44.) The U.S. Polo Assn. decided to use U.S. POLO ASSN. and the Double Horsemen mark on fragrances after using these marks together on clothing and accessories for two years on thousands of products worldwide with no evidence of actual consumer confusion. (Findings at ¶¶ 64-66.) This conduct demonstrates that the U.S. Polo Assn.'s adoption of the Double Horsemen mark represented a good faith effort to use a mark that was distinctive in content and perspective from the PRL polo player trademark, as permitted by the 1984 Order.

Unable to raise any issue of bad faith in the adoption of U.S. POLO ASSN. or the Double Horsemen marks, the PRL Parties focus on the adoption of the color blue for fragrance

packaging.  Before adopting the Double Horsemen mark on fragrance, trade dress in the form of

hangtags and labels utilizing the color blue with gold lettering was created in connection with the

U.S. Polo Assn.'s overall branding and merchandizing program that was recognized by the 1984

Order.  (Findings at ¶ 66.)   The record is clear that PRL monitors the activities of the U.S. Polo

Assn. with respect to its use of hangtags and trade dress and that PRL made an objection to the

U.S. Polo Assn. parties when it had an objection to certain trade dress used by a foreign licensee

of the U.S. Polo Assn. (Findings at ¶ 68.)   PRL has never objected to the U.S. Polo Assn.'s use

of the colors blue and gold on trade dress on apparel and accessories.  (Findings at ¶ 67.)   Thus,

to be consistent with the existing apparel packaging and labels which utilized the Double

Horsemen mark along with the color blue with gold lettering, the U.S. Polo Assn. adopted

similar packaging for fragrance products.  (Findings at ¶ 66.)

     The U.S. Polo Assn. made a business decision to change the color of its fragrance

packaging prior to the PRL Parties' motion for a preliminary injunction.  (Findings at ¶ 76-78.)

In any event, the adoption of the color blue in connection with fragrance product is a non-issue

because the U.S. Polo Assn. is no longer using it and PRL's expert has testified that it was

irrelevant to a confusion analysis in this case.  (Findings at ¶¶ 66, 83 and 129.)  The U.S. Polo

Assn.'s evident good faith in adopting its U.S. POLO ASSN and Double Horsemen marks

weighs heavily in favor of the U.S. Polo Assn. Parties.

c.     The U.S. Polo Assn. Marks Have Been Judicially Recognized As
       Dissimilar From PRL's Marks

     Trademarks are considered similar if they are similar in appearance, sound and meaning.

4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:21 (4th Ed.

2010).  When addressing similarity, the marks should be compared in their entireties.  *Citigroup*

*Inc. v. City Holding Co.*, 171 F. Supp. 2d 333, 347-48 (S.D.N.Y. 2001) (Sweet, J.).

Additionally, the binding precedent regarding the marks at issue in this litigation establish that the marks are in fact dissimilar. The 1984 Order recognized that the U.S. POLO ASSN. mark was distinct from PRL's POLO mark so long as the U.S. Polo Assn. does not use the mark in a way that emphasizes the word "polo" separate and apart from the other elements of the mark. (Ex. PX-15 at ¶ 9C.)  Subsequently, Judge Daniels' 2006 decision, as affirmed by the Second Circuit in 2008,  further recognized that the Double Horsemen mark – the mark at issue in this case – was "distinctive . . . in content and perspective" from the Ralph Lauren polo player mark on apparel, leather goods and watches. *PRL USA Holdings, Inc.*, 2006 WL 1881744.

Here, the word marks at issue are different in appearance, sound and meaning. "U.S. POLO ASSN." looks different from "POLO" and sounds different from "POLO."  The meaning of the marks also differs in that U.S. POLO ASSN. refers to an official sporting association specific to the United States and related to the sport of polo, while PRL uses is mark in a way intended to evoke an association to the fashion designer, Ralph Lauren.  The Double Horsemen mark similarly is different in sight, sound and meaning from the PRL logo.  PRL's polo logo consists of a single horse and rider who are in a static pose, and is used to represent a fashion designer.  In contrast, the Double Horsemen mark is active, referring to and evoking the sport itself by showing two players actively engaged in play.  (Findings at ¶¶ 38; Exs. PX-20 and 21.) Even Leslie Marino's testimony on behalf of L'Oreal indicates that the litigants' marks as a whole are dissimilar; despite her alleged initial momentary confusion when viewing a U.S. Polo Assn. shirt with the Double Horsemen mark by itself, any confusion dissipated in a matter of mere seconds when she read the accompanying "U.S. Polo Assn." logo.  (Findings at ¶ 101.) This judicially-recognized dissimilarity of the marks weighs heavily in favor of the U.S. Polo Assn.

d.    The Fragrance Products Are Not Proximate

This Court has specifically recognized that fragrance products which travel through

different trade channels, such as different tier retail stores, are not proximate. *Elizabeth Taylor*

*Cosmetics Co.*, 673 F. Supp. at 1246.  This Court has further recognized that confusion is less

likely where there is a significant price differential between offered products. *See, e.g., Estee*

*Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511-12 (2d Cir. 1997) (reversing finding of

likelihood of confusion and granting of preliminary injunction because district court failed to

give sufficient weight to the fact that the senior user's moisturizer "cost $32.50 for less than two

ounces . . . and [the junior user's moisturizer] cost a small fraction of that price for 10 or 20

times that quantity"); *Louis Vuitton Mallietier v. Burlington Coat Factory Warehouse Corp.*, No.

04-civ-2644 (RMB), 2006 WL 1424381, at *6 (S.D.N.Y. 2006); *Paco Sport, Ltd. v. Paco*

*Rabanne Parfums*, 86 F. Supp. 2d 305, 317 (S.D.N.Y. 2000).

The record at trial is clear that PRL and U.S. Polo Assn. products are sold in different tier

retail stores and at different price points.  U.S. Polo Assn. fragrance products have been and are

intended to be sold primarily in mid-tier stores at a price point of approximately $24.99.

(Findings at ¶¶ 48 and 52.)  The average retail price for PRL fragrances with the polo player logo

is between $50.00 and $70.00 and for the most part these products are sold in high-end

department stores such as Bloomingdales and Saks.  (*Id.* at ¶¶ 50 and 53.)   Significantly, both

L'Oreal and PRL consciously avoid selling their products with the polo player logo in mid-tier

stores, which is the U.S. Polo Assn.'s intended market.  (*Id.* at ¶ 51.)  The U.S. Polo Assn.'s style

and clientele is also distinguishable from the PRL brand which in contrast portrays a high-end,

elitist and non-approachable atmosphere based on the luxury aspect of a polo lifestyle rather than

the key elements of polo as a competitive sport.  (*Id.* at ¶¶ 54-56.)  This fact is evident from

PRL's advertisements for the Big Pony Collection which depict a luxurious lifestyle that is not

24

akin to a true polo match.  (*Id.* at ¶ 55; Ex. PX-90).  As a result, the products are not proximate

and this factor weighs in favor of the U.S. Polo Assn.

> e.        The PRL Parties Will Not Bridge The Gap Into The Mid-Tier

Whether PRL will bridge the gap between the parties' goods relates to the "senior user's

interest in preserving avenues of expansion and entering into related fields." *Hormel Foods

Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996).

Since the trial record further indicates that no PRL polo player branded products are

intentionally destined for the mid-tier, the PRL Parties will not bridge the gap and offer these

products in the mid-tier.  (Findings at ¶ 51.)  Thus, to the extent this factor is applicable, it also

weighs in favor of the U.S. Polo Assn. and against a finding of a likelihood of confusion.

> f.        No Evidence Has Been Presented Regarding The Quality Of The
>           U.S. Polo Assn. Fragrance Product

The PRL Parties' lack of diligence with respect to the *Polaroid* factor concerning quality

does not support a likelihood of confusion.  With regard to the quality of the U.S. Polo Assn.

fragrance product, both PRL and L'Oreal failed to analyze the offered fragrance product.

(Findings at ¶ 75.)  However, Negar Darsses, Vice President of Brand Management for PRL

stated that she believed the packaging of the U.S. Polo Assn. fragrance product released in

November of 2009 was of high quality.  (*Id.*; Exs. PRLX-16 and PX-103; Darsses Dep.

Designation 194:7-195:7.)  The record establishes that at least PRL was in possession of the

U.S. Polo Assn. product during the discovery period of this case but that the PRL Parties made a

conscious decision to refrain from performing any physical testing on the product.  Accordingly,

this factor weighs in favor of the U.S. Polo Assn.

      g.      Fragrance Consumers Are Sophisticated And Can Readily
Distinguish U.S. Polo Assn. And PRL Fragrances Based Upon
Price-points And Channels of Distribution.

"The more sophisticated the purchaser, the less likely he or she will be confused by the

presence of similar marks in the marketplace." *V & S Vin & Sprit Aktiebolag v. Absolute*

*Publishing USA Inc.,* No. 05-civ-4429 (RMB)(RLE), 2006 WL 197001, at *6 (S.D.N.Y. 2006).

Likewise, Courts of this Circuit have further recognized that the sophistication of fragrance

purchasers in particular enables them to distinguish between different brands under normal

market condition and sold at different price points. *Estee Lauder Inc.*, 108 F.3d at 1511-12

(holding there is "no support for a finding that an appreciable number of ordinarily prudent

consumers would likely think that Lauder, whose product costs $32.50 for less than two ounces

in an upscale store, is the source of products that at Old Navy cost a small fraction of that price

for 10 or 20 times that quantity"); *Eli Lilly and Co. v. Revlon, Inc.*, 577 F. Supp. 477, 485

(S.D.N.Y. 1983) (Sweet, J.).

      The PRL Parties have put forth no evidence to establish that consumers of fragrance

products are unsophisticated. Essentially, the PRL Parties effectively concede this point

especially in light of the significant distance in competitive proximity. This is not unexpected

given case law that recognizes it is the sophistication of fragrance purchasers in particular that

enables them to distinguish between different brands under normal market conditions when they

are sold at different price points. *Estee Lauder Inc.,* 108 F.3d at 1511-12. Accordingly, the

sophistication factor weighs in favor of the U.S. Polo Assn.

      h.      The Strength Of PRL's Marks Must Be Balanced In Connection
With The U.S. Polo Assn.'s Judicially Recognized Licensing
Program And Independent Consumer Recognition.

      This Court has recognized that the presence of a well-recognized brand on products "goes

far to eliminate confusion of origin." *Orb Factory Ltd. v. Design Science Toys, Ltd.*, No. 96-civ-

9469(RWS), 1999 WL 191527, at *8 (S.D.N.Y. Apr. 7, 1999) (Sweet, J.). In the context of competing products, where both have a high degree of renown, the renown of the defendant's mark serves to reduce a likelihood of confusion under the overall *Polaroid* analysis, unless the marks are "essentially identical." *Bachellerie v. Z. Cavaricci, Inc.*, 762 F. Supp. 1070, 1078 (S.D.N.Y. 1991) (Sweet, J.) (stating in competing jean manufacturer case that "[i]n several cases the Second Circuit has held that defendant's use of its own well-known mark would ensure that the goods at issue would be associated with the defendant and not with plaintiff" and finding that because defendant's goods bore defendant's mark, a finding of dissimilarity is disallowed only when the marks are "essentially identical"); *Pristine Industries v. Hallmark Cards, Inc.*, 753 F. Supp. 140, 145 (S.D.N.Y. 1990) (Sweet, J.) ("In several cases the Second Circuit has held that defendant's use of is own well-known mark would ensure that the goods at issue would be associated with the defendant and not with plaintiff.").

As discussed in detail in Section. B.2.a, the renown of the U.S. Polo Assn.'s brand using the U.S. POLO ASSN. and Double Horsemen marks is enormous due to widespread worldwide sales and marketing. The U.S. Polo Assn. Parties' goods, like PRL goods, are available nationwide in major department store chains such as Sears and the U.S. Polo Assn. Parties have enjoyed wholesale domestic sales of approximately $250 million for years. (Findings at ¶¶ 36, 47.) As a result, the U.S. Polo Assn. was recognized by a leading apparel industry trade magazine as one of 50 top "Mega Brands" in the United States. (Findings at ¶ 46; PX-27.) Moreover, as discussed in Section B.2.c, the PRL single polo player marks and the U.S. POLO ASSN. and Double Horsemen marks are clearly not identical and are in fact dissimilar. Accordingly, due to the independent consumer recognition of the U.S. Polo Assn. brand, and the dissimilarity of the marks, this factor weighs in favor of the U.S. Polo Assn. Parties.

i.   A Balancing Of The *Polaroid* Factors Confirms That The PRL
Parties Are Unable To Succeed On The Merits Of Their Claim

When balancing the *Polaroid* factors, district courts "generally should not treat any single

factor as dispositive; nor should a court treat the inquiry as a process by which the party with the

greatest number of factors wins." *V & S Vin & Sprit Aktiebolag*, 2006 WL 197001, at *6.

Instead, the court "should focus on the ultimate question of whether consumers are likely to be

confused." *Playtex*, 2003 WL 21939706, at *2.  Here, each traditional factor supports a finding

of no likelihood of confusion, while "other factors" appropriate to consider in a dispute between

a fashion designer and sporting association over the right of the association to conduct a

judicially approved licensing program weigh heavily in favor of the U.S. Polo Assn.

Accordingly, the PRL Parties cannot establish success on the merits as there is no likelihood of

confusion with respect to both Lanham Act and common law trademark infringement claims.

*SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 443 (S.D.N.Y. 2007)

(dismissing common law trademark infringement claims where Lanham Act claim failed and

noting "the standard for federal mark infringement ... is virtually identical to that under New

York common law, because 'both require a showing that the public is likely to confuse the

defendant's product or service with that of the plaintiff'") (quoting *Allied Maint. Corp. v. Allied

Mech. Trades, Inc.*, 42 N.Y.2d 538, 543, 369 N.E.2d 1162 (1977)).

###### 3.      Properly Controlled And Unbiased Market Surveys Further Indicate No Likelihood Of Confusion

Stripped to its essentials, the PRL Parties' entirely likelihood of confusion case rests on the two defective surveys submitted by Mr. Mantis. As Dr. Helfgott testified, survey confusion does not demonstrate "actual confusion" and rather tests for an association made between the respondent and the test subject. (Findings at ¶ 146.); *see also* 6 McCarthy, at § 32:184 (4th Ed. 2010) ("Surveys do not measure the degree of actual confusion by real consumers making mistaken purchases. Rather, surveys create an experimental environment from which we can get useful data from which to make informed inferences about the likelihood that actual confusion will take place.") Accordingly, because survey confusion does not have all the ingredients of actual confusion, it cannot serve as a substitute for clear evidence from the marketplace. (Findings at ¶ 146.) Here, the overwhelming evidence in the case indicates that the market shows no actual confusion. The PRL Parties cannot rebut such strong marketplace evidence with a highly defective survey.

######     a.      The U.S. Polo Assn.'s Controls Comport With The Controlling Standards While The PRL Parties' Control Misses The Mark

A likelihood of confusion survey must include surveys of the product being tested and of a control product. The percentage of confusion responses in the control survey must be subtracted from the percentage of confusion responses in the test survey in order to obtain a measurement of "net confusion" which may be considered in a likelihood of confusion analysis. *See* 6 McCarthy, at § 32:187. "Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240-41 (S.D.N.Y. 2010) (holding survey was not a reliable indicator of consumer confusion where control "lacked other key unprotectable elements of the test shirts, such as a descriptive term" and as a result

"respondents were less likely to pick the control shirt or give a response that [the expert] would code as confusion") (citing 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:187 (2008)); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC.*, 447 F. Supp. 2d 266, 280–81 (S.D.N.Y. 2006), *judgment aff'd*, 247 Fed. Appx. 232 (2d Cir. 2007) (criticizing control "Lifetime Fitness" where "the survey does not adequately distinguish between [survey] respondents confused because of the name, and those confused because the two facilitates appear to offer a similar service, that is, 24-hour access"); *Simon Prop. Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1045–48 (S.D. Ind. 2000) (noting that control flaw "provides another independent reason for excluding" the survey); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574-75 (E.D.N.Y. 1999) (rejecting survey as unreliable, in part because the controls did not use names similar to plaintiff's product and failed to account for legally irrelevant causes of potential confusion).

The parties agree that a proper control in a likelihood of confusion survey must "share[ ] as many characteristics with the experimental stimulus as possible, *with the key exception of the characteristic whose influence is being assessed.*" *THOIP,* 690 F. Supp. 2d at 240 (S.D.N.Y. 2010) (emphasis supplied) (*citing* Shari Seidman Diamond, Reference Guide on Survey Research, in Reference Manual On Scientific Evidence 229, 258 (Federal Judicial Center 2d ed. 2000) (Ex. PX-68). The purpose of having a control that shares "many characteristics with the experimental stimulus" is to identify and eliminate from "net confusion," the features of the challenged product that are legally permitted and therefore irrelevant to claims of trademark infringement. *Cumberland Packing Corp.*, 32 F. Supp. 2d at 574-75; *THOIP*, 690 F. Supp. 2d at 240; *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999) (the court found that the Trident gum control failed to establish evidence of actual confusion because it failed to

"capture the essence of the allegedly confusing quality at issue," in that case, "ice" as connected

to chewing gum); *see also 24 Hour Fitness USA, Inc.*, 447 F. Supp. 2d at 280; 6 McCarthy, at §

32:187 ("The control question or questions should use a mark similar enough to the actual mark

that it provides an accurate measure of the confusion created by the accused mark, not by some

other similarity.") (*citing 24 Hour Fitness USA, Inc.*, 447 F. Supp. 2d at 280).

Only Dr. Helfgott's survey applied recognized standard for the selection of a valid

control.

### (1)   The Mustang Grille Control Was Fatally Flawed

Two fatal flaws are present with respect to the Mustang Grille control used by Mr.

Mantis: (i) the control utilized a famous mark and could not function to subtract survey noise;

and (ii) the control did not screen for permitted references to the sport of polo by the U.S. Polo

Assn. trademarks.

### (a)   The Mustang Grille Control Did Not Function As A Proper Control

Mr. Mantis selected as a control a metallic blue container that features a chrome

depiction of the Ford "Mustang" trademark housed within a replica of a chrome automotive

grille (the "Mustang Grille"). (Findings at ¶112; Exs. PRLX-20 and PX-101.) The Mustang

Grille control presented a famous trademark – the Ford Mustang logo – in a manner that clearly

evoked an automobile. And if any survey respondent did not recognize the famous Mustang

logo, the Mustang Grille packaging stated that Mustang is a trademark of the Ford Motor

Company.

The use of a control with a name that is more well-known than the test cells at issue is a

severe flaw in the survey. *Citizens Banking Corp. v. Citizens Fin. Group, Inc.*, No. 07-11514,

2008 WL 1995104 (E.D. Mich. May 6, 2008), aff'd, 320 Fed. Appx. 341 (6th Cir. 2009). In

31

*Citizens Banking Corp.,* the Court found a likelihood of confusion study severely flawed when

"Chase Bank" was selected as a control of the a "Citizens" mark. *Citizens Banking*, 2008 WL

1995104, at *10. Testimony offered in *Citizens Banking Corp.* established that "Chase [held] a

five times larger share of market deposits in this region than Plaintiff" and that the expert

acknowledged "that one would not want 'the 800 pound gorilla' – a bank whose market share

and name recognition exceeded the Plaintiff's – as the survey's control." *Id.* Ultimately, the

*Citizens Banking* Court severely criticized the control selection as the most significant flaw and

afforded minimal weight to the associated likelihood of confusion survey that was proffered by

the trademark infringement plaintiff. *Id.*

  The survey of Mr. Mantis is similarly flawed. Mr. Mantis' second survey, his only

survey that tests products still at issue in this case, demonstrated the fame of Ford Motor

Companies MUSTANG trademark.   Respondents associated the Mustang Grille stimulus with

"Ford," "Mustang" or other automobile references with a frequency of 64%. (Findings at ¶ 118;

Ex. PRLX-9 at A 99-126.) Using such a famous control effectively reduces the sample size of

the control pool, because respondents who correctly associate the Mustang Grille with Ford,

Mustang or automobiles, will not associate it with Ralph Lauren. In Mr. Mantis' second survey,

reducing the purported control group (117 respondents) by individuals who recognized the

association between the Mustang Grille and automobiles (75 respondents) resulted in a revised

control group of 42 respondents. Mr. Mantis can not and does not suggest that a 42 person

control group is statistically viable as it accounts for less than 25% of each test cell's group of

approximately 200 respondents. 6 McCarthy, at § 32:171 (noting that "[c]onducting a survey

with a number of respondents too small to justify a reasonable extrapolation to the target group at

large will lessen the weight of the survey.") As a result of the fame of the Mustang trademark,

the Mustang Grille package could not and did not function as an appropriate control in this case, and the conclusions of Mr. Mantis stemming from the use of this control should be given no evidentiary weight.

> (b)   The Mustang Grille Control Failed To Screen For
>        Permitted References To The Sport Of Polo

The Mustang Grille control was also fatally flawed because it did not screen for confusion responses based on legally permitted features of the U.S. Polo Assn. fragrance products. The U.S. Polo Assn. is permitted to use trademarks that refer to the sport of polo. (Ex. PX-15 at ¶ 9.C.); *PRL USA Holdings, Inc.*, 520 F.3d 109. A proper control in this case must make reference to the sport of polo or the word "polo" in order to determine the appropriate level of confusion responses stemming from permitted references to the sport of polo in U.S. Polo Assn. trademarks. *See 24 Hour Fitness USA, Inc.*, 447 F. Supp. 2d at 280 (holding a control must screen for confusion responses arising from element of gym name that refers to gym being open 24 hours, because no gym has the exclusive right to state that it is open 24 hours).

Ignoring the legal context in which this case arises, Mr. Mantis intentionally selected a control that did not refer to the sport of polo. (Ex. PRLX-20; Findings at ¶¶ 121-122.) Mr. Mantis was apparently shielded from the 1984 Order and associated legal precedent annexed to Plaintiffs' declaratory judgment complaint. (Findings at ¶¶ 124.) Mr. Mantis was unaware that the 1984 Order expressly permitted the U.S. Polo Assn. to utilize *inter alia*, "the USPA horsehead symbol (Reg. No. 1,304,236) or a mounted polo player or equestrian or equine symbol which is distinctive from the PFI polo player symbol in content and perspective ...." (Exs. PX-15 at 9.C. and PX-17.) Mr. Mantis was also unaware that that the 1984 Order permitted the U.S. Polo Assn. to use its name. (Findings at ¶¶ 124-125, Ex. PX-15 at 8.d.)

Although Mr. Mantis acknowledged Dr. Diamond's teachings that the control must "share[ ] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed," Mr. Mantis could not identify any significant shared characteristics between the Mustang Grille and the U.S. Polo Assn. products at issue.

The only actual similarity that Mr. Mantis could identify between the Mustang Grille and the products at issue is that both portray a horse. (PRLX-20; Findings at ¶ 122.) But the U.S. Polo Assn. packaging portrays two horses mounted by polo players and clearly engaged in the sport of polo while the Mustang Grille portrays an unmounted mustang galloping free. (Exs. PRLX-20; PX-51-53.)

Straining credibility, Mr. Mantis also contends that a second shared characteristic of the Mustang Grille and the U.S. Polo Assn. fragrances is that they both contain "disclaimers." (Findings at ¶ 123; PRLX-20.) The U.S. Polo Assn. packaging states: "Not affiliated with Polo Ralph Lauren Corp." (Exs. PX-51-53.) It is a statement asserting a lack of affiliation and therefore is a disclaimer. The Mustang Grille packaging states: Mustang is a trademark owned and licensed by Ford Motor Company. (Ex. PRLX-20.) It is a statement asserting an affiliation and therefore is not a disclaimer.

The Mustang Grille control is flawed in the same way that the control criticized in *24 Hour Fitness USA, Inc.*, which involved an action to enjoin use of the mark 24/7 FITNESS brought by the owner of the 24 HOUR FITNESS trademark. *24 Hour Fitness USA, Inc.*, 447 F. Supp. 2d at 280. The court reduced the probative value given to a survey presented by plaintiff which used "Lifetime Fitness" as a control and found survey evidence inconclusive with respect to whether consumers were likely to be confused. *Id.* at 281-82. The court found that the control

should have referred to a fitness facility that advertised that it was open 24 hours a day, such as

"The 24 Hour Gym" or "All Day Gym." *Id.* at 280. No gym has the exclusive right to identify

itself as open for 24 hours. Therefore, the court found, a control must identify, and eliminate

from the "net confusion" tally, any confusion responses arising from the defendant's permitted

reference to the fact that its facility is open 24 hours a day. *Id.* at 280. In this case, the PRL

Parties do not have an exclusive right to use trademarks that refer to or depict the sport of polo.

The Mustang Grille cannot function as a proper control because it does not identify, and

eliminate from the "net confusion" tally, any confusion responses arising from the U.S. Polo

Assn.'s permitted references to the sport of polo.

Mr. Mantis rejected the possibility of using as a control a trademark approved for use by

the U.S. Polo Assn. under the 1984 Order, such as the U.S. Polo Assn.'s horsehead trademark

(Reg. No. 1,304,236)[3] (the "Horsehead Trademark"). To support his position, Mr. Mantis

pointed to language in Dr. Diamond's treatise which cautions against using a "control stimulus in

a case of alleged trademark infringement [that] is itself a likely source of consumer confusion."

(Findings at ¶ 138; PX-68 at 258.) Mr. Mantis testified that the U.S. Polo Assn.'s Horsehead

Trademark is too "infringing" to function as a proper control in this case. But no where does Dr.

Diamond suggest that where a Court as already determined that a trademark is not likely to cause

consumer confusion, and therefore not infringing, the expert can substitute his judgment for the

Court's, and offer an untested conclusion of infringement that is contrary to a Court judgment.

Mr. Mantis effectively admitted that he did not contemplate using a control containing

trademarks that made reference to the sport of polo because he designed his survey to test

whether the U.S. Polo Assn. had the right to use trademarks that make reference to the sport of

---

[3]        The U.S. Polo Assn. has a valid federal registration (Reg. No. 2,629,444) for use of the horsehead mark on
apparel that is identical to the horsehead logo approved in the 1984 Order.  (Findings at ¶ 139; Ex. PX-17A.)

polo. (Findings at ¶ 121.) By selecting a control in this manner, Mr. Mantis designed a survey intended to support the PRL Parties' claim to a monopoly to the use of polo-related trademarks on fragrance products. But the right of the U.S. Polo Assn. to license polo-related trademarks has been established by controlling authority in this Circuit, and Mr. Mantis has no authority to revoke this right. Starting with the legally invalid premise that the right of the U.S. Polo Assn. to conduct a licensing program is "in dispute", Mr. Mantis selected the Mustang Grille control that shared no essential features with the U.S. Polo Assn. products at issue and therefore was fatally flawed. The resulting survey conducted by Mr. Mantis cannot and does not contribute any measurement of likelihood of consumer confusion with respect the U.S Polo Assn. fragrance products at issue.

        (2)     The U.S. Polo Assn. Parties' Two Controls Functioned As Proper Controls

            (a)     The Horsehead Control Followed The Letter Of Professor Diamond's Teachings

Dr. Helfgott designed a survey using the Horsehead Trademark to create a control which followed the letter of Dr. Diamond's teachings on control selection, because it shared "as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." *THOIP*, 690 F. Supp. 2d at 240-41 (Diamond, Reference Guide on Survey Research, at 258). Dr. Helfgott did not exercise independent judgment on the question of whether the U.S. Polo Assn. has the right to commercially license polo-related trademarks. Rather, in constructing a control, he relied on the 1984 Order's holding that the U.S. Polo Assn. was permitted to commercially license its trademarks and its identification of trademarks that the U.S. Polo Assn. was permitted to use. (Ex. PX-15 at ¶ 9.C.) Dr. Helfgott's Horsehead Trademark control packaging was virtually identical to the U.S. Polo Assn. fragrance packaging that he was testing. (Ex. PX- 51-54.) The only substantive difference

between the control and test packaging was that he removed the Double Horsemen logo, which

has not yet been approved for use on fragrance products, and replaced it with the U.S. Polo Assn.

Horsehead Trademark that was specifically sanctioned in the 1984 Order. (Findings 136.; Exs.

PX-54 and 15 at 9.C.) All features of Dr. Helfgott's Horsehead Trademark control packaging

have been judicially determined as non-infringing under the 1984 Order. (Findings at ¶ 136; PX-

15 at 8.d. and 9.C.) Dr. Helfgott also selected the U.S. Polo Assn. Horsehead Trademark for his

control packaging because this trademark had been used as a control in a survey accepted into

evidence in prior litigation between the parties. (Findings at ¶ 136; PX-57.)

In accordance with Dr. Diamond's instructions, Dr. Helfgott designed the Horsehead

Control to isolate the effect on consumers of the use of the Double Horsemen on fragrance

products, the only issue in this case that has not yet been judicially determined. His survey

results show that the Double Horsemen generates no "net confusion" on U.S. Polo Assn.

fragrance products and therefore is not likely to cause consumer confusion. (Findings at ¶ 147;

PX-48 at 12-14.)

        (b)    The Beverly Hills Polo Club Fragrance Control
               Functioned As A Proper Control

Dr. Helfgott adopted a second control intended to measure the benchmark level of

confusion generated by products in the marketplace whose marks also contain references to the

sport of polo. (Findings at ¶ 142-143, Ex. PX-55.) Dr. Helfgott selected as this control the

fragrance products of the Beverly Hills Polo Club, a company that PRL permits to sell fragrance

products depicting polo related trademarks, based upon a settlement agreement. (Findings at ¶

142.)

Given the substantial investment that PRL has made in advertising and promoting an

association between Ralph Lauren and the sport of polo, it is not surprising that some

respondents in a survey context will associate Ralph Lauren with any polo-related trademark. But just because a survey respondent makes an association between Ralph Lauren and a polo-related trademark in a survey setting, it does not mean that the consumer will be actually confused when encountering this product in the marketplace. 6 McCarthy, at § 32:184. In the context of this case, a proper control must screen for and eliminate confusion responses based merely upon a respondent's association of Ralph Lauren with the sport of polo, because the U.S. Polo Assn. has a judicially recognized right to use polo-related imagery.

Dr. Helfgott selected Beverly Hills Polo Club packaging as a second control because this product was an actual product on the market based upon a settlement agreed in 1985 litigation between PRL and the Beverly Hills Polo Club, Inc. The PRL Parties offered no evidence that the Beverly Hills Polo Club fragrance products have resulted in unfair competitive harm to the PRL Parties fragrance products. Dr. Helfgott's testing of the Beverly Hills Polo Club control provided an independent measure of the acceptable level of "confusion responses" that may be expected in a survey involving trademarks that depict or refer to the sport of polo. (Findings at ¶¶ 143-146.)

Additionally, the Beverly Hills Polo Club product is a more appropriate control than the Mustang Grille because it is commercially available and more similar to the test packages as it makes reference to the sport of polo. *See ConAgra, Inc. v. George A. Hormel & Co.*, 784 F. Supp. 700, 730-31 (D. Neb. 1992) (noting that ConAgra's use of LIGHT BALANCE as a control was not a good control because it did not control either for the words HEALTHY, HEALTH or for the color green; product on market named Healthy Recipes was a more effective control and shared more features in common). Mr. Mantis also rejected using Beverly Hills Polo Club product as a control because it depicts and contains reference to the sport of polo. (Findings at ¶

121.) Again, Mr. Mantis assumed, contrary to law, that the PRL Parties may have a monopoly on polo-related trademarks and that third parties may only use such trademarks where permitted to do so by the PRL Parties.

Using the Beverly Hills Polo Club fragrance product to screen for and deduct from "net confusion" the confusion responses attributable to an association between Ralph Lauren and the sport of polo, Dr. Helfgott again found the U.S. Polo Assn. fragrance products at issue generate no net confusion.  (Findings at ¶ 147; PX-48 at 12-14.)

> (c)    There Is No 20% Rule For A Control And No Basis
>         For Adopting Such A Rule

The PRL Parties further assert, without authority, that a control that results in confusion responses in excess of 20% can never be used.  To the contrary, surveys using controls that have generated confusion responses of over 20% confusion have been used and accepted, and there is no support to claim that control results over 20% confusion responses should be excluded as a matter of law.  *See, e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,* 618 F.3d 1025, 1036 (9th Cir. 2010) (utilized control group demonstrated 43% noise in likelihood of confusion survey); *Reed-Union Corp. v. Turtle Wax,* 77 F.3d 909, 912 (7th Cir. 1996) (affirming finding of no infringement where survey found 25% rate of confusion between competing products but control survey found "noise" of 20%); *Edison Bros. Stores, Inc. v. Cosmair, Inc.,* 651 F. Supp. 1547 (S.D.N.Y. 1987) (deducting "noise" of 24.5% to arrive at actual confusion figure, which was found not determinative because of flaws in the survey unrelated to selection of control).

The article by Dr. Jacob Jacoby that the PRL Parties rely upon as sole support for their proposed 20 percent rule does not contain this rule and rather indicates that "there are times when a control will yield estimates of confusion (or deception) that exceed 10%. Thus, it is

important not to lose sight of the fact that, the question of desirability aside, the more important consideration is whether when the control estimate is subtracted from the test estimate, the "net" exceeds 15% (or whatever value the court believes is appropriate)." Jacob Jacoby, "Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys," 92 Trademark Reporter 890, 931-32, n.68 (2002).

The PRL Parties' attempt to establish an absolute rule stating that controls can generate no more than 20% confusion response is in fact a thinly veiled effort to establish a judicially enforced monopoly with respect to trademarks that refer to the sport of polo. Through extensive advertising and merchandising intended to create a strong association in the minds of consumers between the sport of polo and Ralph Lauren, PRL has increased the possibility that in an artificial survey context, respondents will make an association between polo-related trademarks and Ralph Lauren. But confusion responses in a survey at best measure associations not actual market confusion. (Findings at ¶ 146.) In this case, as the evidence of the marketplace has shown, the association that survey respondents make between the sport of polo and Ralph Lauren measured in surveys has not translated into evidence of actual confusion in the marketplace.

A proper control measures legally permitted conduct, regardless of the level of confusion responses generated by that legally permitted conduct. The 20 percent rule advocated by the PRL Parties would interfere with the ability of controls to perform their recognized purpose of screening out confusion responses based upon legally permitted features of a trademark.

Dr. Helfgott's survey, which followed legally recognized principles in control selection, demonstrates that the use of the Double Horsemen mark on U.S. Polo Assn. fragrance products does not generate a likelihood of consumer confusion. Mr. Mantis' survey, which disregards established principals of control selection, has no evidentiary value.

b.    Survey Questions Must Be Directed To The Proper Universe And
Non-Leading In Nature

Mr. Mantis' survey was also flawed because he ignored crucial product pricing and failed

to approximate the proper universe. It is axiomatic that "in a traditional case claiming 'forward'

confusion . . . the proper universe to survey is the potential buyers of the junior user's goods or

services." 6 McCarthy, at § 32:159 (*citing Hutchinson v. Essence Commc'ns, Inc.*, 769 F. Supp.

541, 559-60 (S.D.N.Y. 1991) (holding survey of only potential users of the senior user's product

was improper and stating "[i]t is well-settled in this circuit that the universe of the survey must

include potential purchasers of the junior user's product"); *see also Paco Sport, Ltd.*, 86 F. Supp.

2d at 322-23. District Courts in other jurisdictions have held that pricing information beyond the

scope of the junior user's price points have created a situation in which the selected universe was

overbroad. *Roederer v. J. Garcia Carrión, S.A.*, No. 06-213 (JNE/SRN), 2010 WL 3200034, at

*31 (Aug. 10, 2010 D. Minn.); *see also Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502

F.3d 504, 518 (6th Cir. 2007).

Mr. Mantis omitted key pricing information concerning the U.S. Polo Assn.'s product

and, consequently, his surveys do not utilize an appropriate survey universe. (Findings at ¶¶

109-110.) The trial record indicates that the retail price for the production run of U.S. Polo Assn.

fragrance was $24.99. (Findings at ¶ 52.) The average retail price for PRL fragrances with the

polo player logo is between $50.00 and $70.00 depending on the bottle size. (Findings at ¶ 53.)

Due to the significant price point disparity between the senior and junior user, the Mantis Survey

is flawed and his survey should be afforded little weight in that it includes potential consumers of

men's fragrance products beyond the price point of the U.S. Polo Assn.'s product. In contrast,

Dr. Helfgott's survey universe was appropriately limited to the potential purchasers of the junior

user's product in that he screened for price in the range of $20.00 to $30.00 – the exact price

point of the U.S. Polo Assn. Product.   (Findings at ¶ 132.)  Dr. Helfgott's survey correctly

reflects that marketplace reality and therefore includes the correct universe.  *See, e.g., Leelanau*

*Wine Cellars, Ltd.,* 502 F.3d at 518 (6th Cir. 2007).

Mr. Mantis' survey also utilized an impermissible leading question that further detracts

from the reliability of the overall confusion assessment.  Question One stated: "Who or what

*individual*, company, or organization do you think makes or puts out this product?" (Ex. PRLX-9

at 5 (emphasis supplied).)  At least one district court has held that a question providing the origin

of a "company or store" where the defendant was an "individual" was an improper leading

question.  *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008).  The survey

results obtained by Mr. Mantis further support this conclusion and identify 81.6% of the total

confusion responses to test cell samples as obtained in connection with Question 1, a leading

question.  (Ex. PRLX-9 at 11-12 and PRLX-10 at 3.)  86.5% of those purportedly confused

respondents identified Ralph Lauren as the *individual,* company, or organization that made or put

out the product.  (Ex. PRLX-9 at 11-12 and PRLX-10 at 3 (emphasis supplied).)  Accordingly,

Mr. Mantis' survey should be afforded little weight as it introduces bias towards the selection of

Ralph Lauren – an individual not a party to this suit – to survey respondents.

By contrast, Dr. Helfgott's origin/source question number one was appropriately

balanced and non-biased.  It asked: "What organization do you think puts out this product, or

don't you know?" (Ex. PX-48 at 8.)  As testified to at trial by Dr. Helfgott, the American

Heritage College Dictionary (3d ed. 2000) defines "organization" as, among other things, a

"structure through which individuals cooperate systematically to conduct business."  (Findings at

¶ 135; Ex. PX-50A.)  Accordingly, the single word "organization" would provide the survey

respondents with the ability to identify and consider a company or corporation like PRL as

included within the concept of "organization" and this question was properly balanced.

      c.     Dr. Helfgott's Survey Appropriately Approximated Market
           Conditions By Allowing Respondents To View The Product
           During The Administration Of The Questionnaire

The PRL Parties criticize Dr. Helgott's survey as a "reading test" because the tested

product was left in the presence of the respondent during the interview.  With respect to the

actual administration of the survey, Courts have recognized that "the closer the survey context

comes to marketplace conditions, the greater weight it has." *ConAgra, Inc.*, 784 F. Supp. at 734

(*quoting* McCarthy, at § 32:48 at 771).  Additionally, this very Court has held that purchasers of

cosmetics and fragrances are likely sophisticated consumers who are accustomed to

distinguishing between products at different price points and lines of distribution, and to be

conscious of such distinctions. *See, e.g., Eli Lilly and Co.*, 577 F. Supp. at 485.

In the present case, Dr. Helfgott's survey administration which included keeping the

actual product on the table during the survey was appropriate and adequately replicated

marketplace conditions.  Significantly, in retail stores such as the ones in which U.S. Polo Assn.

fragrances will be sold, the sales person does not show the product to the customer and then

remove it.  Rather, the product is on a shelf or counter, where consumers may handle it and view

it as long as they desire.  The PRL Parties provide no legal support nor any evidence in the case

of Dr. Helfgott's survey that there is any impropriety in allowing a respondent to view a

fragrance product and packaging while being questioned about it.

      d.     The Delegation Of Coding And Tabulation To A Professional
           Survey Firm Is Entirely Appropriate

District Courts have permitted survey experts to rely on data coded and tabulated by staff

of survey firms in forming expert opinions. *See, e.g., Edge Wireless, LLC v. U.S. Cellular Corp.*,

Case No. Civ. 03-1362-AA, 2004 WL 1661992 at *7 (D. Or. Jul. 23, 2004) (holding admissible survey's responses were reviewed and coded under expert's direction by her firm's data collection and processing staff); *THOIP*, 690 F. Supp 2d at 242 (finding challenge to survey "that Dr. Helfgott relied on a subcontractor to review the verbatim responses" went to weight and not exclusion); *see also Georgia Pacific Consumer Products v. Kimberly-Clark Corp.*, No. 09-C-2263, 2010 WL 1334714, at *5 (N.D. Ill. Mar. 31, 2010).

The PRL Parties contend that Dr. Helfgott is not qualified to testify as to his survey results because he did not perform all review, coding and tabulation functions associated with his report. The trial record evidences that the Helfgott Survey interviews were conducted and the results tabulated by Suburban Marketing Research, LLC, a nationally recognized professional survey company that has performed similar services for Dr. Helfgott for more than twenty-five years. (Findings at ¶ 148.) At all times, the employees responsible for collecting and coding the survey data worked under Dr. Helfgott's direction and supervision and the procedures complied with industry standards. (Findings at ¶¶ 149-150.)   Dr. Helfgott further testified it was both typical and acceptable in the industry for the verbatim responses to be reviewed, coded and tabulated by staff under the supervision and at the direction of the testifying expert. (Findings at ¶ 151.) Dr. Helgott also developed and reviewed field interview instructions with William Bartlett before they were provided to the individuals who performed the actual interviews and therefore maintained control of general field operations. (Findings at ¶ 152.) Dr. Helfgott reviewed the data obtained from the field with Mr. Bartlett over the phone each day after it was obtained. (Findings at ¶ 150.)

Despite having the chance to do so at his deposition and at trial, neither PRL nor L'Oreal have presented any evidence to suggest that Dr. Helfgott's expert report contains coding or

tabulation errors nor have they presented case law to suggest that Dr. Helfgott is not qualified to

testify under the facts of this case. (Findings at ¶ 153.) Thus, the PRL Parties have provided no

justification for seeking to exclude Dr. Helfgott's report and his testimony on this basis.

### C. The Absence Of A Showing Of A Likelihood Of Confusion Also Tolls The Death Knell For The PRL Parties' Federal And Common Law Unfair Competition Claims

In either a claim of trademark infringement under § 32 or a claim of unfair competition

under § 43, a *prima facie* case is made out by showing the use of one's trademark by another in a

way that is likely to confuse consumers as to the source of the product. *Le Book Pub., Inc. v.*

*Black Book Photography, Inc.*, 418 F. Supp. 2d 305, 312 (S.D.N.Y. 2005).[4] Accordingly, since

it is the same facts which substantiate an action for trademark infringement and false designation

of origin under the Lanham Act, a claim for false designation of origin and unfair competition

under the Act must also fail where there is no likelihood of confusion. *Eli Lilly & Co.*, 577 F.

Supp. at 482 (denying injunctive relief on unfair competition claims under the Lanham Act

where there was "no substantial likelihood of confusion, despite the similarity between the two

terms at issue"); *see also See Bi-Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1192-93

(S.D.N.Y.1983) (quoting *New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th

Cir. 1979) ("Whether we call the violation infringement, unfair competition or false designation

of origin, the test is identical.").

The same general analysis governs the PRL Parties' common law trademark and unfair

competition claims. *See Andy Warhol Enter., Inc. v. Time, Inc.*, 700 F. Supp. 760, 763-64

(S.D.N.Y. 1988) (denying injunctive relief and noting "the gravamen of a Lanham Act claim or a

common law unfair competition claim is likelihood of confusion"); *see also SLY Magazine, LLC*,

---

[4]      Counsel for the PRL Parties have advised that they will not be briefing their state and federal dilution claims in connection with their post-trial submissions. Therefore, it is respectfully requested that the Court dismiss these claims with prejudice.

529 F. Supp. 2d at 443 (dismissing New York misappropriation and unfair competition claims as a matter of course where no likelihood of confusion found in connection with Lanham Act claim). In a common law unfair competition claim under New York law, "the plaintiff must show … a likelihood of confusion where equitable relief is sought." *U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 178 (S.D.N.Y. 2001). Significantly, in addition to the showing made for claims brought under the Lanham Act, a New York state law claim for unfair competition requires the "additional element of bad faith or intent." *Girl Scouts of U.S.A. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 808 F. Supp. 1112, 1131 (S.D.N.Y. 1992) (granting summary judgment in favor of defendant on federal and state unfair competition claims); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). Here, despite the PRL Parties' repeated attempts to maintain that the U.S. Polo Assn.'s activities concerning fragrance products were in bad faith, the record reveals that the U.S. Polo Assn. Parties approved fragrance packaging in good faith in accordance with the 1984 Order to be consistent with the existing apparel packaging and labels which utilized the Double Horsemen mark along with blue with gold lettering. (Findings at ¶¶ 66, 70-71.) Additionally, despite years of co-existence, PRL never complained of the U.S. Polo Assn.'s use of a blue background and gold lettering on hangtags in the United States in connection with any of its products. (Findings at ¶ 67.) PRL's insistence that the U.S. Polo Assn. Parties' adoption of blue was made in bad faith is also belied by the PRL Parties' expert testimony that the color blue was not a factor associated with the confusion responses that were obtained in PRL's likelihood of confusion surveys. (Findings at ¶ 129.) For these reasons and a lack of a likelihood of confusion, the trial record is unable to support a claim of unfair competition under either federal or common law as there is no evidence

before the Court to suggest anything other than that these counts are re-dressed trademark infringement claims.

### D.    The PRL Parties Cannot Prevail On Their Remaining State Law Claims

#### 1.    The PRL Parties' Claim Under New York General Obligations Law § 349 Fails

N.Y. Gen. Bus. Law § 349 is modeled after the Federal Trade Commission Act. *Do Denim, LLC. v. Fried Denim*, 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009). Consequently, "federal courts have interpreted the statute's scope as limited to the types of offenses to the public interest that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety." *Do Denim, LLC*, 634 F. Supp. 2d at 409; *U-Neek, Inc.*, 147 F. Supp. 2d 158. Additionally, "in order to assert a *prima facie* cause of action under General Business Law § 349, a plaintiff must be able to establish that a defendant intended to deceive its customers to the customers' detriment and was successful in doing so." *Samiento v. World Yacht Inc.*, 10 N.Y.3d 70, 81, 833 N.E.2d 990 (2008). The PRL Parties offer no proof of an intent to deceive the public in this case nor proof of actual harm to the public. Nor have the PRL parties offered any proof to show that the public was materially misled or deceived in the way contemplated by § 349.

Additionally, the PRL Parties claim of deceptive trade practices must fail because "claims that arise out of a trademark infringement action, and disputes between competitors where the core of the claim is harm to another business as opposed to consumers, both constitute situations which courts have found to reflect a public harm that is too insubstantial" for purposes of a claim under § 349." *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F. Supp. 2d 535, 552 (S.D.N.Y. 2003) (cit. omitted); *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("It is well settled . . . that trademark or trade dress infringement

claims are not cognizable under [§ 349] unless there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."). The record is devoid of any evidence of harm to the public that would go beyond ordinary claims of trademark infringement between competitors. Accordingly, the claim under Section 349 must fail.

### 2. The PRL Parties' Claim Under New York General Business Law Section 133 Fails As A Matter of Law

N.Y. Gen. Bus. Law § 133 "protects tradenames from unlawful infringement by prohibiting the use of someone else's name, style or symbol as part of one's own name with an intent to deceive the public." *Sovereign Bus. Forms, Inc. v. Stenrite Indus., Inc.*, 00 Civ. 3867(BDP), 2000 WL 1772599, at *12 (S.D.N.Y. Nov. 28, 2000). Thus, to prevail on a claim under § 133, the PRL Parties must show that the U.S. Polo Assn. used its name and the Double Horsemen mark "as part of its 'corporate, assumed or trade name' for purposes of advertising with an intent to deceive." *U-Neek, Inc.*, 147 F. Supp. 2d at 176 (*citing Oliveira v. Frito-Lay, Inc.*, 96 Civ. 9289, 1997 WL 324042 (S.D.N.Y. June 13, 1997)). Significantly, the PRL Parties have offered no proof that the U.S. Polo Assn. Parties have intentionally adopted, or used the U.S. POLO ASSN. or the Double Horsemen mark to deceive or mislead the public. To the contrary, the only use of U.S. POLO ASSN. in connection with the fragrance product is the use of the U.S. Polo Assn.'s name which it is expressly permitted to do in connection with the 1984 Order. (Findings at ¶ 27; Ex. PX-15 at ¶¶ 8.d and 9.C.) Likewise, the adoption and use of the Double Horsemen mark and the associated procedural case law that stems from the 1984 Order negates any claim of an intent to deceive. Accordingly, this claim must fail.

### III. THE PRL PARTIES WILL NOT SUFFER IRREPARABLE INJURY IN THE ABSENCE OF A PERMANENT INJUNCTION

There is no presumption of irreparable harm. *New York City Triathlon, LLC*, 704 F. Supp. 2d at 328. PRL has presented no evidence of irreparable injury that can, or has, resulted

from use by the U.S. Polo Assn.'s name and a court approved Double Horsemen mark. This failure, in and of itself, is fatal to the PRL Parties' request for a permanent injunction

The trial record establishes that PRL agreed to the U.S. Polo Assn.'s use of the Double Horsemen mark on clothing and chose not to oppose a federal trademark registration. (Findings at ¶¶ 39-40.)  When PRL revoked its agreement, a jury's approval was obtained in 2006. (Findings at ¶ 44.)  PRL cannot now make a serious argument that while it cannot, as a matter of law, show harm from that use on apparel, it will be irreparably harmed by use of the same mark on fragrance.  The cosmetics and toiletries market is closely related to the market for designer clothing, and most designers develop their own fragrance and heavily market such products in connection with apparel.   (Findings at ¶¶ 64, 91 and 93.)  PRL's arguments to the contrary are belied by their own actions in the marketplace and do not demonstrate actionable irreparable harm. (Findings at ¶¶ 92-96.)  Further, if PRL truly were being harmed each day that the U.S. Polo Assn. was free from being enjoined, even in the absence of any actual confusion, it is difficult to fathom why PRL would have delayed judicial proceedings and waited approximately four months to file its preliminary injunction motion or why it would not have conducted follow-up market investigations regarding the presence of the product on the market.  (Findings at ¶ 103.)

As in *International Star Class Yacht Racing Association, supra,* the U.S. Polo Assn.'s status as a legitimate representative of the sport of polo weighs heavily in favor of its right to conduct a licensing program. The U.S. Polo Assn.'s use of its marks on fragrance is a natural expansion of its rights to use the marks on clothing under the 1984 Order and cannot cause harm to PRL where the marks have co-existed in the apparel category for approximately four years. (Findings at ¶¶ 44, 97.)  Significantly, as discussed in Section B.2.a, unlike in the *New York City*

*Triathlon, LLC* case which relied heavily on concrete evidence of actual confusion during a period of co-existence, there is absolutely no evidence of actual confusion in this case despite years of co-existence with PRL in a wide array of product lines especially where there are legal mechanisms in place for reporting such confusion to the parties. (Findings at ¶¶ 44, 97-102, 104-106.); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 343. The PRL Parties have also provided insufficient evidence to suggest that the PRL and U.S. Polo Assn. products are available in the same market space. To the contrary, the evidence indicates that the products are sold at significantly different price points and that no PRL fragrance product bearing the polo player logo is intentionally sent into the mid-tier. (Findings at ¶¶ 48-53.) As a result, PRL's conclusion that a hypothetical inferior quality U.S. Polo Assn. product – both untested and in the face of testimony that PRL viewed the appearance of the product to be of high quality – could somehow cause a loss of control of reputational harm and goodwill is misplaced here because the products are not proximate and the brand recognition of the U.S. Polo Assn. is independently significant. (Findings at ¶¶ 46, 48-53, 75.; Marino PI Dec. at ¶ 15 (Docket No. 17).)

## IV.   THE BALANCING OF HARDSHIPS WEIGHS IN FAVOR OF THE U.S. POLO ASSN. PARTIES

The balance of the hardships analysis will further tip in favor of the U.S. Polo Assn. Plaintiffs if the temporary suspension of sales of fragrance product is converted into a permanent injunction. Since 1924, the U.S. Polo Assn. has used the "U.S. POLO ASSN." service mark for identification of its sporting association services and activities. (Findings at ¶ 4; Cummings Decl. in Opposition to Motion for a Preliminary Injunction, at ¶ 3 (Docket No. 42).)   The trial record establishes that in 1996, the U.S. Polo Assn. developed the Double Horsemen symbol to be consistent with the 1984 Order and filed for trademark protection for clothing, watches and leather goods. (Findings at ¶ 38-39; Exs. PX-22 and 23). Since the primary trademarks of the

U.S. Polo Assn. licensing program are the U.S. POLO ASSN. word mark and the Double

Horsemen mark, a massive and successful licensing program was launched using these marks as

permitted by the 1984 Order. (Findings at ¶ 41.)  The U.S. Polo Assn. Parties made a conscious

decision to construct a judicially recognized licensing program around the 1984 Order and

incorporate their guidelines in every license agreement with third parties as well as their Brand

Rule Book. (Findings at ¶¶ 22-24; Ex. PX-19.)  Accordingly, by requiring the U.S. Polo Assn. to

stray from its judicially recognized licensing program and to re-design a fragrance product that

does not use its signature marks, the U.S. Polo Assn. Parties will loose goodwill and brand

recognition associated with such marks.  This is especially true in light of the strong consumer

recognition of the overall brand and the Double Horsemen mark that has resulted in

approximately $250 Million in United States wholesale sales each year from 2007 to 2009.

(Findings at ¶¶ 47.)

PRL has a history of attempting to exclude the U.S. Polo Assn. from legitimately

competing in the market and making references to the sport of polo.  In 2000, PRL sought to

prevent the authorized publisher of the U.S. Polo Assn. from offering its official magazine using

the word "Polo Magazine" as its title.  In reversing the district court's injunction, the Fifth

Circuit recognized the "unique" situation presented by these parties:

> PRL products became famous by basking in the reflected glow of an elegant
> sport. PRL now asserts that it, not the sport, is the source of the glow. While
> PRL's primary claim is the essence of the ordinary trademark case, we cannot be
> blind, when balancing the equities, to the fact that PRL is arrogating the very
> name of a sport from the players' publication. In a sense, PRL is biting the hand
> that fed it.

*Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 673 (5th Cir. 2000).  With its

counterclaims, PRL continues to bite the hand that feeds it by seeking to displace the governing

body of the sport of polo.  As a result, the balance of the hardships weighs against entering an injunction in this case.

## V.    THE PUBLIC INTEREST WILL BE SERVED BY DENYING PRL'S MOTION

The PRL Parties' have made no attempt to identify how a permanent injunction stemming from this case would benefit anyone other than the behemoth fashion designer nor have they put forth any evidence regarding public deception.   It is obvious in this case that PRL's motivation is to prevent competition from using polo-related trademarks.  The U.S. Polo Assn., on the other hand, is a sporting association that uses its name and trademarks that refer to the sport which it governs in order to fund its activities and raise the profile of the game.  The fact that PRL's goals do not serve the public interest is evidenced from the 1984 Order and the public's evident ability to distinguish between a high-end fashion label such as Ralph Lauren and that of the U.S. Polo Assn. – an authentic brand that is inextricably tied to the sport which it governs.

As L'Oreal's lead witness conceded, separate and apart from PRL and the designer Ralph Lauren, the sport of polo has independent meaning and has historically represented a prestigious and high-end game.  (Findings at ¶ 85.)  Despite PRL's financial gain from the U.S. Polo Assn.'s senior and legitimate sponsoring activities, it ignores the fact that the U.S. Polo Assn. licensing activities supply revenue so that it can continue to grow the sport in the United States for the good of the public at large.  (Findings at ¶ 3.)   It is respectfully requested that the Court view such activities in connection with the U.S. Polo Assn.'s inherent right to continue and control a licensing program that benefits the way the sport is viewed and played in this country.  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, No. 94-civ-2663(RPP), 1995 WL 241875 (S.D.N.Y. Apr. 26, 1995).  Additionally, consumers of moderately priced U.S. Polo Assn. goods should be afforded the ability to choose between U.S. Polo Assn. and PRL fragrance

products, which promotes free competition as encouraged by legitimate co-existence. *U.S. Polo Ass'n, Inc.,* 1984 WL 1309, at *18. The public interest is best served by denying injunctive relief in this case.

## CONCLUSION

Based on the forgoing, the U.S. Polo Assn. Parties respectfully request: (i) a declaration of the Court that the U.S. Polo Assn. has the right to license and sell fragrance products and packaging bearing "U.S. POLO ASSN." and the Double Horsemen trademark in the United States, and (ii) judgment in its favor dismissing all counterclaims brought against it by the PRL Parties and their associated request for permanent injunctive relief.

Dated: November 1, 2010
New York, New York

Respectfully submitted,

**BAKER & HOSTETLER LLP**

45 Rockefeller Center
New York, NY 10111
(212) 589-4200

By: _Gerald J Ferguson_

Gerald Ferguson (0370)
David Sheehan (4818)

*Attorneys for Plaintiffs United States Polo Association, Inc., and USPA Properties, Inc.*

53