UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

UNITED STATES POLO ASSOCIATION, INC.,
and USPA PROPERTIES, INC.,

              Plaintiffs,                  09 Civ. 9476

    -against-                       <u>OPINION</u>

PRL USA HOLDINGS, INC., and
L'ORÉAL USA, INC.,

              Defendants.



------------------------------------------X

A P P E A R A N C E S:

        <u>Attorneys for Plaintiffs</u>

        BAKER & HOSTETLER LLP
        45 Rockefeller Plaza
        New York, NY  10111
        By:  Gerald Ferguson, Esq.
             David Sheehan, Esq.

        <u>Attorneys for Defendant L'Oréal USA, Inc.</u>

        PAUL, HASTINGS, JANOFSKY & WALKER, LLP
        75 East 55th Street
        New York, NY  10022
        By:  Robert L. Sherman, Esq.

        <u>Attorneys for Defendant PRL USA Holdings, Inc.</u>

        KELLEY DRYE & WARREN LLP
        101 Park Avenue
        New York, NY  10178
        By:  William R. Golden, Jr., Esq.

**Sweet, D.J.**

         In this action, the plaintiffs United States Polo
Association, Inc. ("USPA") and USPA Properties, Inc.
("Properties") (collectively, the "USPA Parties" or
"Plaintiffs") sought a declaration pursuant to 28 U.S.C. § 2201:
(1) that they have the right to license and sell in the United
States fragrance products and packaging bearing "U.S. POLO
ASSN.," the Double Horsemen Trademark and "1890," and other
products bearing the marks identified in Trademark Application
Serial Nos. 77/738,105, 77/760,033 and 77/760,071 on the
products identified in those applications; (2) that their use
and licensing of such fragrance products and packaging does not
violate Section 43(a) and (c) of the Lanham Act, 15 U.S.C.
§ 1125(a) and (c), nor constitute infringement, dilution or
unfair competition with respect to the rights of the defendants
PRL USA Holdings, Inc. ("PRL") and L'Oréal USA, Inc. ("L'Oréal")
(collectively, the "PRL Parties" or "Defendants"); and (3) that
their use and licensing of such fragrance products and packaging
does not violate the common law of the State of New York
relating to trademark infringement, unfair competition and
trademark dilution.

The PRL Parties have brought counterclaims against the USPA Parties for trademark infringement, unfair competition, and trademark dilution under Sections 32, 43(a) and 43(c) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and (c), and for common law trademark infringement, trade dress infringement, trademark dilution, unfair competition, unfair and deceptive practices, and misappropriation in violation of the statutory and common law of each state in which the USPA Parties do business, including New York General Business Law ("GBL") Sections 133, 349 and 360-1. The PRL Parties also filed a motion for a preliminary injunction.

Upon all the proceedings had herein and the findings of fact and conclusions of law set forth below, the USPA Parties' request for a declaratory judgment is denied, the PRL Parties' request for a permanent injunction is granted.

**Prior Proceedings**

This action was commenced by the USPA Parties on November 13, 2009, naming only PRL as a defendant. On February 11, 2010, L'Oréal's motion to intervene was granted. PRL filed its answer and counterclaims on February 16, 2010. On March 2,

2

2010, L'Oréal filed its answer and counterclaims, and the PRL Parties moved for a preliminary injunction.

On consent of the parties, the motion for a preliminary injunction was converted into a request for a permanent injunction. The trial and submission of evidence was held from September 27 through September 30, 2010. Final argument was held on November 17, 2010.

**Findings of Fact**

The Parties

USPA is a not-for-profit Illinois corporation with a place of business at 4307 Iron Works Parkway, Suite 110, Lexington, Kentucky 40511. USPA is the governing body of the sport of polo in the United States. (Tr. 137:3-6.[1]) It has been in existence continually since 1890. (Tr. 146:23-147:7.) USPA derives the majority of its revenue from royalties received as a result of licensing its trademarks. (Tr. 297:23-299:4.)

Properties is an Illinois corporation with a place of business at 771 Corporate Drive, Suite 430, Lexington, Kentucky

---

[1]     "Tr." denotes a citation to the trial transcript.

40503, and is a wholly-owned subsidiary of USPA.  Properties'
sole function is to manage the licensing program of USPA.  (Tr.
297:23-299:4.)

PRL is a Delaware corporation with a place of business
at 650 Madison Avenue, New York, NY 10022.  PRL is the owner and
licensor of the trademarks of Polo Ralph Lauren Corporation,
including the Polo Player Logo and "POLO" used in connection
with fragrances.

L'Oréal is a Delaware corporation with a place of
business at 575 Fifth Avenue, New York, NY 10017.  L'Oréal is
the exclusive licensee of certain PRL trademarks in the
categories of fragrances, cosmetics and related goods, including
the Polo Player Logo and "POLO."

The PRL Trademarks in Issue

In the 1960s, Mr. Ralph Lauren started his own
business, which today is known as Polo Ralph Lauren Corporation.

In the late 1970s, when the predecessor to PRL (also
referred to as PRL) decided to expand into fragrances, cosmetics

4

and related products, an exclusive license agreement was entered into with L'Oréal.  (Deposition of Negar Darsses 25:21-26:9.)

In 1978, the first fragrance introduced into the market under that license appeared in a green bottle and packaging and prominently featured, and to this day continues to feature, the logo known as the "Polo Player Logo," as well as the word mark "POLO" and less prominently "Ralph Lauren."  (Tr. 35:4-9; PRL Ex. 26.[2])

That fragrance has been sold continuously for 32 years and was voted into the industry's Fragrance Foundation's Hall of Fame.  (Tr. 52:13-21.)

Beginning in approximately 2002, the PRL Parties began adding new men's fragrances to the line, each prominently displaying the Polo Player Logo and the word mark "POLO."  In 2002, POLO Ralph Lauren BLUE was launched, followed by POLO BLACK in 2005, POLO DOUBLE BLACK in 2006, POLO EXPLORER in 2007 and POLO Ralph Lauren RED, WHITE & BLUE in 2009.  (Tr. 36:8-37:21; PRL Exs. 11, 27-31.)  The PRL Parties recently introduced four new fragrances to the marketplace, referred to as the "Big

---

[2]    "PRL Ex." denotes a citation to a trial exhibit submitted by the PRL Parties, and "USPA Ex." denotes a citation to a trial exhibit submitted by the USPA Parties.

Pony Collection," each displaying the Polo Player Logo and the word "POLO."  (PRL Exs. 32-35.)

All of the aforementioned PRL Parties' fragrances are still being sold today.   (Tr. 38:8-17.)   The PRL Parties' products come in different sizes and colors and exhibit different scents, but all of them use the Polo Player Logo and the word "POLO."  (Tr. 36:8-37:21; 51:11-19; PRL Exs. 26-35.)

PRL owns a number of federal trademark registrations for the Polo Player Logo, alone or in combination with words, names, symbols or devices, for fragrances and related products, including, among others, U.S. Reg. Nos. 1,212,060; 1,327,818; 2,922,574; 3,076,806; and 3,095,176, as well as a pending use-based Trademark Application Serial No. 77/883,516.   Those registrations are valid and subsisting in PRL, with Reg. Nos. 1,212,060 and 1,327,818 having attained incontestable status. (PRL Ex. 14.)

The USPA Trademarks in Issue

USPA currently owns more than 900 trademarks worldwide, including "U.S. POLO ASSN." and the "Double Horsemen

Mark," which are the primary trademarks of USPA's licensing program. (USPA Ex. 14; Tr. 163:16-165:6.)

Existing trademark registrations with respect to these two primary marks include: (a) Registration No. 3,370,932 for USPA and the Double Horsemen Trademark in International Class 25; (b) Registration No. 3,598,829 for the Double Horsemen Trademark in International Classes 14, 18 and 25; (c) Registration No. 2,188,594 for the Double Horsemen Trademark in International Class 14; (d) Registration No. 2,991,639 for U.S. POLO ASSN. SINCE 1890 in International Class 25; (e) Registration NO. 2,282,427 for U.S. POLO ASSN. SINCE 1890 in International Classes 14 and 18; (f) Registration No. 2,908,391 for U.S. POLO ASSN. in International Classes 14 and 18; and (g) Registration No. 3,367,242 for U.S. POLO ASSN. in International Class 25.[3]

USPA began to commercially license its trademarks in the early 1980s, but did not actively license in the United States until 1998. (Tr. 167:19-168:15.)

---

[3]    International Class 14 covers "[p]recious metals and their alloys and goods in precious metals or coated therewith, not included in other classes; jewelry, precious stones; horological and chronometric instruments." International Class 18 covers "[l]eather and imitations of leather, and goods made of these materials and not included in other classes; animal skins, hides; trunks and travelling bags; umbrellas, parasols and walking sticks; whips, harness and saddlery." International Class 25 covers "[c]lothing, footwear, headgear." See 37 C.F.R. § 6.1.

The USPA Parties and their licensees have
manufactured, marketed, and sold products bearing the words
"U.S. POLO ASSN." and the "Double Horsemen Mark," in numerous
apparel and accessory categories. The products have been sold
in more than 5,000 independent retail stores throughout the
United States, including major national chains such as Kohl's,
J.C. Penney, Sears, Ross, Peebles, Goody's, Dr. J's, and Stage
Stores, as well as in fifteen USPA outlet stores. (Tr. 209:22-
210:2.)

JRA Trademark Company Ltd. ("JRA") is USPA's master
licensee in the United States for fragrances and all products
other than rosaries and watches. (Tr. 166:15-18.)

In 2008, USPA commenced discussions with JRA about
expanding into the fragrance market. (Tr. 212:24-213:4-8.)

In 2009, JRA designed packaging for use on a USPA
men's fragrance that featured the Double Horsemen Mark, which
was being used by USPA on apparel. (Tr. 214:22-24.) The
packaging used a dark blue background as its predominant color,
with the Double Horsemen Mark, accompanying word mark lettering
as well as a thin line creating a border around the perimeter of

8

the front panel all appearing in gold.   (PRL Ex. 16; Tr. 54:1-55:21.)

Approximately 10,000 units of USPA's fragrance bearing the Double Horsemen Mark were produced in November 2009.   (Tr. 277:11-15.)   Around that time and shortly thereafter, USPA's fragrance product was offered for sale at USPA outlet stores and through V.I.M. Jeans stores.   (Tr. 221:20-222:7.)   Between November 2009 and March 2010, approximately 3,500 units were sold through USPA outlet stores.   (Tr. 278:10-13.)

On March 19, 2010, counsel for USPA represented in writing to this Court that USPA agreed to "immediately cease all sales of fragrance products, and use of packaging bearing the Double Horsemen mark and to refrain from advertising, offering for sale, selling, transferring or donating fragrance products and packaging bearing the Double Horsemen Trademark" until after the decision on the PRL Parties' motion for a preliminary injunction motion.   (Tr. 277:16-25.)   On March 24, 2010, the USPA's written submission was "so ordered" by the Court.

In addition to the approximately 3,500 units of the USPA Parties' fragrance that were sold, approximately 1,000 were recalled and quarantined.   (Tr. 278:1-279:7.)   Approximately

5,500 units are unaccounted for, except to the extent it is known that they were sold to V.I.M. Jeans at some point in time. (Tr. 278:14-25.)   It is not known whether they continued to be sold after March 19, 2010.   (Tr. 279:1-4.)

Prior Litigation

In 1984, USPA and its licensees commenced an action in this court against PRL for a declaratory judgment that various articles of merchandise bearing a mounted polo player symbol did not infringe PRL's Polo Player Logo.   PRL counterclaimed for trademark infringement.   The matter came before the Honorable Leonard B. Sand.

In his Order (the "1984 Order"), Judge Sand denied USPA's request for a judgment of non-infringement, found that USPA and its licensees infringed PRL's Polo Player Logo, POLO, POLO BY RALPH LAUREN trademarks and PRL's trade dress, and engaged in unfair competition.   (USPA Ex. 15 ¶¶ 8-9.)   The 1984 Order enjoined USPA and its licensees from infringing PRL's marks, including the Polo Player Logo and the word "POLO," but not from engaging in a licensing program that did not use infringing trademarks.   Specifically, the 1984 Order permitted USPA to conduct a retail licensing program using its name, "a

mounted polo player or equestrian or equine symbol which is
distinctive from . . . [PRL's] polo player symbol in its content
and perspective," and other trademarks that refer to the sport
of polo, subject to certain conditions and restrictions set
forth in the 1984 Order.  (Id. ¶ 9; Tr. 169:9-25.)  Paragraph 8
of the 1984 Order bars any use of the "United States Polo
Association" name or other name "which emphasizes the word POLO
(or the words U.S. Polo), separate, apart and distinct from any
such name in a manner that is likely to cause confusion."  (USPA
Ex. 15 ¶ 8.)


        The requirements of the 1984 Order are incorporated
into all sublicense agreements into which JRA enters and into
the so-called "Brand Rule Book" generated by USPA.  (Tr. 170:22-
178:18; USPA Ex. 19.)


**Conclusions of Law**


**I.  Claims Under Lanham Act §§ 32 & 43(a)**


        The parties assert claims under both Section 32 of the
Lanham Act, for trademark infringement, and Section 43(a), for

11

false designation of origin or passing off.[4]   Section 43(a) of

the Lanham Act prohibits the use in commerce of any word, term,

name, symbol, device, or combination thereof that

> is likely to cause confusion, or to cause mistake, or
> to deceive as to the affiliation, connection, or
> association of such person with another person, or as
> to the origin, sponsorship, or approval of his or her
> goods, services, or commercial activities by another
> person . . .

15 U.S.C. § 1125(a)(1) and (a)(1)(A).[5]


Section 32 of the Lanham Act provides in relevant part:


(1)  Any person who shall, without the consent of the
registrant—

> (a) use in commerce any reproduction, counterfeit,
> copy, or colorable imitation of a registered mark in
> connection with the sale . . . of any goods or
> services on or in connection with which such use is
> likely to cause confusion, or to cause mistake, or to
> deceive; or

> (b) reproduce, counterfeit, copy, or colorably imitate
> a registered mark and apply such . . . to labels,
> signs, prints, packages, wrappers, receptacles or
> advertisements intended to be used in commerce upon or
> in connection with the sale . . . of goods or services
> on or in connection with which such use is likely to
> cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action. . . .

---

[4]    The PRL Parties do not pursue their dilution claims.  PRL Parties Post-
Trial Memorandum of Law at 1 n.1.
[5]    Section 43(a) protects both registered and unregistered trademarks.
Rescuecom Corp. v. Google Inc., 562 F.3d 123, 128 n.3 (2d Cir. 2009) (citing
Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)).

15 U.S.C. § 1114.

In order to prevail in an action for trademark infringement under Section 43(a), a party must establish, under the two-prong test of Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072 (2d Cir. 1993), (1) that it possesses a valid, legally protectable trademark and (2) that the junior user's mark is likely to cause confusion as to the origin or sponsorship of the product at issue. Virgin Enterprises v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003) (citing Gruner, 991 F.2d at 1074 (2d Cir. 1993)). This two-prong test is applicable to trademark infringement claims brought under both Section 32 and Section 43(a) of the Lanham Act. Virgin Enterprises, 335 F.3d at 148 (citing Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999)). Accordingly, both claims will be analyzed together here.

## A. The PRL Parties' Mark is Valid and Entitled to Protection

"To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others." Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999). In this Circuit, the scale articulated

13

by Judge Friendly in Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2d Cir. 1976), is traditionally utilized to determine the distinctiveness of a mark.   The Abercrombie continuum classifies marks from least to most distinctive in categories: generic, descriptive, suggestive, arbitrary or fanciful.   The Second Circuit has elaborated this continuum as follows:

> A generic mark is generally a common description of goods, one that refers, or has come to be understood as referring, to the genus of which the particular product is a species. A descriptive mark describes a product's features, qualities or ingredients in ordinary language, or describes the use to which a product is put. A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods. [T]he term "fanciful," as a classifying concept, is usually applied to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, *i.e.*, when it is applied in an unfamiliar way, the use is called "arbitrary."

Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997)(internal quotations and citations omitted).

A mark's distinctiveness determines its level of protection.   At one end, "[g]eneric marks are not protectable." Lane Capital Mgmt., 192 F.3d at 344.   While at the other, "[f]anciful, arbitrary, and suggestive marks are deemed inherently distinctive" and so "will be automatically protected." Id.   Descriptive marks fall in between the two

14

extremes. See Pretty Girl, Inc. v. Pretty Girl Fashions, Inc., -
- F. Supp. 2d --, No. 11 Civ. 0662 (NGG)(MDG) (E.D.N.Y. March
14, 2011).


     The word "polo" may be generic, for example, with
respect to polo shirts, or descriptive, with respect to aspects
of the sport.   With respect to men's fragrances, the PRL
Parties' contend that the POLO word mark and Polo Player Logo
are arbitrary.   As Judge Sand stated in his 1984 opinion,
"[p]olo is certainly not suggestive or descriptive of a
fragrance which a toiletry manufacturer would seek to imitate."
U.S. Polo Association, Inc. v. Polo Fashions, Inc., No. 84 Civ.
1142 (LBS), 1984 WL 1309, at *14 (Dec. 6, 1984) ("Sand
Opinion").   There is no natural connection between the image of
a polo player and fragrance products.   The same is true of the
POLO word mark.


     In  Polo Fashions, Inc. v. Extra Special Products,
Inc., 451 F. Supp. 555, 559 (S.D.N.Y. 1978), Judge Goettel held
that the use of POLO on ties is fanciful.   Judge Sand concluded
"that it would follow a fortiori and is demonstrated in the
record in this case that the use of POLO in a trademark sense on
non-apparel items unrelated to the sport, such as home
furnishings, is a fanciful, not a descriptive use."   Sand

Opinion, 1984 WL 1309, at *3.   This Court similarly concludes that as a common word or symbol applied an unfamiliar way, POLO and the Polo Player Logo qualify as arbitrary and therefore "will be automatically protected." Lane Capital Mgmt., 192 F.3d at 344.

Regardless, PRL owns a number of federal trademark registrations for the Polo Player Logo, alone or in combination with words, names, symbols or devices, for fragrances and related products, including, among others, U.S. Reg. Nos. 1,212,060; 1,327,818; 2,922,574; 3,076,806; and 3,095,176, as well as a pending use-based Trademark Application Serial No. 77/883,516.   "A certificate of registration with the PTO is prima facie evidence that the mark is registered and valid (i.e., protectible), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce."   Lane Capital Mgmt., 192 F.3d at 345 (citing PaperCutter, Inc. v. Fay's Drug Co., 900 F.2d 558, 563 (2d Cir. 1990)).   The USPA Parties have not rebutted this presumption.

As registered, arbitrary marks, the PRL's Polo Player Logo and POLO trademarks as used in the context here on men's fragrances, are protectable.

## B. The Polaroid Factors

It is well-established that the eight factors set
forth in Polaroid Corp. v. Polaroid Elects. Corp., 287 F.2d 492
(2nd Cir. 1961), cert. denied, 368 U.S. 820 (1961), control the
analysis of whether there is a likelihood of confusion in
trademark infringement cases in this Circuit.   Those factors
include: (1) the strength of his mark, (2) the degree of
similarity between the two marks, (3) the proximity of the
products, (4) the likelihood that the prior owner will bridge
the gap, (5) actual confusion, (6) the reciprocal of defendant's
good faith in adopting its own mark, (7) the quality of
defendant's product, and (8) the sophistication of the buyers.
Id. at 495.  "'[E]ach factor must be evaluated in the context of
how it bears on the ultimate question of likelihood of confusion
as to the source of the product.'"   Brennan's Inc. v. Brennan's
Rest., L.L.C., 360 F.3d 125, 130 (2d Cir.2004) (quoting Lois
Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867,
872 (2d Cir. 1986)).

For the reasons stated below, under the Polaroid
analysis, USPA's use of the Double Horsemen and "U.S. POLO ASSN.

17

1890" marks in the context and manner[6] in which they have been used here on a men's fragrance infringes the PRL Parties' trademark rights.

As a threshold issue, the USPA Parties contend that Judge Sand's 1984 Order was the product of a <u>Polaroid</u> analysis and that to prevail the PRL Parties must show that the USPA Parties violated the 1984 Order.   This Court conducts an independent <u>Polaroid</u> analysis, as USPA does not seek to use the marks at issue in the 1984 case or in the context of the same market conditions.[7]   Judge Sand's 1984 Order anticipates re-application of <u>Polaroid</u> by permitting USPA to conduct a licensing program using "a mounted polo player or equestrian or equine symbol which is distinctive from . . . [PRL's] polo player symbol in its content and perspective," but barring any use of the "United States Polo Association" name or other name

---

[6]    Except as pertain to its findings regarding USPA's good faith, the Court's Lanham Act analysis is based upon USPA's use of the beige, not blue, trade dress, because the USPA Parties withdrew their use of blue trade dress during the course of this litigation (Dkt. 45), and represented to the Court that "as of March 17, 2010 they have ceased, and will not resume, use of the color blue as the principle color for the packaging of any of Plaintiffs' fragrance products." (<u>Id.</u>; Oral Argument Transcript 48:23-24) ("We're not using it, never going to use it").   Were USPA to use blue trade dress, this might weigh more heavily in favor of the PRL Parties' claims because of the PRL Parties' use of blue tradedress in their best-selling POLO BLUE line (Tr. 39:11-25; 52:1-12; PRL Ex. 15), and Judge Sand's 1984 order prohibiting USPA's use of blue trade dress utilizing white or silver lettering or emphasizing the world "POLO."  (USPA Ex. 15 ¶¶ 8-9.)

[7]    USPA's Double Horsemen Mark did not exist prior to 1996.   Brand awareness of PRL's Polo Player Logo in 1984 was approximately 37%, 1984 Opinion at **12-13, while today it is 82-85%. (PRL Ex. 13.)   In 1984 PRL had only one fragrance product that displayed the Polo Player Logo, while today it has at least nine.  (Tr. 36:8-37:21 (Marino); PRL Parties Exs. 26-35.)

"in a manner that is likely to cause confusion." (USPA Ex. 15 ¶¶ 8-9.) The analysis of which symbols are distinctive from PRL's Polo Player logo--that is, not infringing--and whether the "United States Polo Association" name or other name is used in a manner that "is likely to cause confusion" requires application of Polaroid. In finding a likelihood of confusion, the Court duly notes that the USPA parties have violated the 1984 Order insofar as it prohibited USPA's adoption of infringing marks.

Nor are the PRL Parties' claims foreclosed by a jury's finding in 2006 that while (1) USPA's solid Double Horsemen mark infringed PRL's Polo Player Symbol, (2) the solid Double Horsemen mark with "USPA," outline Double Horsemen mark, and outline Double Horsemen mark with "USPA" were not infringing in the context of the apparel market. PRL USA Holdings, Inc. v. United States Polo Association, Inc., No. 99 Civ. 10199(GBD), 2006 WL 1881744 (S.D.N.Y. 2006), aff'd 520 F.3d 109 (2d Cir. 2008). Most saliently, the marks at issue here are employed in the context of fragrances, not apparel. This case involves the use of the Double Horsemen mark with the word mark "U.S. POLO ASSN. 1890," not alone or with "USPA" beneath. In contrast to the 2006 apparel case, the dominant term in the word portion of USPA's mark here--and that which consumers are most likely to view as having trademark significance--is "POLO." As the

19

Trademark Trial and Appeal Board noted in rejecting USPA's summary judgment motion regarding the use of the marks at issue here for fragrances and other products in Class 3,[8] this issue here "involves different transactional facts material to the claim. Therefore the district court's order [in the apparel litigation] does not have preclusive effect on this proceeding." (PRL Ex. 110 at 5.[9])   For the same reasons, the apparel litigation is not controlling here.[10]

### 1.   The Strength of the PRL Parties' Marks

The strength of a mark refers to "its tendency to identify the goods sold under the mark as emanating from a particular source." Lois Sportswear, 799 F.2d at 873 (internal quotations and citations omitted).   The concept of strength

---

[8]   Class 3 includes: "Bleaching preparations and other substances for laundry use; cleaning, polishing, scouring and abrasive preparations; soaps; perfumery, essential oils, cosmetics, hair lotions; dentifrices." 37 C.F.R. § 6.1.

[9]   The Trademark Trial and Appeal Board also noted that the apparel litigation addressed the Double Horsemen with and without "USPA" beneath it for goods in International Classes 14, 18, 25, and 28 (respectively, precious metals/stones; leather and bags; clothing, footwear, headgear; games and sporting articles, see 37 C.F.R. § 6.1) whereas the issue before it, as here, involves the use of the Double Horsemen with "U.S. Polo Ass'n" above and "1890" below for goods in Class 3. (PRL Ex. 110.)

[10]   The use of the word "POLO" might additionally produce less confusion in the apparel market, due to the greater use of attire to signal affiliation with a sports team or association than the use of fragrances, and possible differences in consumers in the two markets.   In some instances, the word mark "POLO" and PRL's Polo Player Logo might also be considered more arbitrary with respect to fragrances than with respect to apparel, giving rise to greater distinctiveness and strength in the PRL Parties' mark in this context.

encompasses both "inherent distinctiveness" and "acquired distinctiveness." See Brennan's, 360 F.3d at 130-31; Virgin Enterprises, 335 F.3d at 147-49.

By both measures, the PRL Parties' Polo Player Logo and POLO marks are extremely strong. PRL has registered federal trademarks for the Polo Player Logo, alone or in combination with words, names, symbols or devices, for fragrances and related products, including, among others, U.S. Reg. Nos. 1,212,060; 1,327,818; 2,922,574; 3,076,806; and 3,095,176. Therefore, their marks are presumed to be distinctive. Lois Sportswear, 799 F.2d at 871. As discussed above, both the PRL Polo Player Logo and "POLO" word mark are arbitrary with regard to fragrances and so their inherent distinctiveness is robust. Furthermore, at trial, the PRL Parties demonstrated that in the last ten years alone, L'Oréal has spent more than one hundred million dollars advertising PRL men's fragrances bearing the Polo Player Logo and "POLO" mark in the U.S., with forty million dollars spent advertising POLO BLUE. (Tr. 39:15-25 (Marino); PRL Ex. 15.) This bolsters its strength. See Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 139 (2d Cir.1999); 24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, 447 F. Supp. 2d 266, 272 (S.D.N.Y. 2006).

21

At the same time, the awareness in the marketplace of these marks is commercially strong, with evidence at trial demonstrating that surveyed men and women ages 18 to 60 report between 82% and 85% awareness of PRL fragrances bearing the Polo Player Logo and "POLO" brand, ranking it second in brand awareness in the fields of fashion and fragrances. (Tr. 43:7-44; 50:17-25; PRL Ex. 13 at 3.) In the last ten years, U.S. retail sales of men's fragrances bearing the Polo Player Logo and "POLO" mark were just over one billion dollars (Tr. 39:1-10; PRL Parties Ex. 15), with one dollar out of every $12 spent on men's fragrances in the United States being spent on a PRL fragrance bearing the Polo Player Logo and "POLO" mark. (Tr. 42:5-11.)

Accordingly, the strength of the marks weighs strongly in the PRL Parties' favor.

## 2.    The Degree of Similarity Between the Two Marks

"Of salient importance among the Polaroid factors is the 'similarity of the marks' test, which attempts to discern whether the similarity of the marks is likely to cause confusion among potential customers." Louis Vitton Malletier v. Burlington Coat Factory Warehouse, 426 F.3d 532, 537 (2d Cir. 2005).   An assessment of the similarity of marks examines the similarity

22

between them in appearance, sound, and meaning. See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331 (2d Cir. 1975). When assessing the similarity of marks, courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." Louis Vitton, 426 F.3d at 537.

When the products being compared will not be displayed side-by-side in the marketplace, as they will not be here (Tr. 44:6-9;  44:21-45:3  (Marino);  Tr.  285:4-10;  288:14-289:4 (Cummings)), the appropriate question is not "whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." Louis Vuitton, 426 F.3d. at 538. The analysis should consider "the products' sizes, logos, typefaces, and package designs and colors" to determine whether the overall impression in the relevant market context would lead consumers to believe that the junior user's product emanates from the same source as products bearing the senior user's mark. Paco Sport, Ltd. v. Paco Rabanne Perfumes, 234 F.3d 1262 (2d Cir. 2000).

The similarity between the PRL Parties' and the USPA's marks is apparent. Both marks are similar in perspective--containing a polo player on horseback, facing slightly to the viewer's left, leaning forward with a polo mallet raised. Both are monochrome logos that are similar in their level of abstraction. Both are displayed in embossed metallic or glossy material—-with PRL's appearing in a number of colors including silver and gold, and USPA's appearing in a light gold. (PRL Exs. 16, 22, 23, 25-35, USPA Ex. 52.)

The primary difference between the marks is that the PRL's logo contains one player, while USPA's contains two, one with mallet raised and the other with mallet lowered, which significantly overlap. In USPA's mark, the front horseman is displayed in solid metallic ink, while the rear horseman is only outlined, such that the background packaging shows through. This gives the front--mallet raised--horseman more visual prominence, while the torso of the rear horseman can be said to fade into the background. Both of USPA's horsemen share the same directional perspective and overlap to a degree that it is difficult to discern if there is one horse or two. As counsel for L'Oreal noted at argument, USPA's Double Horsemen Mark strongly resembles a composite of the PRL's Polo Player Logo

24

with the logo that USPA was enjoined from using in 1984 by Judge Sand.  Oral Argument Transcript, 30:18-31:17.

Except for the PRL Parties' Big Pony Collection, the proportionate size of the logos as presented on the products is roughly similar. (PRL Exs. 16, 22, 23, 25-35, USPA Ex. 52.)  The USPA's product bears a gold border that runs around the edge of the front panel of the fragrance box, as do some but not all of the PRL Parties' fragrance products.  On both parties' products, except the PRL Parties' Red White & Blue and Big Pony lines, the logos are set against a solid color background.

The PRL Parties' fragrances display the word mark "POLO" prominently, except in the Big Pony Line.  The USPA Parties' product bears the "U.S. POLO ASSN." word mark arched above the Double Horsemen logo and "1890" below.  The typefaces are in a similar serif font, though several of PRL's fragrances emphasize POLO in larger font as distinct from RALPH LAUREN or the reverse, while USPA's "U.S. POLO ASSN." is presented in the all the same sized font.

The USPA Parties maintain that the USPA Marks have been judicially recognized as dissimilar from PRL's marks, relying on the 1984 Order, the 2006 jury trial before Judge

25

Daniels, and the Second Circuit's affirmance of that decision. This argument is unpersuasive. No prior decision addressed the marks at issue here in the fragrance market, and the similarity of marks "analysis focuses on the particular industry where the marks compete." Brennan's, 360 F.3d 955.

Nor does the addition of "U.S." "ASSN." and "1980" defeat a finding of confusing similarity. See North American Graphics, Inc. v. North American Graphics of US, Inc., No. 97 Civ. 3448(RSW), 1997 WL 316599, at *6. It is the general rule that one may not "avoid a likelihood of confusion by the addition [to the senior user's mark] of descriptive or otherwise subordinate matter." Bellbrook Diaries, Inc. v. Hawthorn-Mellody Farms Dairy, Inc., 253 F.2d 431, 432-33 (C.C.P.A. 1958) ("Vita-Slim" confusingly similar to "Slim"). USPA's addition of the words "U.S" "ASSN." and "1890" does not change the emphasis on "POLO" as the operative part of the word mark, or the likelihood of confusion when used in conjunction with the Double Horsemen logo. See A.T. Cross Co. v. Jonathan Bradley Pens, Inc., 470 F.2d 689, 692 (2d Cir. 1972) (addition of "by Bradley" did not prevent confusion between "Cross" pens and "LaCross by Bradley" pens); Rodgers v. Wright, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) ("First Ladies of Chic" confusingly similar to "Chic"); Am. Express Co. v. Am. Express Limousine Serv., 772 F.

Supp. 729, 733 (E.D.N.Y.1991) (addition of "Limousine Services" to "American Express" mark enhanced rather than dispelled confusion). Indeed, USPA disclaimed the use of "U.S.", "ASSN." and "1890" in their trademark application, further underscoring that neither can properly be regarded as the principal or dominant part of their mark.   See Application Serial Nos. 77/738,105 and 77/760,071.

Considering the totality of factors that could cause confusion, the differences between the parties' marks are unlikely to be memorable enough to dispel confusion.   The similarity of the marks substantially increases the likelihood of confusion between the USPA Parties' and PRL Parties' products.

## 3.   The Proximity of the Products

This factor "concerns whether and to what extent the two products compete with each other." Cadbury Beverages Inc. v. Cott Corp., 73 F.3d 474, 480 (2d. 1996). In assessing the proximity of the parties' products, courts "look to the nature of the products themselves and the structure of the relevant market.   Among the considerations germane to the structure of the market are the class of customers to whom the goods are

27

sold, the manner in which the products are advertised, and the channels through which the goods are sold." Id. (citations and internal quotations omitted). "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." Virgin Enterprises, 335 F.3d at 150 (citing Cadbury Beverages, 73 F.3d at 480-81).

Both parties' products are men's fragrances. The USPA Parties urge that they and the PRL Parties are not in competitive proximity due to product pricing disparities, actual and intended channels of trade, and diverse clientele. Specifically, the USPA Parties contend that their fragrance products will be sold primarily in mid-tier stores such as Sears, Kohl's, and J.C. Penney and at a price point of approximately $25, while USPA argues that PRL fragrances sell on average for between $50 and $70 and for the most part in high-end stores such as Bloomingdales and Saks.

However, the testimony of Leslie Marino, L'Oreal's General Manager, Designer Fragrance Division, established that fragrances displaying the PRL Parties' Polo Player Logo and POLO mark are sold in department stores as well as specialty stores,

cosmetic stores, and over the internet.[11] (Tr. 44:6-45:1; 46:17-24.)   David Cummings, CEO of Properties, testified that the mid-tier stores where USPA intends to sell its fragrance also sell over the Internet. (Tr. 209:22-210:2; 285:22-25.)   Accordingly, the parties may be in direct competition.   Mr. Cummings further acknowledged that the license agreement between the USPA Parties and their licensee does not restrict the channels of distribution of its fragrance product, and he agreed that there is nothing to prevent distribution of the USPA Parties' fragrance in the same channels used by the PRL Parties. (Tr. 285:4-10.)


        While USPA contends it will sell its fragrances at lower price-points than those of PRL, this difference is not so vast as to place a large competitive distance between the companies' products.   USPA's reliance on Louis Vitton Malletier v. Burlington Coat Factory Warehouse Corp., No. 04-civ-2644(RMB), 2006 WL 1424381, at *6 (S.D.N.Y. 2006), is unavailing, as that court found adequate difference between defendant's handbags, which sold for $29.98, and plaintiff's, which sold for $360 to $3,950.   Nor is Estee Lauder Inc. v. The Gap, Inc., 108 F. Supp. 1503 (2d Cir. 1997) of help to USPA.

---

[11]    Other PRL Parties' fragrances are sold in mid-tier stores such as Kohl's and J.C. Penney. (Tr. 44:21-45:3.)

The Estee Lauder Court found no support for likelihood of confusion where products were sold in "mutually exclusive types of stores" and plaintiff's products were priced more than 10 to 20 times more per ounce, id. at 1511-12, neither of which is the case here.

In consideration of these factors, the Court finds the parties' products to be competitively proximate. "Moreover, competitive proximity must be measured with reference to the first two Polaroid factors," Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987). The singular strength of PRL's marks "demands that [they] be given broad protection against infringers," id., and the great similarity between the two marks further increases the likelihood that a consumer will confuse USPA with PRL.

4.   **The Likelihood that the PRL Parties will Bridge the Gap**

This factor concerns the likelihood that senior user that is not in direct competition with a junior user at the time a suit is brought will later expand the scope of its business so as to enter the junior user's market. See Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995). Because the parties in this case are already competitively proximate, there

is no gap to bridge and so this factor is irrelevant. See Sarbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97 (2d Cir. 2009) ("'bridging the gap' factor is irrelevant . . . where, as here, the two products are in direct ompetition with each other."); Star Indus. v. Bacardi & Co., 412 F.3d 373, 387 (2d Cir. 2005) (holding that "[b]ecause . . . the products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the Polaroid analysis").


5.   **Actual Confusion**


"It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." Lois Sportswear, 799 F.2d at 875. See also Harold F. Ritchie, Inc., 281 F.2d 755, 761 (2d Cir. 1960); New York City Triathalon, 704 F. Supp. 2d 305 (S.D.N.Y. 2010); Pfizer Inc. v. Sachs, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009). This is particularly true when an infringing product has been on the market for only a short time--or, as here, no time at all.[12] See York City Triathalon, 704 F. Supp.

---

[12]   Sales of the USPA's product through USPA's retail outlets were _de minimis_ in duration and scope. (Tr. 221:20-222:7; Tr. 278:10-13.)

2d at 318; Pfizer, 652 F. Supp. 2d at 523 ("The absence of proof of actual confusion is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (quotation marks omitted).

The USPA Parties argue that the PRL Parties proffered no evidence of actual confusion in the apparel industry and that the parties' co-existence in the apparel industry weighs against a showing of a likelihood of confusion with regard to fragrances. This argument is unconvincing for two reasons. First, insufficient evidence regarding whether or not actual confusion exists in the apparel industry was presented at trial for the Court to adequately weigh its potential affect. Second, there has been no co-existence of fragrances without confusion-- a fact, which if true, would support USPA's claim. Lack of confusion as to apparel may or may not be indicative of lack of confusion as to fragrances.

Consumer surveys can provide another form of evidence of the likelihood of confusion. See, e.g., MetLife, Inc. v. Metropolitan Nat'l Bank, 388 F. Supp. 2d 223, 232 (S.D.N.Y. 2005) ("a survey as to the potential consumer confusion may be weighed when considering the likelihood of confusion") (citing

Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259 (2d Cir. 1987)); Jordache Enterprises, Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 518 (S.D.N.Y. 1993) ("Evidence of actual confusion consists of (1) anecdotal evidence of confused consumers in the marketplace; and (2) consumer survey evidence").

Here, the parties each conducted surveys. L'Oréal engaged George Mantis, who conducted two surveys. Mantis's first survey was a national mall intercept conducted in each of the nine Census districts with 324 individuals who had a stated intention to purchase a men's fragrance product in the next six months. Mantis' first survey used a replica of the USPA Parties' fragrance as shown in Exhibit B of the USPA's declaratory judgment complaint. (PRL Ex. 9 at 150-51.) The control group was shown a Mustang Blue cologne package and product. Id. at 152-53. That cologne comes in metallic blue box and displays a horse in profile set against a black and silver grate, with "MUSTANG BLUE" below. Survey noise was estimated based on the proportion of survey respondents who associated the control sample with PRL (PRL Ex. 9 at 4), and subtracted from the reported confusion levels to produce a "net confusion" figure.

33

Mantis' second survey followed the same methodology, but with two different test samples, due to USPA's stipulated change in the color to be used for their packaging. The survey involved over 500 individuals drawn from the nine census districts. (Tr. 86:15-17). Both test samples in the second Mantis' survey displayed the Double Horsemen Trademark, one bearing "U.S. POLO ASSN." arched above and "1890" below (PRL Ex. 10 Ex. E); and the other bearing "USPA" below (PRL Ex. 10 Ex. E). Both test marks appeared on beige packaging. The same Mustang Blue cologne and packaging was used as the control. (PRL Ex. 10 Ex. G.)

Mantis' first survey found 32.4% gross confusion and 4.6% confusion in the control group, resulting in a net confusion level of 27.8%. This represents the controlled portion of those who believed the fragrance bearing the Double Horsemen Mark with "U.S. POLO ASSN." arched above and "1890" below on blue packaging was put out by, connected to, or authorized by Polo Ralph Lauren. (PRL Ex. 9 at 2.)

The second Mantis survey found gross confusion levels of 25.9% for the use of USPA's Double Horsemen Trademark in combination with "U.S. POLO ASSN." above and "1890" below, on a beige background, as well as 21.2% gross confusion for the use

34

of the Double Horsemen in combination with "USPA" below, on a
beige background. (PRL Ex. 10 at 6.) Mantis found 3.4% confusion
for the Mustang control product.   This equates to 22.5% net
confusion for the "U.S. POLO ASSN." test product and 17.8% net
confusion for the "USPA" test product.

The USPA Parties presented a survey conducted by Dr.
Myron Helfgott, which involved interviews with 1,000 respondents
in shopping malls in ten geographically dispersed metropolitan
areas.   (USPA Ex. 48.)   The sample was screened to consist of
men and women between the ages of 18 and 35 who reported that
they are likely to purchase a men's fragrance product costing
$20 to $30 in the next six months.    In each interview,
respondents were shown a bottle and carton for a men's
fragrance, which they were told sells for $24.99.

The Helfgott survey tested three fragrance packages,
all set on beige packaging with gold lettering:   (1) the Double
Horsemen logo with "USPA" beneath, (2) the Double Horsemen logo
with "U.S. POLO ASSN." beneath, and (3) the Double Horsemen logo
with "U.S. POLO ASSN." arched above and "1890" below.   Helfgott
used two controls.   One sported identical packaging and gold ink
to the three tested fragrances, except instead of the Double
Horsemen logo, the control featured USPA's horsehead mark, which

35

consists of a picture of a horse's head in an oval shape formed by a stylized horseshoe, with "U.S. POLO" arched above. The second control is a fragrance which presents a gold embossed polo player astride a horse, facing directly to the viewer's right, with "Beverly Hills" arched above and "Polo Club" below. The logo and word mark are in gold and set in a red box. The packaging is black.

The Helfgott survey found 28% gross confusion with the Double Horsemen logo with "USPA" beneath; 27% gross confusion with the Double Horsemen logo with "U.S. POLO ASSN." beneath; and 25.5% gross confusion with the Double Horsemen logo with "U.S. POLO ASSN." arched above and "1890" below. (USPA Ex. 48 at 2.) The survey found 28.5% confusion with the USPA's horsehead mark control and 32% confusion with the Beverly Hills Polo Club control. (Id.) The Helfgott survey concluded that because confusion levels for the test products were similar to or lower than confusion levels provoked by the controls, net confusion was zero for all test products and "the source of the measured test product confusion was something **other** than the presence of the double horsemen illustration." (USPA Ex. 48 at 13.) Because the level of confusion associated with the three test products did not exceed the level of confusion caused by

the Beverly Hills Polo Club control, Helfgott concluded that "[t]here is not residual confusion."   (Id. at 14.)

The parties dispute the methodology of each other's surveys.   Specifically, the PRL Parties assert that Dr. Helfgott's first survey question, which stated that respondents were being shown a fragrance that costs $24.99 and limited respondents to what "organization" put out the product, id. at 8, likely affected the way that those surveyed responded.   In addition, the PRL Parties contend that Helfgott's screening method, which limited respondents to those with the intent to purchase a fragrance in the $20 to $30 price range, preconditioned respondents by referencing price.   Dr. Helfgott acknowledged at trial that his tipping off respondents to a price range could have affected responses (Tr. 401:17-402:7 (Helfgott)), and that the proper sample in a forward looking confusion survey consists of those likely to purchase in the product category, not only prospective purchasers of one company's products.   (Tr. 405:1-19 (Helfgott).)   The Helfgott study's screening for those intending to purchase a men's frangrance in the $20-$30 range; the inclusion of cost in Helfgott's first question; and that the study's first question limited survey responses to "organization", all preconditioned his survey respondents.

37

The PRL Parties also criticize the Helfgott study on the basis that Bill Bartlett of Suburban was responsible for reading the questionnaires and deciding how each of the responses on those questionnaires should be coded i.e., confused or not confused (Tr. 375:14-16; 433:4-7 (Helfgott)), and Dr. Helfgott conceded that he personally did not review all the questionnaires. (Tr. 432:23-433:3 (Helfgott).)   However, Dr. Helfgott testified that he did discuss how to code certain of the survey responses Mr. Bartlett deemed problematic and read to him over the telephone, and the Court credits that testimony. (Tr. 406:25-407:6, 407:16-22 (Helfgott).)   More problematically, the report that Dr. Helfgott prepared did not contain a "verbatim" section that set out the responses of interview respondents recorded on the questionnaires by the interviewers during the survey interviews, such that the Court is not able to independently determine whether the responses were properly classified.

The most significant error in the Helfgott study was its choice of control variables.   Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology.   "In designing a control group study, the expert should select a stimulus for the control group that

38

shares as many characteristics with the control group as possible, with the key exception of the characteristic whose influence is being assessed." J. Jacoby, "Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys," 92 Trademark Rep. 890, 920 (2002)(quoting the Federal Judicial Center's Reference Manual on Scientific Evidence). Here, Helfgott's controls were improper in that they included the very elements being assessed,[13] namely, the word mark "POLO" and, in the case of the Beverly Hills Polo Club control, also a mounted polo player image.

The high levels of confusion elicited by Dr. Helfgott's controls throw the study's use into further doubt. (USPA Parties Ex. 48 (28.5% for Horse Head, 32% for Beverly Hills Polo Club).) See Jacoby, 92 Trademark Reporter 890, 931-32 ("[I]n the best of all possible worlds, it would not be desirable for a control to yield confusion estimates that exceeded 10%. If it did, the control itself would begin to reach an actionable level of confusion and its utility as a control thereby compromised."). Dr. Helfgott was not in substantial disagreement. He testified that the Beverly Hills Polo Club sample really did not act as a control. (Tr. 436:21-437:7

---

[13]    (See L'Oréal's counterclaims ¶¶ 36, 46, 47; PRL Parties Ex. 14; Docket Entry 52 at 2, 10.)

(Helfgott).[14]) The USPA Parties argue that surveys using controls
that generate confusion levels in excess of 20% have been used
and accepted.  However, those controls were used in surveys
different from those here, in which the survey respondents were
shown both the plaintiff's product and the defendant's product
bearing the mark. See Fortune Dynamic, Inc. v. Victoria's Secret
Stores  Brand  Mgmt.  Inc.,  618  F.3d  1025,  1036  (9th  Cir.
2010)(side-by-side  product  comparison);  Edison  Bros.  Stores,
Inc. v. Cosmair, Inc., 651 F. Supp. 1547, 1559 (S.D.N.Y. 1987)
(same).  Studies using that methodology generally produce higher
levels of confusion.  See Phyllis J. Welter, TRADEMARK SURVEYS §
6.01[4] (Release #6, June 1999).  The results of those studies
therefore cannot be properly compared with the studies here.

Dr. Helfgott's survey is further limited in its
utility because it permitted respondents to "correct for
confusion" by reading the label back to the interviewer, and

---

[14]    In relevant part the transcript reads:
        Q. And in your report you referred to that control as a benchmark,
        isn't that right?
        A. Yes.
        Q. You can look at it.
        A. Yes, yes, yes.
        Q. But you don't -- but the report doesn't describe what the benchmark
        was, right? I mean, what was the measurement that constituted the
        benchmark?
        A. It was a likelihood of confusion response.
        Q. So you would agree with me that it wasn't measuring what survey
        experts called background noise?
        A. No, exactly. I agree with that.
(Tr. 436:21-437:7 (Helfgott).)

allowed respondents to view the test samples for 8-10 minutes while being questioned. (Tr. 387:23-388:1; 388:2-20; 390:16-391:12 (Helfgott).)   In sum, due to its significant drawbacks, the Court gives the Helfgott study no weight.

With regard to the Mantis surveys, the USPA Parties contend that Mantis' first survey question was leading.   That question asked "Who or what individual, company or organization makes or puts out this product?" after respondents were shown USPA's packaging and product. (PRL Ex. 9 at 5.)   That form and sequence of questioning has become standard methodology in trademark infringement surveys, however, following the methodology used in Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366 (7th Cir. 1976) cert. denied, 429 U.S. 830 (1976) (approving what is now known as the "Ever-Ready" test). USPA's reliance on Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302 (N.D. Ga. 2008), is misplaced. There, the survey question required the respondent to answer "which company or store do you think puts out this shirt?" despite the fact that the defendant was an individual. Omitting a possible choice (there, "individual"), where it was not only relevant but also was the choice being tested, was found to be inappropriate. Here, Mantis included, not omitted, all reasonable choices, and allowed the respondent to provide his/her genuine answer.   The

first Mantis survey question therefore was not misleading. This finding is confirmed by the relatively similar levels of gross confusion found by both Mantis' and Helfgott's surveys.

The USPA Parties' criticisms that the Mantis study did not screen for price are meritless. USPA was not marketing the product at the time and its price was unknown. (Tr. 89:7-15 (Mantis).) As Dr. Helfgott principally acknowledged (Tr. 405:1-25 (Helfgott)), it was proper for Mantis not to screen for price.

The USPA Parties additionally dispute the appropriateness the Mantis study's control, arguing that the Mustang mark was too famous to act as a proper control. However, the Mantis control replicated market conditions in so far as the Mustang product is currently on the market, did not contain any of the elements being assessed, provided the survey respondent the opportunity for guessing, contained a symbol of a horse and, with respect to the first survey, was the same color as the test sample. While the Mantis survey's control could have perhaps shared more features with the test product in terms of the shape and material of the fragrance box, the Court gives some weight to its results.

42

The confusion levels ascertained by the Mantis surveys have been accepted as indicative of likelihood of confusion by other courts in this Circuit. See Kraft General Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 130 (S.D.N.Y. 1993) (discussing a mall intercept survey that indicated net confusion of twenty-six percent (26%) and finding the "extreme demonstration of confusion evidenced by the survey demonstrates Kraft's likelihood of success on the merits, as even a substantially lesser showing of confusion would support Kraft's motion for a preliminary injunction"). See also Empressa Cubana Del Tabaco v. Crelbro Corp., 70 U.S.P.Q. 2d 1650 (S.D.N.Y. 2004), rev'd on other grounds, 399 F.3d 462 (2d Cir. 2005) (confusion rate of 15% - 21% indicates a likelihood of confusion); Energybrands, Inc. v. Beverage Marketing USA, Inc., No. 02 CIV. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002) (17% net confusion warranted grant of preliminary injunction); Volkswagen Astiengesellschaft v. Uptown Motors, No. 91 Civ. 3447 (DLC), 1995 WL 605605 (S.D.N.Y. May 11, 1995) (two surveys showing 17.2% and 15.8% net confusion justified grant of injunction).

The Mantis surveys are appropriately suggestive of actual confusion. Accordingly, this factor weighs in the PRL Parties' favor.

## 6.   USPA's Intent in Adopting Its Mark

"Courts and commentators who have considered the question equate a lack of good faith with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship." EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc., 228 F.3d 56, 67 (2d Cir. 2000) (citations omitted) (noting inquiry is "whether defendant in adopting its mark intended to capitalize on plaintiff's good will"). "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." Starbucks v. Wolfe's Borough Coffee, Inc., 588 F.3d 97 (2d Cir. 2009) (quoting Star Industries, 412 F.3d at 388). Under this factor, "the 'only relevant intent is intent to confuse.'" Id. (quoting 4 McCarthy on Trademarks § 23.113).

Bad faith can be found where prior knowledge of the senior user's mark or trade dress is accompanied by similarities so strong that it seems plain that deliberate copying has occurred. Paddington Corp. v. Attiki Imps. & Distrib., Inc., 996 F.2d 577, 587 (2d Cir. 1993) ("Intentional copying, of course, does not require identical copying. Where the copier references

44

the prior dress in establishing her design with the apparent aim
of securing the customers of the other based on confusion,
intentional copying may be found.").

Here, USPA was undoubtedly fully familiar with the PRL
Parties' marks and trade dress, given the extensive history of
trademark litigation between the parties.  USPA's intent to
capitalize on PRL's reputation and goodwill can be inferred from
its decision to adopt a mark that is so strikingly similar to
the PRL Polo Player Logo and initially employ the same color and
similar trade dress to that used for PRL's most popular
fragrance line sold under the Polo Player Logo. (Tr. 55:10-21
(Marino); PRL Parties Exs. 16 and 27.)  The explanation given by
USPA's President, Mr. Cummings, to explain its initial adoption
of similar blue trade dress is not persuasive.  Cummings
testified that blue packaging was used because USPA had adopted
blue trade dress, namely on the inseam and waistband labels and
hangtags of certain articles in its apparel lines, and USPA
believed that using blue packaging would better enable consumers
to identify the product as USPA's. (Tr. 215:8-218:2 (Cummings)).

Notably, USPA could have avoided this situation
entirely by choosing a logo that depicts a polo player in a
position and from a perspective that differs from the Polo

45

Player Logo with a more clearly distinct form of packaging (e.g. initially utilizing a different color, non metallic ink, and with no thin matching border edging). But it chose not to do so. That the USPA Parties and their licensee did not have any expertise in purveying fragrances or develop a strategic business plan, a budget, or sufficient funding for advertising; and that they worked with a licensee which would not disclose its name because it was concerned, as USPA was aware, that it might be dragged into a lawsuit with Ralph Laruen and had been unable to find sublicensees due to threat of a trademark action (Tr. 270:22-277:10 (Cummings)) further indicates that the USPA Parties intended to capitalize on PRL's reputation and goodwill--instead of building their own. Therefore, the Court finds that USPA adopted its mark with the intention of capitalizing on PRL's reputation and goodwill.[15]

## 7. The Quality of USPA's product

Under the seventh _Polaroid_ factor calls for an examination of the quality of USPA's fragrance product. The

---

[15]   This is distinct from a finding that USPA knowingly acted unlawfully at least with regard to USPA's adoption of the Double Horsemen mark on fragrances. Whether or not the USPA Parties acted in reliance on the 1984 Order and 2006 apparel litigation in adopting the Double Horsemen with regard to fragrances, this is not in tension with the Court's finding that USPA adopted the mark, and for fragrances initially with trade dress that is strikingly similar to the POLO BLUE line, with the intention of capitalizing on PRL's reputation, goodwill, and any confusion between its and the PRL's product.

Court makes no findings on this issue, as neither USPA nor the PRL Parties proffered evidence in this regard, and the USPA Parties' product was pulled from the market nearly immediately after being introduced.

However, it is the loss of control over quality that is the real gravamen of this factor. Accordingly, "a senior user may sue to protect his reputation even where the infringer's goods are of top quality." Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 259, 260 (2d Cir. 1987). A senior user, "is not required to put its reputation in [a junior users] hands, no matter how capable those hands may be." Id. (quoting James Burrough, Ltd. v. Ferrara, 165 N.Y.S.2d 825, 826 (Sup. Ct. 1957)). At the same time, courts in this Circuit have found that similarity in the quality of the products may create an even greater likelihood of confusion as to source inasmuch as consumers may expect products of similar quality to emanate from the same source. See generally Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221 F. Supp. 2d 410, 420 (S.D.N.Y. 2002) (discussing the two ways in which quality of the junior user's product has been analyzed); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 305, 325-26 (S.D.N.Y. 2000) (same); Jordache Enterprises, Inc., 841 F. Supp. 506, 520 (S.D.N.Y. 1993) (stating that because parties both manufacture

47

quality apparel, the senior user need not be concerned about reputational harm due to tarnishment, but that the equivalent quality of the products "supports the inference that they emanate from the same source").

Thus, while this factor is neutral, either reasoning might additionally support the PRL Parties' claims.

## 8.    The Sophistication of Fragrance Buyers

"Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in . . . trademarks will result in confusion concerning the source or sponsorship of the product." Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1046 (2d Cir. 1992).  Although it may be that purchasers of expensive fragrances are typically found to be somewhat sophisticated consumers, see, e.g., Nina Ricci, S.A.R.L. v. Gemcraft Ltd., 612 F. Supp. 1520, 1529 (S.D.N.Y. 1985), there is nothing in the record to indicate that purchasers of low- to mid-priced fragrances at low- to mid-range retailers are comparably sophisticated.  The USPA Parties state that they will sell their apparel and other products at Sears and similar mid-tier merchandisers at price points below those of the PRL Parties.

48

In so far as this will be the case, prospective purchasers of the USPA Parties' products may nonetheless be confused into believing that USPA's product is an authorized "down market" version or extension of the PRL Parties' fragrance products, or that USPA and the PRL Parties are otherwise affiliated.   See Nikon Inc. v. Ikon Corp., 987 F.2d 91, 95 (affirming district court's finding that consumers of lower-end products were less sophisticated and "could be confused about an affiliation between the products.").

"Where a second-comer acts in bad faith and intentionally copies a trademark or trade dress, a presumption arises that the copier has succeeded in causing confusion." Paddington Corp., 996 F.2d at 586-87 (citing Warner Bros. Inc. v. American Broadcasting Cos., 720 F.2d 231, 246-47 (2d Cir.1983); Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc., 618 F.2d 950, 954 (2d Cir. 1980); Bristol-Myers Squibb, 973 F.2d at 1044-45; Charles of the Ritz Group Ltd. V. Quality King Distributors, Inc., 832 F.2d 1317, 1322 (2d Cir. 1987)). This factor therefore cuts in the PRL Parties' favor.

Weighing the Factors

49

Weighing the various Polaroid factors and based on the evidence presented at trial, the Court finds that USPA's use of the Double Horsemen Mark along with the word mark "U.S. POLO ASSN." in the context of men's fragrances creates a strong likelihood of confusion with the PRL Parties' products. The marks are so similar that it is likely that consumers would be confused, whether by believing that PRL had authorized a down market product or by confusing the products outright.

## II. State Law Claims

"[T]he standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable." Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998); see also Genesee Brewing, 124 F.3d at 149; Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp., 937 F. Supp. 204, 208-09 (S.D.N.Y. 1996). The only additional element that must be shown to establish a claim for unfair competition under the common law is bad faith. Girl Scouts v. Bantam Doubleday Dell Publ'g Group, Inc., 808 F. Supp. 1112, 1131 (S.D.N.Y. 1992), aff'd, 996 F.2d 1477 (2d Cir. 1993) ("Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element

50

of bad faith or intent") (internal quotations omitted); <u>Jeffrey</u> <u>Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.</u>, 58 F.3d 27, 34-35 (2d Cir. 1995) ("[T]he essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods").

Since the PRL Parties have demonstrated a likelihood of confusion between the parties' marks under their Lanham Act claims and USPA intended to capitalize on PRL's reputation and goodwill, the PRL Parties prevail on their unfair competition claims as well.

Because the PRL Parties have prevailed on their Lanham Act and unfair competition claims, the Court need not reach the parties' additional state law claims in order to issue a permanent injunction. The scope of the relief sought--an injunction prohibiting the USPA Parties from using the "U.S. POLO ASSN." name in conjunction with the Double Horsemen mark in men's fragrances--is identical regardless of whether the PRL Parties would succeed on any of their additional claims.

**IV. Permanent Injunctive Relief**

Traditionally, in trademark infringement actions in this Circuit, a party seeking a permanent injunction "must succeed on the merits and show an absence of an adequate remedy at law and irreparable harm if the relief is not granted." Gayle Martz, Inc. v. Sherpa Pet Group, Inc., 651 F. Supp. 2d 72, 84-5 (S.D.N.Y. 2009) (citing Roach v. Morse, 440 F. 3d 53, 56 (2d Cir. 2006). However, the Second Circuit's recent decision in Salinger v. Colting, 607 F.3d 68, 74-75, announced in the context of a copyright infringement action that this standard for injunctive relief had been abrogated by eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006). The Second Circuit held that a preliminary injunction should issue where the plaintiff has shown a likelihood of success on the merits[16] and that: (1) "he is likely to suffer irreparable injury in the absence of an injunction"; (2) "remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the balance of hardships tips in his favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction." Salinger v. Colting, 607 F.3d 68, 80 (2d Cir.2010) (citing eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

---

[16]    "The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."  Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12.

Although the holding in <u>Salinger</u> was explicitly "limited to preliminary injunctions in the context of copyright cases," <u>Id.</u>, 607 F.3d at 78 n.7, the Court saw no reason why "<u>eBay</u> would not apply with equal force to an injunction in *any* type of case." <u>Id</u>. at 78 n.7(emphasis in original). And the panel noted that "<u>eBay</u> strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context." <u>Id</u>. at 78.

While the Second Circuit has not yet spoken on this issue in the context of trademark infringement actions,[17] <u>Salinger</u> suggest that these cases should be analyzed under the standards for injunctive relief articulated by the Supreme Court in <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S. 388 (2006). This Court agrees with other courts in this Circuit to have considered <u>Salinger's</u> applicability to trademark actions that there appears to be no principled reason not to adopt the newly announced standard in the trademark context. See <u>Pretty Girl, Inc.</u>, 2011 WL 887993, at *2; <u>New York City Triathlon LLC v. NYC Triathlon Club, Inc.</u>, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010).

---

[17]     Prior to <u>Salinger</u>, there was a split among the district courts about the applicability of the eBay standard to trademark cases. See <u>Gayle Martz, Inc. v. Sherpa Pet Group, Inc.</u>, 651 F.Supp.2d 72, 84-85 (S.D.N.Y. 2009) (comparing <u>Microsoft Corp. v. AGA Solutions, Inc.</u>, 589 F.Supp.2d 195, 204 (E.D.N.Y. 2008) (applying <u>eBay</u> standard in trademark action) with <u>Patsy's Italian Restaurant, Inc. v. Banas</u>, 575 F.Supp2d 427, 464 & n.25 (E.D.N.Y.) (declining to apply <u>eBay</u>)).

Moreover, this Court recognizes that "'a major departure from the long tradition of equity practice should not be lightly implied.'" eBay, 547 U.S. at 392 (quoting Weinberger v. Romero-Barcelo, 426 U.S. 305, 320 (1982)). Salinger strongly suggested that eBay's standard applies in the context of any injunction, so long as Congress does not intend otherwise. 607 F.3d at 77-78 & n.7. As in eBay, no Congressional intent to the contrary is evident here, but instead the reverse. See eBay, 547 U.S. at 391-92. The Lanham Act expressly provides that federal courts "have power to grant injunctions, according to the principles of equity" in trademark infringement and dilution cases. 15 U.S.C. § 1116(a). Similarly, the Act expressly states that the senior owner of a mark "shall be entitled" to an injunction "subject to the principles of equity" with respect to dilution claims. 15 U.S.C. § 1125(c)(1).

Accordingly, the Court concludes that the four-factored injunction standard articulated in eBay and Salinger applies to this action.

## A.   Likelihood of Irreparable Injury

This Circuit has previously recognized a presumption of irreparable harm in trademark infringement actions. Even quite recently, the Circuit has held that as long as there has not been undue delay in bringing a claim, a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005); Zino Davidoff SA v. CVS Corp., 571 F.3d, 246 (2d Cir. 2009). See also, Dunkin' Donuts Franchised Rests. LLC v. Tim & Tab Donuts, Inc., No. 07-CV-3662 (KAM)(MDG), 2009 WL 2997382, at *8 (E.D.N.Y. Sept. 15, 2009) (irreparable injury "is automatically satisfied by actual success on the merits as irreparable harm is established by a showing of likelihood of confusion.") (internal quotation and citation omitted).

Prior to Salinger, which eliminated an analogous presumption in the context of copyright claims,[18] it was less clear whether eBay's elimination of the presumption of irreparable harm applied to trademark infringement actions. See also Chloe v. DesignersImports.com USA, Inc., No. 07 Civ. 1791 (CS)(GAY), 2009 WL 1227927, at *11 (S.D.N.Y. April 30, 2009)

---

[18] "After eBay . . . courts must not simply presume irreparable harm. Rather, plaintiffs mush show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." Salinger, 607 F.3d at 82.

(retaining pre-eBay presumption); Montblanc-Simplo GmbH v. Colibri Corp., 692 F. Supp. 2d 245 (E.D.N.Y. 2010) (same). In light of Salinger's clarification that "eBay's central lesson is that, unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard," 607 F.3d at 77-78 & n.7, the presumption of irreparable injury in trademark cases is no longer appropriate. See Pretty Girl, 2011 WL 887993, at *2 & n.4; New York City Triathlon, 704 F. Supp. 2d at 342-43. Even without the presumption, however, the PRL Parties have adequately demonstrated irreparable harm here.

"Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable." New York City Triathlon, 704 F. Supp. 2d at 343 (internal quotation marks ommitted) (quoting Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir. 1985); Omega Importing Corp. v. Petri-Kine Camera Co., 451 F.2d 1190, 1195 (2d Cir. 1971).

Here, absent an injunction, given the likelihood of confusion between the Polo Player Logo and USPA's Double Horsemen Trademark, the reputation and goodwill cultivated by PRL's would be out of its hands.  The USPA Parties' product may or may not be of high quality, sold with sufficient care to customer service, or convey the same branding image that has been highly cultivated by Ralph Lauren.  In any event, the impression given to consumers by the USPA Parties' product, and so the reputation and goodwill of the PRL Parties', will not be in PRL's control.  The Court therefore agrees that though the harm the PRL Parties will suffer in terms of reputation and goodwill cannot be quantified, the PRL Parties will be irreparably injured in the absence of a permanent injunction.

**B.    Adequacy of Remedies at Law**

Because the losses of reputation and goodwill and resulting loss of customers are not precisely quantifiable, remedies at law cannot adequately compensate Plaintiff for its injuries.  See generally Northwestern Nat'l Ins. Co. of Milwaukee, Wisc. v. Alberts, 937 F.2d 77, 80 (2d Cir. 1991) ("The irreparable injury requisite for the preliminary injunction overlaps with the absent lack of adequate remedy at law necessary to establish the equitable rights.").

Accordingly, the court finds that remedies at law are inadequate to compensate the PRL Parties in this case.

## C.    The Balance of Hardships

The equities weigh in the PRL Parties' favor.    PRL has sold men's fragrances bearing the PRL Polo Player logo and POLO marks for over thirty years and has multiple registered trademarks for their use on fragrances.    (Tr. 52:13-21.; PRL Ex. 14.)    The substantial likelihood of consumer confusion and potential loss to PRL both in terms of sales and reputation threaten to cause the PRL Parties serious harm.    In contrast, the USPA Parties have yet to enter the fragrance market in earnest.    While 10,000 units of the USPA's product have been produced at their cost(Tr. 277:11-15), only approximately 3,500 of which  were sold (Tr. 278:10-13), this is not so great as to outweigh the harm that would be done to the PRL Parties absent an injunction.

## D.    The Public Interest

The consuming public has a protectable interest in being free from confusion, deception and mistake.    See New York City Triathlon, 704 F. Supp. 2d at 344 ("[T]he public has an

interest in not being deceived--in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.") (citing <u>SK & F. Co. v. Premo Pharm. Labs., Inc.</u>, 625 F.2d 1055, 1067 (3d Cir. 1980)); <u>Gayle Martz</u>, 651 F. Supp. 2d at 85).

Because of the likelihood of consumer confusion in this case, the public interest would be served by the issuance of an injunction, and this factor weighs in Plaintiff's favor.

## Conclusion

The USPA Parties contend that the PRL Parties are attempting to monopolize the depiction of the sport of polo.  No monopoly over the use of the word polo or its depiction exists. As Judge Sand noted, the PRL Parties do not have a right to take action with respect to the use of <u>any</u> equestrian figure or the word "polo."  Sand Opinion, 1984 WL 1309, at *17.  As Judge Sand observed, and Judge Goettel before him, it is clear that "polo" is generic with regard to polo shirts and coats.   <u>Id.</u> at *2. Polo may be descriptive as to other shirts and coats as well as to various uses with regard to the sport.  Nothing in this order is intended to prevent the USPA Parties from using "polo" to the extent they do so generically or descriptively.   There continue

59

to be countless ways in which the sport of polo can be depicted without infringing on the PRL Parties' marks.

There is, in Judge Sand's words, clearly room in our vast society for both the USPA Parties and the PRL Parties to engage in licensing activities that do not conflict with one another, and nothing contained in this opinion should be construed as precluding such activities.  Id. at *8. Nonetheless, to the extent the USPA Parties use "polo" in conjunction the Double Horsemen mark on fragrances, this is another matter.  The USPA Parties use of "POLO" in conjunction with the Double Horsemen mark in the context here infringes the PRL Parties' substantive trademark rights.

Based on the findings and conclusions set forth above, the claims of the United States Polo Association Parties are dismissed and the PRL Parties are granted injunctive relief.

Submit judgment on notice.  It is so ordered.

New York, NY
May 13 , 2011

ROBERT W. SWEET
U.S.D.J.

60