UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

UNITED STATES POLO ASSOCIATION, INC.,
and USPA PROPERTIES, INC.,

        Plaintiffs,                09 Civ. 9476

   -against-                    OPINION

PRL USA HOLDINGS, INC., and
L'ORÉAL USA, INC.,

        Defendants.

------------------------------------------X

A P P E A R A N C E S:


      Attorneys for Plaintiffs United States Polo
      Association, Inc.

      BAKER & HOSTETLER LLP
      45 Rockefeller Plaza
      New York, NY  10111
      By:  Gerald J. Ferguson, Esq.
          John D. Parker, Esq.
          David Sheehan, Esq.


      Attorneys for Defendant L'Oréal USA, Inc.

      PAUL, HASTINGS, JANOFSKY & WALKER, LLP
      75 East 55th Street
      New York, NY  10022
      By:  Robert L. Sherman, Esq.


      Attorneys for Defendant PRL USA Holdings, Inc.

      KELLEY DRYE & WARREN LLP
      101 Park Avenue
      New York, NY  10178
      By:  William R. Golden, Jr., Esq.

1

John M. Callagy, Esq.
Andrea L. Calvaruso, Esq.
Matthew D. Marcotte, Esq.


Attorneys for JRA Trademark Company, Ltd.

WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
By:  Michael S. Sommer, Esq.
     Jessica L. Margolis, Esq.
     Scott D. Tenley, Esq.

**Sweet, D.J.**

Defendant PRL USA Holdings, Inc. ("PRL" or the "Defendant") has moved to hold plaintiffs United States Polo Association, Inc. ("USPA") and USPA Properties, Inc. ("USPAP") (collectively, the "USPA Parties" or the "Plaintiffs") in contempt for violating the Permanent Injunction and Final Judgment entered in this action on March 5, 2012 (the "Injunction") and the Final Order, Judgment and Decree entered on December 6, 1984 (the "1984 Order").  Non-party JRA Trademark Company, Ltd. ("JRA") has moved to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure.

This is the latest outbreak of a twenty-eight year trademark war between PRL and its predecessor, possessors of the highly-successful Ralph Lauren Polo Player Logo, and the USPA, a national association dedicated to the promotion of the sport of polo and the sale of products which are designated as polo products.  The parties have conducted this feud in various battlegrounds with tenacity, ability and assisted by eminent and high-skilled counsel.  The outcome of these battles has not produced the clarity to compel the termination of the conflict. What follows is the outcome of another skirmish which involves a

dispute over the USPA's parties' use of variants of its Double
Horsemen Mark and U.S. POLO ASSN. marks on eyewear.

On the facts and conclusions set forth below, JRA'
motion to intervene is considered first to allow for
consideration of its opposition, and is granted.  PRL's motion
for contempt and appropriate sanctions is also granted.

## I. **Preceding Litigations and Prior Proceedings**

In 1984, USPA and its licensees commenced an action
against PRL for a declaratory judgment that various articles of
merchandise bearing a mounted polo player symbol did not
infringe PRL's Polo Player Logo.  PRL counterclaimed for
trademark infringement.  The matter came before the Honorable
Leonard B. Sand.

In his 1984 Order, Judge Sand denied USPA's request
for a judgment of non-infringement, found that USPA and its
licensees infringed PRL's Polo Player Logo, POLO, POLO BY RALPH
LAUREN trademarks and PRL's trade dress, and engaged in unfair
competition.  See U.S. Polo Ass'n v. Polo Fashions, Inc., No. 84
Civ. 1142 (LBS), 1984 WL 1309 (S.D.N.Y. Dec. 6, 1984).

4

The 1984 Order enjoined USPA and its licensees from infringing PRL's marks, including the Polo Player Logo and the word "POLO," but not from engaging in a licensing program that did not use the infringing trademarks.  Specifically, the 1984 Order included the following provisions enjoining the USPA parties and those in concert with them from the following:

a.   using any of the Polo Marks or any name or mark or symbol which is confusingly similar thereto, in connection with the sale or offering for sale of any goods or the rendering of any services;

b.   manufacturing, distributing, advertising, promoting, importing, licensing, authorizing, sponsoring, holding for sale or selling any goods, labels, tags, logos, decals, emblems, signs and other forms of markings, any packaging, wrappers, containers and receptacles and any jacquard cards, catalogs, price lists, promotional materials and the like bearing an infringement or colorable imitation of any of the Polo Marks;

c.   using for any commercial purposes whatsoever any symbol, logo, trade name or trademark which may be calculated to or has the effect of falsely representing that the services or products of or licensed by plaintiffs are sponsored or authorized by, or in any way associated with defendants, Ralph Lauren or any entity affiliated with any of them;

d.   using for any commercial purposes whatsoever, the name "United States Polo Association," or any other name which emphasizes the word POLO (or the words U.S. POLO) separate, apart and distinct from such name in a manner which likely to cause confusion with defendants, Ralph Lauren or any entity affiliated with any of them.

5

(Cal. Dec. Ex. B, ¶ 8).  The 1984 Order, however, permitted USPA to conduct a retail licensing program using its name, "a mounted polo player or equestrian or equine symbol which is distinctive from . . . [PRL's] polo player symbol in its content and perspective," and other trademarks that refer to the sport of polo, subject to certain conditions and restrictions set forth in the 1984 Order.  Id.  The USPA Parties did not appeal the 1984 Order.

In 2000, PRL brought a lawsuit in the Southern District of New York against the USPA and its master licensee affiliates, seeking to bar the use of USPA's name, the Double Horsemen Mark and other logos on apparel and related products. PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., No. 99 Civ. 10199 (GBD) (S.D.N.Y. 2000) (the "Apparel Litigation").

On September 5, 2003, the PRL and USPA Parties entered into a settlement agreement that partially settled the claims made by PRL against the USPA Parties in the Apparel Litigation (the "2003 Settlement Agreement").  The 2003 Settlement Agreement set forth terms for the USPA to use its name and certain other logos, designs and packaging on apparel, leather goods and watches.  It also incorporated by reference the 1984

Order and provided a mechanism for PRL to raise complaints and objections regarding packaging that it believed was infringing its rights or in violation of the 2003 Settlement Agreement. However, the parties failed to resolve whether the USPA had a right to use four of variants of its Double Horsemen Mark. Instead, the parties agreed to resolve that issue though a trial before the Honorable George B. Daniels, and that the result of the trial would be incorporated into the 2003 Settlement Agreement.

On October 20, 2005, a jury verdict concluded that three out of the four versions of the Double Horsemen Mark did not infringe PRL's single horseman mark when used on apparel, leather goods and watches. PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., No. 99 Civ. 10199 (GBD), 2006 WL 1881744, at *1 (S.D.N.Y. July 7, 2006). Specifically, "the jury found (1) [USPA Parties'] solid double horseman mark infringed PRL's Polo Player Symbol trademarks; and (2) [USPA Parties'] solid double horseman mark with 'USPA,' outline double horseman mark, and outline double horseman mark with 'USPA' did not infringe PRL's Polo Player Symbol trademarks."

After considering post-trial briefing by the parties, Judge Daniels denied PRL's motion for a new trial in July 2006.

7

PRL appealed the jury's verdict, which the United States Court of Appeals for the Second Circuit upheld.  See PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc., 520 F.3d 109 (2d Cir. 2008).

On November 13, 2009, the USPA Parties filed a complaint for declaratory judgment that sought the right to license and sell in the United States fragrance products bearing U.S. POLO ASSN., the Double Horsemen Marks and "1890," the year of the founding of the U.S. Polo Assn. (the "Fragrance Litigation"). (Dkt. No. 1).  PRL and its exclusive fragrance licensee, L'Oreal USA, Inc. ("L'Oreal"), intervened in the action without objection.  (Dkt. No. 12).  PRL and L'Oreal brought various counterclaims against the USPA Parties and sought a preliminary injunction barring the use of the Double Horsemen Logo on March 2, 2010.  (Dkt. Nos. 11, 14, 15).

The parties agreed that the preliminary injunction hearing would be consolidated with a trial on the merits. After a bench trial, an opinion was entered on May 13, 2011 by this Court (the "May 13 Opinion") determining that the USPA Parties' use of a confusingly similar logo consisting of two mounted polo players and their use of composite word marks in which the word "POLO" predominated, infringed the PRL Marks with respect to

8

fragrance products.   (Dkt. No. 80); see U.S. Polo Ass'n v. PRL

USA Holdings, Inc., 800 F. Supp. 2d 515 (S.D.N.Y. 2011).


     The May 13 Opinion held that PRL's federally

registered Polo Player Logo and POLO trademarks (collectively,

the "PRL Marks") on fragrance products were valid and "extremely

strong" and were entitled to a substantial degree of protection

from infringement.   Id. at 527-28.   The May 13 Opinion also

found that the similarity between PRL's Polo Player Logo and

USPA's Double Horsemen Mark was "apparent[,]"   Id. at 528,

noting that,


          Both marks are similar in perspective —
          containing a polo player on horseback, facing
          slightly to the viewer's left, leaning forward
          with a polo mallet raised.  Both are displayed in
          embossed metallic or glossy material — with PRL's
          appearing in a number of colors including silver
          and gold, and USPA's appearing in a light gold.

          The primary difference between the marks is that
          the PRL's logo contains one player, while USPA's
          contains two, one with mallet raised and the
          other with mallet lowered, which significantly
          overlap.  In USPA's mark, the front horseman is
          displayed in solid metallic ink, while the rear
          horseman is only outlined, such that the
          background packaging shows through.  This gives
          the front — mallet raised — horseman more visual
          prominence, while the torso of the rear horseman
          can be said to fade into the background.  Both of
          USPA's horsemen share the same directional
          perspective and overlap to a degree that it can
          be difficult to discern if there is one horse or
          two.

Id. at 528-529.

The May 13 Opinion also found that the USPA acted in bad faith in adopting the Double Horsemen Mark for fragrances and that "USPA's use of the Double Horsemen Mark along with the word mark 'U.S. POLO ASSN.' in the context of men's fragrances created a strong likelihood of confusion with the PRL Parties' products."  Id. at 538.

On March 5, 2012, PRL's motion for attorneys' fees was denied and the Injunction was entered.  (Dkt. Nos. 94, 95).  The Injunction provided that the USPA Parties were permanently enjoined and restrained from:

   a. Using the Double Horsemen Mark, . . . alone or in combination with any name, symbol, device or other word(s) in connection with the advertising, promotion, offering for sale or sale of fragrances or related products such as cosmetics, personal care products and beauty products;

   b. Using the word "POLO" alone or in combination with any name, symbol, device or other word(s) in connection with the advertising, promotion, offering for sale or sale of fragrances or related products such as cosmetics, personal care products and beauty products;

   c. Using the PRL marks or any other name or mark, including the image of one or more mounted polo players, that constitutes a colorable imitation of or is confusingly similar to PRL's Polo Player Logo . . . or "POLO" word mark in connection with the sale or

offering for sale of any goods or rendering of any
services;

d. Using for any commercial purpose whatsoever any
symbol, logo, trade name, trademark, or trade dress
which is calculated to or has the effect of
representing that the products or services of or
licensed by the USPA Parties are associated with,
sponsored, endorsed, or authorized by, or are in any
way connected or associated with the PRL Parties or
any entity affiliated with them.

(Injunction ¶¶ 3(c)-(d)).


On April 3, 2012, the USPA Parties appealed the May 13
Opinion and the Injunction to the Second Circuit.  (Dkt. No.
96).  On February 11, 2013, the Second Circuit affirmed this
Court's judgment of dismissal and entry of permanent injunction.
U.S. Polo Ass'n v. PRL USA Holding, Inc., No. 12 Civ. 1346, 2013
WL 490796 (2d Cir. Feb. 11, 2013) (the "USPA Appeal").


On August 21, 2012, PRL brought the instant motion for
sanctions and contempt of the Injunction, based upon the USPA
Parties' sale of eyewear bearing logos, which according to PRL,
are colorable imitations of PRL's Polo Player Logo.


After learning of PRL's motion for contempt and
sanctions, JRA contacted the USPA Parties to seek its consent
for JRA to intervene in this action for the purpose of defending

11

against PRL's motion and the interpretation of the Injunction on Wednesday, August 22, 2012.  That consent was given on August 27, 2012.  The next day, JRA requested PRL's consent for its intervention.  On August 29, 2012, PRL notified JRA that it would not consent to JRA's intervention because that intervention would cause undue delay.  In response, JRA agreed to be bound by whatever schedule the named parties agreed to and submitted its opposition for consideration should its motion to intervene be granted.

Both motions were heard and marked fully submitted on October 3, 2012.

## II.   The Applicable Facts

Since 1978, PRL has marketed eyewear and sunglasses, which bear its Polo Player Logo and other trademarks.  Sales of PRL's eyewear products have generated nearly $300 million in the United States since 2007.  According to PRL, it and its licensees have spent approximately $17 million in the last five years to advertise and promote eyewear bearing the PRL Marks.

In July 2010, USPAP's President and CEO David Cummings ("Cummings") provided deposition testimony that eyewear was

12

being sold in the U.S. market with the Double Horsemen Mark and also testified during the trial of this action stating the same. The USPA Parties presented evidence at trial that included 49 computer-assisted designs ("CADs") for sunglasses bearing the Double Horsemen mark and that the U.S. POLO ASSN. name that had been approved for sale in the United States by the USPA. According to the USPA Parties, since 2009, more than 987,000 pairs of sunglasses bearing the USPA's trademarks have been sold in the United States, with more than $1 million in sales each year from 2010 through 2012.

In April 2011, the USPA Parties filed an intent-to-use application with the United States Patent and Trademark Office ("USPTO") to register the Double Horsemen Mark for "eyewear, namely, ophthalmic eyewear frames, reading glasses, sunglasses, eyeglass cases and covers, sun clips in the nature of eyewear." (the "USPA Eyewear Application"). On December 21, 2011, PRL filed a notice of opposition to the registration of the USPA Eyewear Application with the Trademark Trial and Appeal Board ("TTAB"), alleging that the USPA's Double Horsemen Mark as applied to eyewear was so similar to PRL's Polo Player Logo that it was likely to cause confusion. USPA did not contest PRL's notice of opposition but instead asked PRL to consent to the withdrawal of the USPA Eyewear Application. PRL refused.

13

On May 30, 2012, the USPA abandoned the USPA Eyewear Application, resulting in a TTAB order sustaining PRL's opposition with prejudice (the "TTAB Order"). The USPA withdrew the trademark application limited to the Double Horsemen Mark, and re-filed applications (Serial Nos. 85695036 and 85695059) for eyewear with the composite mark of the Double Horsemen Mark and "USPA" on August 3, 2012.

The USPA Parties are promoting and selling at least 11 different styles of sunglasses bearing the Double Horsemen Mark through major retail locations, including Kohl's, TJ Maxx, Burlington Coat Factory and Ross stores, as well as at its own retail outlets. The USPA Parties' sunglasses are sometimes sold with a navy blue case bearing the Double Horsemen Mark colored in silvery cream or very light gold with the words "U.S. POLO ASSN." underneath. A navy blue hang tag displaying a monochromatic gold Double Horsemen Mark on the front is attached to the USPA sunglasses.

Recently at the 2012 London Olympic Games, PRL was an official outfitter for Team USA, and holds a license from the United States Olympic Committee (the "USOC") to use certain Olympic symbols, labels, and trademarks (the "USOC Commercial

14

Marks") in connection with the licensed merchandise, including sunglasses. Under its USOC license, PRL has produced products for Team USA and its fans, including sunglasses, which display the USOC Commercial Marks together with the PRL Marks.

PRL also created a special Olympic Polo Player Logo, which is displayed exclusively on Olympic products. The logo was prepared for the 2012 Olympics and consists of PRL's Polo Player Logo in white on a blue background, encircled by a red band with white borders, with "RALPH LAUREN" and "2012" appearing within the band (the "Olympic Polo Player Logo").

Beginning with the 2008 Olympic Games, PRL had used the Olympic Polo Player Logo, altered to include the applicable year of the then current games, on products donated to Team USA and sold to consumers. The Olympic Polo Player Logo was also used on products promoted and sold in connection with the Olympic Games held in Canada in 2010. To date, in 2012, sales of PRL products bearing the Olympic Polo Player Logo and the USOC Commercial Mark have exceeded several million dollars.

According to PRL, the USPA Parties' "Cape Cod" sunglasses style bears a colorable imitation of PRL's Olympic Polo Player Logo. USPA's logo consists of a sold white colored

15

Double Horsemen Mark on a blue background, encircled by a red band with white borders, with "U.S. POLO ASSN." appearing in the red band and is displayed on the temple portion of the frame next to the hinge.[1]  PRL contends that the Double Horsemen mark imprinted on these sunglasses blur together, making it difficult, without close inspection, to decipher whether there is one horseman or two.  In addition, PRL asserts that the shape of this style of the USPA Parties' sunglasses is similar to the PRL Olympic sunglasses.

According to PRL, the use of the USPA Double Horsemen Mark on their sunglasses is a violation of ¶ 3(c) - (d) of the Injunction and constitutes contempt of the Injunction.  In opposition, the USPA contends that the Injunction is limited to fragrance products only, that there is no evidence of confusion, and that PRL has been aware of the conduct complained of since July 2010 but did not act until over five month after the entry of the Injunction.

JRA, as the exclusive licensee for the USPA Marks in the United States, avers that they have a significant and

---

[1] During 2010 and 2011, the USPA used blue and gold trade dress in the United States and its Cape Cod style sunglasses were among the sunglasses included in the evidence admitted at trial in this action in 2011.

16

compelling interest in the outcome of the instant motion and the appropriate use of the contested marks.

## III. **JRA's Motion to Intervene is Granted**

Rule 24(a) of the Federal Rules of Civil Procedure provides for intervention as a matter of right when certain specific circumstances are met.[2]  To demonstrate a right to intervene under Rule 24(a), a prospective intervener must show that "(1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (2) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." MasterCard Int'l. Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 389 (2d Cir. 2006).

---

[2] On timely motion, the court must permit anyone to intervene who:

(1) is given an unconditional right to intervene by a federal statute, or

(2) claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a).

17

Alternatively, even if a court concluded that a party could not intervene as of right, Rule 24(b) provides for permissive intervention.[3]  Under Rule 24(b)(1)(B), a court has the discretion to "permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  In addition, Rule 24(b)(3) states that "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).

Within this discretion, courts have held that Rule 24(b)(2) is to be liberally construed in favor of intervention. See e.g., Degrafinreid v. Ricks, 417 F. Supp.2d 403, 407 (S.D.N.Y. 2006); Williston v. Feliz, No. 04 Civ. 4454, 2005 WL 1669008, at *1 (S.D.N.Y. July 14, 2005).  Additional relevant factors considered by courts "'include the nature and extent of the intervenors' interests,' the degree to which those interests are 'adequately represented by other parties,' and 'whether

---

[3] On timely motion, the court may permit anyone to intervene who:

(a) is given a conditional right to intervene by a federal statute; or

(b) has a claim or defense that shares with the main action a common question of law or fact.

Fed. R. Civ. P. 24(b)(1).

parties seeking intervention will significantly contribute to
[the] full development of the underlying factual issues in the
suit and to the just and equitable adjudication of the legal
questions presented.'" Diversified Group Inc. v. Daugerdas, 217
F.R.D. 152, 157 (S.D.N.Y. 2003); (citing H.L. Hayden Co. of N.Y.
v. Siemens Med. Sys., Inc., 797 F.2d 85, 89 (2d Cir. 1986)).

While JRA may have an absolute right of intervention,
the issue need not be reached because permissive intervention is
warranted under Rule 24(b).  As an initial matter, JRA moved to
intervene promptly and in a manner calculated to effectively
eliminate any delay caused by its intervention.  While
timeliness "defies precise definition," in determining whether a
motion to intervene is timely, courts generally consider:  "(1)
how long the applicant had notice of the interest before it made
the motion to intervene; (2) prejudice to existing parties
resulting from any delay; (3) prejudice to the applicant if the
motion is denied; and (4) any unusual circumstances militating
for or against a finding of timeliness." United States v.
Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994).

Here, JRA commenced its efforts to intervene on August
22, 2012, one day after PRL filed its motion for contempt and
sanctions.  Promptly thereafter, within a week, JRA contacted

19

counsel for the parties seeking consent to intervene.  When PRL
refused to consent, and rejected JRA's briefing schedule, JRA
commenced its instant motion.  Any delay was minimal and thus,
JRA made a timely motion.

JRA's sole purpose is to manufacture and sell products
bearing the USPA Marks.  JRA has invested millions of dollars
into the USPA brand and derives substantial revenue from the
products currently threatened by the pending litigation.  The
majority of the administrative and financial burden of complying
with the Court's decision would also fall on JRA, giving it
greater incentive to limit the scope of any adverse decision or
reporting requirement.  Thus, JRA has a sufficient significant
interest as a potential intervenor.

In addition, courts have characterized the "adequacy
of interest" requirement of Rule 24(a) as "minimal."  Trbovich
v. United Mine Workers of America, 404 U.S. 528, 538, 92 S. Ct.
630, 30 L.Ed. 2d 686 (1972) ("The requirement of the Rule is
satisfied if the applicant shows that representation of his
interest 'may be' inadequate; and the burden of making that
showing should be treated as minimal.").  While the USPA Parties
and JRA share some similar interests and both seek to defeat
PRL's motion, the parties do not have identical interests.  JRA

20

has contractual and business concerns involving agreements with
sub-licensees for the design and production of USPA products,
including eyewear.   JRA and its sub-licensees also employ
thousands of individuals who perform all of the functions
necessary to bring USPA products to the marketplace in the
United States.  Thus, JRA, not the USPA Parties, will bear the
primary burden of complying with the outcome of PRL's motion.


        Moreover, contrary to PRL's assertion that JRA's
intervention would result in a delay in the final resolution of
its contempt motion and complicate the proceedings, JRA has
already briefed its opposition for consideration as to avoid
such concerns.  Resolution of JRA's motion has also not required
any additional discovery that would cause any delay or
prejudice.  See Berroyer v. United States, No. 10 Civ.
3888(ADS)(ARL), 2012 WL 1486758, at *4 (E.D.N.Y. May 5, 2012)
(holding that no prejudice to existing parties to litigation
where no additional discovery needed by putative intervener).
Instead, there is no risk of undue delay or prejudice here, and
permitting JRA to intervene will ensure "that all relevant
parties to the dispute are present before the Court."  Louis
Berger Grp., Inc. v. State Bank of India, 802 F. Supp. 2d 482,
489 (S.D.N.Y. 2011).


                            21

Taken together, JRA has demonstrated that it has a substantial interest in the outcome of this proceeding, and is therefore permitted to intervene for the limited purpose of defending against PRL's contempt motion.

## IV.  PRL's Motion for Contempt is Granted

### A) The Standard For Civil Contempt

Rule 65(d) states that "[e]very order granting an injunction and every restraining order must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail — and not by referring to the complaint or other document — the act or acts retrained or required." Fed. R. Civ. P. 65(d).  As the Supreme Court noted, this rule "reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S. Ct. 201, 19 L. Ed. 2d 236 (1967)).  Thus, the clarity of the order must be such that it enables the enjoined party "to ascertain from the four corners of the order precisely what acts are forbidden." Dry Wall Tapers and Pointers of Greater New York,

22

Local 1974 v. Local 530 of Operative Plasterers and Cement
Masons Int'l Ass'n, 889 F.2d 389, 395 (2d Cir. 1989).
Ambiguities are usually resolved in favor of the party charged
with contempt.  See e.g., N.Y. Tel. Co. v. Commc'ns Workers of
Am., AFL-CIO, 445 F.2d 39, 48 (2d Cir. 1971).


     A contempt order is a "potent weapon to which courts
should not resort where there is a fair ground of doubt as to
the wrongfulness of the defendant's conduct."  Tactica Int'l,
Inc. v. Atl. Horizon Int'l, Inc., 154 F. Supp.2d 586, 609
(S.D.N.Y. 2001) (internal citations and quotations omitted).
Thus, the prerequisites for a finding of civil contempt are as
follows: (1) the order which has been violated must be clear and
unambiguous; (2) the violation must be proved by clear and
convincing evidence; and (3) the violating party has not made a
diligent effort to comply with the terms of the order. See,
e.g., Benham Jewelry Corp. v. Aron Basha Corp., No. 97 Civ. 384,
1997 WL 639038 at *1 (S.D.N.Y. Oct. 15, 1997) (citing cases);
Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.
Info. Tech., Inc., 369 F.3d 645, 655 (2d Cir. 2004).  A finding
of contempt, however, does not require a court to find
willfulness. Paramedics, 369 F.3d at 655.

The clear and convincing standard "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation occurred."  Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002); see also Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102-103 (2d Cir. 1965) (per curiam) ("A civil contempt order will not issue unless there is 'clear and convincing' proof of violation of a court decree; a bare preponderance of the evidence will not suffice.").  The moving party must demonstrate that the enjoined party "had knowledge of and disobeyed a clear, explicit and lawful order of the court and that the offending conduct prejudiced the right of the opposing party."  Levin, 277 F.3d at 251.

### B) **The USPA Has Violated The Injunction**

Although the USPA Parties and JRA have contended that the Injunction is limited to fragrance products and that the context of the underlying action was limited to proof of confusion (USPA Opp. at 13-15), the Injunction by its terms is not so limited.  PRL has also produced clear and convincing evidence demonstrating non-compliance with the Injunction.

24

i.   The Injunction Clearly and Unambiguously Bars the
     Double Horseman Mark

The Injunction prohibits the USPA Parties from, among

other things, use of "the image of one or more mounted polo

players, that constitutes a colorable imitation of or is

confusingly similar to PRL's Polo Player Logo . . . or 'POLO'

word mark in connection with the sale or offering for sale of

any goods or rendering of any services," and/or "any symbol,

logo, trade name, trademark, or trade dress which is calculated

to or has the effect of representing that the products or

services of or licensed by the USPA Parties are associated with,

sponsored, endorsed, or authorized by, or are in any way

connected or associated with the PRL Parties," "for any

commercial purpose whatsoever."   Injunction ¶¶ 3(c-d).


The injunctive provisions in the 1984 Order are

similar to their counterparts in the Injunction.   (See

Comparison Table attached to the Calvaruso Dec. as Exhibit G).

This resemblance is especially evident with respect to the

provisions against the USPA Parties' expansion of the use of the

infringing marks to other items.   See also U.S. Polo Ass'n, 2013

WL 490796 at *4 (finding that that the Injunction "merely tracks

the language of the 1984 Order, to which USPA was already

subject."). Both the Injunction and the 1984 Order sought
appropriately to eliminate the source of future controversy
between the parties.

The USPA Parties' and JRA contend that the Injunction
made no reference to any of the eyewear designs and trade dress
about which PRL now complains. They aver that the specificity
of the prohibitions in ¶¶ 3(a) and (b) of the Injunction, which
states that the Double Horseman Mark and marks using the word
POLO may not be used on fragrance products, logically implies
that the ¶¶ 3(c) and (d) cannot be interpreted to include
eyewear. (USPA Opp. at 12). According to the USPA Parties,
such an interpretation of ¶¶ 3(c) and (d) would render the first
two paragraphs "extraneous and unnecessary," a result that is
"presumptively invalid." (Id. at 12). Their argument suggests
that the Injunction must be limited to fragrance products alone
and that the prohibition against the use of a colorable
imitation of the Polo Player Logo on any other product requires
proof similar to that addressed in the trial of this action.

Such an interpretation, however, would ignore the
plain text of the Injunction and negate the latter two
paragraphs completely. See DBT Gmbh v. J.L. Min. Co., 544 F.
Supp.2d 364, 377 (S.D.N.Y. 2008) (stating the fundamental rule

26

that "a contract should be interpreted in a manner that gives meaning to every provision."). Despite the USPA's protestations, there is no contradiction between the first and latter two provisions of ¶ 3 of the Injunction or ambiguity in the wording of the prohibitions. Instead, the plain meaning of the words "the sale or offering for sale of <u>any goods</u>, or rendering of <u>any services</u>" neither restricts the Injunction to fragrances only nor fails to include eyewear within the meaning of the words "any goods." Injunction ¶ 3(c).

Courts have repeatedly rejected arguments similar to the USPA Parties' that ¶¶ 3(c) and 3(d) cannot serve "as a basis for holding a party in contempt as to goods, marks or trade dress that were not before the Court in this or any prior proceeding . . . ." (USPA Opp. at 13). For an injunction to be "clear and unambiguous," it need only be "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." <u>New York State Nat'l Org. for Women v. Terry</u>, 886 F.2d 1339, 1352 (2d Cir. 1989). "This does not mean that every conceivable example of the prohibited conduct must be spelled out in the text of the order." <u>GMA Accessories, Inc. v. Eminent, Inc.</u>, No. 07 Civ. 3219 (LTS)(DF), 2008 WL 2355826, at *3 (S.D.N.Y. May 29, 2008).

In Bear U.S.A., Inc. v. Kim, for example, the Court
found an injunction to be clear and unambiguous where the
language prohibited defendants from using plaintiff's trademark
and from "manufacturing, importing, financing, circulating,
selling, offering for sale, moving or otherwise disposing of any
product bearing any simulation, reproduction, counterfeit, copy,
colorable imitation or confusingly similar imitation [of] the
trademarks." 71 F. Supp. 2d 237, 247 (S.D.N.Y. 1999). The
defendant suggested that the language of the judgment was
insufficiently clear as to whether only the genuine trademark,
but not the modified version, was prohibited. In rejecting the
defendant's contention, the Court reasoned that "[i]njunctions
necessarily rely on descriptive language," and that "[i]t is not
necessary [for an injunction] to anticipate and name every
variation on a trademark that a creative infringer might use in
order to skirt a judgment[.]" Id.

Similarly, in GMA Accessories, the Court held a
defendant in contempt of a consent injunction which prohibited
the defendant from "using the mark CHARLOTTE or any marks
similar to or substantially indistinguishable therefrom,
including the mark CHARLOTTE SOLNICKI." 2008 WL 2355826, at *1.
Soon after, the defendant contended that the injunction did not
clearly prohibit its use of the mark CHARLOTTE RONSON and that

28

it was unclear whether its new mark was "similar to" the
CHARLOTTE mark.

In rejecting defendant's argument, the Court clarified
that the injunction "was unambiguously broad enough to cover
other marks – including two-word marks that were 'similar to'
the 'CHARLOTTE' mark." Id. at *9. The Court noted that
although it "did not expressly rule that 'CHARLOTTE RONSON' was
covered by the injunction, the plain suggestion of the Court's
ruling . . . was that the mark likely fell within the
injunction's proscriptions." Id. Further, the Court stated
that "the case law makes plain that merely broadening an
injunction to prohibit the use of marks 'similar to' an
infringing mark does not render the injunction ambiguous for
purposes of avoiding a contempt sanction." Id. at *3.

The structure of the Injunction, which starts with
narrow prohibitions and moves to broader ones, is also typical
of those used in trademark infringement suits. See 1984 Order;
see also Jon Devlin Dancercise v. Dancersize, Inc., 525 F. Supp.
973, 975 (D.C.N.Y. 1981) (entering an injunction barring a mark
on specific goods including "dance exercise record albums and
dance exercise services" as well as "any goods or services.").

In addition, the use of the words "colorable imitation" in the Injunction does not render it overly vague. See Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 1432 (7th Cir. 1985) (stating that such language "are words of legal art," which do not require "a torrent of words when more words would not produce more enlightenment about what is forbidden."). Nor is the scope of the Injunction too broad. See U.S. Polo Ass'n, 2013 WL 490796 at *4 (in discussing the scope of the Injunction, stating that "[t]he breadth of the challenged injunction is particularly warranted given that the 1984 Order had explicitly barred USPA's confusing use of either the word "polo" or any mark confusingly similar to the PRL logo, and the district court founds that USPA had violated that injunction.") (emphasis in original).  The Second Circuit also noted that "[t]his case presents no concerns akin to those raised in Starter Corp. v. Converse, Inc., 170 F.3d 286 (2d Cir. 1999)." Id.

In that case, the Second Circuit held that the district court had abused its discretion because the injunction exceeded the scope of the jury's findings, which were limited to the use of the Starter Star marks alone and not those "in combination with any other words or designs[,]" which conclusion the jury did not reach.  Starter Corp., 170 F.3d at 300.  The

Court also noted that the different marketplaces in which the parties directed their goods would produce "little likelihood of confusion where two entities use the same trademark in different though related markets." Id. (stating that the parties had "virtually conceded that there would be no 'likelihood that purchasers of the product may be misled in the future.'" (citing Burndy Corp. v. Teledyne Industries, Inc., 748 F.2d 767, 772 (2d Cir. 1984)).

Both the 1984 Order and the outcome of the Fragrance Litigation made clear that "both courts recognized the fact that the USPA Parties may, having no judicially granted right to do so, enter the marketplace just as any other may so long as they do not infringe the PRL Parties' marks or otherwise violation the terms of injunctions." U.S. Polo Ass'n v. PRL USA Holdings, Inc., No. 09 Civ. 9476, 2012 WL 697137, at *4 (S.D.N.Y. Mar. 5, 2012). Here, not only are the instant parties competing for the same market, but the Double Horsemen Mark now being used by the USPA Parties on their eyewear is virtually identical to the Double Horsemen Mark previously held to be a colorable imitation of the Polo Player Logo in the context of fragrances.

Taken together, the plain language of the Injunction communicated what was and is forbidden and imposed a duty on the

31

USPA Parties to use a distinctively different mark from PRL's
Polo Player Logo on "any goods or rendering of any services[,]"
aside from those found to be non-infringing in the Apparel
Litigation, which had issue-preclusive effect now and at the
time of the drafting of the Injunction.  The case law and scope
of the Injunction also supports a finding that the Injunction
was clear and unambiguous to be enforceable in the instant case.

       ii.   PRL Has Sufficiently Demonstrated the USPA Parties'
            Non-Compliance

It is well-established that the eight factors set
forth in Polaroid Corp. v. Polarad Elects. Corp., 287 F.2d 492
(2nd Cir. 1961), cert. denied, 368 U.S. 820, 82 S. Ct. 36, 7
L.Ed.2d 25 (1961), control the analysis of whether there is a
likelihood of confusion in trademark infringement cases in this
Circuit.  "When, however, the Court is only called upon to
determine whether an injunction prohibiting certain trademark
use has been violated, the Court faces a much narrower
question."  GMA Accessories, Inc., 2008 WL 2355826 at *4.  A de
novo examination of the question of likelihood of confusion or
examination of the Polaroid facts is neither appropriate nor
necessary on a motion for contempt.  See, e.g., Wells
Corporation v. Wella Graphics, Inc., 37 F.3d 46, 48 (2d Cir.
1994) (finding that the district court erred in considering the

Polaroid factors in making its contempt determination); Wolfard Glassblowing Co. v. Willy Vanbrangt, 118 F.3d 1320, 1322 (9th Cir. 1997) (stating that following Wella, the only question for the court was whether, given the language of the injunction, defendant's product was a "colorable imitation" of plaintiffs).

Accordingly, the only question for this Court is whether PRL has demonstrated, by clear and convincing evidence that the Double Horsemen Mark is a "colorable imitation" or is "confusingly similar" to PRL's Polo Player Logo.

The USPA Parties have not disputed their sale of eyewear displaying the Double Horsemen Mark on the sunglasses, tags, and packaging, and a depiction of a single mounted polo player with raised mallet on the inside of some of the tags. The USPA Parties' sunglasses are often sold with a navy blue carrying case bearing the Double Horsemen Mark in a silvery cream or light gold color above the term "U.S. POLO ASSN." (See Kaplan Dec. Ex. 1-3, 5-7). The navy blue hang tag on the USPA Parties' sunglasses also bears a monochromatic gold Double Horsemen Mark. (See id. Ex. 1-3, 5-7, 9-12, 14-15, 17-24).

The USPA Parties contend that "[n]either this Court nor any prior court heard evidence or made findings that PRL has

trade dress rights in blue pouches or hangtags on eyewear or any such rights have been infringed." (USPA Opp. at 19). However, the trade dress, shape, or design of the USPA eyewear, standing alone, is not what constitutes contempt or violates the Injunction. Rather, the May 13 Opinion, upon which the Injunction is based, determined that the similarities between the Double Horsemen Mark and PRL's Polo Player Logo were "apparent," and that "[t]he similarity of the marks substantially increases the likelihood of confusion between the USPA Parties' and PRL Parties' products." U.S. Polo Ass'n, 800 F. Supp.2d at 528 - 530. Specifically, this Court noted that,

> Both marks are similar in perspective – containing a polo player on horseback, facing slightly to the viewer's left, leaning forward with a polo mallet raised. Both are monochrome logos that are similar in their level of abstraction. Both are displayed in embossed metallic or glossy material—with PRL's appearing in a number of colors including silver and gold, and USPA's appearing in a light gold. (citing to PRL Exs. 16, 22, 23, 25-35, USPA Ex. 52).

Id. at 528-29.

In addition, the shape and style of the frames of USPA's "Cape Cod" sunglasses are similar to that of PRL's Olympic style sunglasses. The temples of the sunglasses frames each bear a design of a white colored Double Horsemen Mark on a

34

blue background, encircled by a red band with white borders, with "U.S. POLO ASSN." inserted in the band in white type. Thus, unlike in Starter Corp., there is a plausible likelihood here that these goods may mislead purchasers.  170 F.3d at 300.

Having reviewed both parties' marks as displayed in the accompanying exhibits, PRL has shown by clear and convincing evidence that the Double Horsemen Mark, which the USPA is using on its sunglasses, packaging and attached tags, is a simulation and colorable imitation of the Polo Player Logo prohibited by the Injunction.

### iii.  The USPA Parties' Efforts to Comply with the Injunction

The Injunction was entered on March 6, 2012.  On April 4, 2012, the USPA Parties timely submitted a compliance report (the "Compliance Report") that detailed the actions they took with respect to the fragrance products.  However, the USPA Parties continued to sell a broad selection of sunglasses bearing the Double Horsemen Mark, which is a colorable imitation of and confusingly similar to PRL's Polo Player Logo, and marks emphasizing the word POLO to department stores, specialty retailers and at their own retail stores.  No evidence has been shown of any attempts by the USPA Parties to alter the marks or

logos of their retail sunglasses.  In fact, the USPA commenced
the sale of sunglasses bearing marks similar to PRL Olympic Polo
Player Logo after the Injunction was issued.  Accordingly, the
USPA Parties did not diligently comply with the Injunction.

**iv.**  Determination of Violation of the 1984 Order is
        Inappropriate

        Although PRL has contended that the USPA Parties are
in contempt of the 1984 Order, this action is not the
appropriate forum for such a determination.  A civil contempt
proceeding regarding a permanent injunction is a continuation of
the case in which the injunction is issued. See Leman v.
Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452, 52 S. Ct.
238, 76 L. Ed 389 (1932) (citing Gompers v. Buck Stove & Range
Co., 221 U.S. 418, 444, 31 S. Ct. 492, 55 L. Ed 797 (1911))
("Proceedings for civil contempt [based on a violation of an
injunction in a patent infringement case] are between the
original parties, and are instituted and tried as a part of the
main cause."); Keene Corp. v. Acstar Ins. Co. (In re Keene
Corp.), 168 B.R. 285, 288 (Bankr. S.D.N.Y. 1994) ("Civil
contempt proceedings are instituted primarily on the motion of
the plaintiff and are part of the underlying action.").  As this
Court is an inappropriate forum for adjudication as to whether

36

the USPA Parties are in contempt of the 1984 Order, no such determination is made here.

C) **The Appropriate Sanctions For Any Continued Violation Is The Loss Of Future Profits**

The USPA Parties submitted a Compliance Report specifying actions taken by USPA with respect to the sale of USPA Fragrance Products only.  PRL did not contend upon receiving the report that the Court's Order required the USPA Parties to take any actions with respect to eyewear.  Thus, the position taken by PRL on the instant motion with respect to the USPA Parties' sale of eyewear containing the Double Horsemen Mark was not included in the prior proceedings, although evidence of such sales had been presented.

During Cummings' testimony in the trial of this action, the USPA Parties offered evidence of products bearing the Double Horsemen mark that had been approved for sale in the United States, including the designs for sunglasses that are the subject of this motion.  Both PRL and L'Oreal objected to the admission of this exhibit.

PRL obtained knowledge of the USPA Parties' sales of eyewear bearing the Double Horsemen mark no later than July

37

2010, when these sales were testified to Cummings in deposition.
PRL never filed a litigation challenging use of the USPA
Parties' marks on eyewear, nor did PRL seek to amend its
counterclaims in the Fragrance Litigation to include eyewear
products.

The prior acquiescence by PRL is relevant to the
consideration of an appropriate sanction.  See, e.g., Getty
Petroleum Corp. v. Shore Line Oil Co., 642 F. Supp. 203, 206
(E.D.N.Y. 1986) (plaintiff had full knowledge for over a year
that defendant had delivered unleaded gas to certain gas
stations; plaintiff had therefore acquiesced to such conduct and
its contempt motion was denied); Derek & Constance Lee Corp. v.
Kim Seng Co., 467 F. App'x 696, 697-98 (9th Cir. 2012)
(affirming denial of contempt order as barred by laches because
plaintiff knew for at least a year that defendant was violating
the injunction and waited another five months to bring contempt
proceeding after discovering product in market).

Because of PRL's prior acquiescence and the
controversy concerning the application of the Injunction, PRL is
entitled only to the future profits of any sales of sunglasses
containing the Double Horsemen Mark sixty days following the
date of this order.

38

## V. Conclusion

Based upon the facts and conclusions set forth above, the motion of JRA to intervene and the motion of PRL to hold USPA in contempt for violation of the Injunction are granted.

PRL is granted any profits arising out of the sales of the USPA Parties' eyewear bearing the Double Horsemen Mark sixty days after the entry of this Order.

It is so ordered.

New York, NY
March 5 , 2013

ROBERT W. SWEET
U.S.D.J.